# EXHIBIT C

# SUB-ADVISORY AGREEMENT

## TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

THIS SUB-ADVISORY AGREEMENT (this "**Agreement**") is made as of the 18th day of June, 2020 (the "**Effective Date**") by and between Tecumseh-Infinity Medical Receivables Fund, LP, a Delaware limited partnership (the "**Company**") and Infinity Capital Management, Inc., a Nevada corporation (the "**Sub-Adviser**").

The Company desires to retain Sub-Adviser to the Company to perform certain services and Sub-Adviser is willing to perform the services on the terms described below. In consideration of the mutual promises contained herein, the parties agree as follows:

1. *Appointment of Sub-Adviser and Services*. The Company hereby retains the Sub-Adviser and the Sub-Adviser hereby agrees to provide certain services to the Company that are set forth on **Exhibit A**, attached hereto as the same may be updated from time to time, or as otherwise mutually agreed to by the parties (collectively, the "**Services**").

2. *Compensation*. In full and complete payment for all services provided by the Sub-Adviser and for all obligations assumed by the Sub-Adviser hereunder, the Company agrees to remit to the Sub-Adviser (or its designee) the compensation as set forth in **Exhibit B**, attached hereto (the "**Compensation**"). Sub-Adviser will pay any associated sales fees, commissions, or direct operating costs of its own operating staff from the Acquisition Fee (as defined in **Exhibit B**).

3. *Term and Termination*.

    (a) *Term*. The term of this Agreement will commence as of the Effective Date, or such other date as agreed upon by the parties, and will continue until December 23, 2023, unless otherwise extended by the parties upon mutual agreement (the "**Term**"). The last day on which the Sub-Adviser is engaged by the Company, whether such separation is voluntary or involuntary or is with or without Cause (as defined below), is referred to herein as the "**Termination Date**." On or immediately following the Termination Date, the Sub-Adviser agrees to return any and all confidential information or property belonging to the Company in the Sub-Adviser's custody (including, without limitation, e-mails, papers, notes, and other company documents, agreements, or records relating in any way to the Company's business, unless the Sub-Adviser has received the written consent of the Company specifying otherwise.

    (b) *Termination Event*. This Agreement will terminate immediately upon the first occurrence of any of the following events (each, a ("**Termination Event**"):

        (i) the expiration of the Term;

        (ii) the dissolution of the Sub-Advisor or death of the Sub-Adviser's owners in which case any payments owed to the Sub-Adviser by the Company for Services performed during the Term will still be paid to the Sub-Adviser; or

        (iii) the delivery of written notice of termination by the Company after the Sub-Adviser has become unable to perform the Sub-Adviser's duties to the Company by reason of illness or incapacity, which illness or incapacity results in the Sub-Adviser's failure to discharge the Sub-Adviser's responsibilities.

(c) *Cause Event*. Notwithstanding anything to the contrary contained herein, the Company may, without prejudice to any other right or remedy it may have, terminate this Agreement, at any time, immediately upon written notice to the Sub-Adviser for Cause. For purposes of this Agreement, "**Cause**" means: (i) the Sub-Adviser's owners being convicted of or pleading no contest to any felony; (ii) the Sub-Adviser's owners' conviction of, or pleading no contest to, any crime or act of dishonesty, fraud or moral turpitude; (iii) the owners of Sub-Adviser engaging in any intentional conduct which is in reckless disregard of the Company or the Company's business, or materially injurious to the Company or its affiliates, and such conduct has not been cured within thirty (30) days after written notice from the Company to the Sub-Adviser; (iv) the Sub-Adviser's material or habitual neglect through absenteeism or other dereliction of duties hereunder, and such neglect has not been cured within ten (10) days after written notice from the Company to the Sub-Adviser; or (v) the Sub-Adviser's failure to perform or observe any other material provision of this Agreement or any other substantial lawful obligation of Sub-Adviser's engagement hereunder, and such failure has not been cured within thirty (30) days after written notice from the Company to the Sub-Adviser (each, a "**Cause Event**") under this Agreement for a continuous period of sixty (60) calendar days.

(d) *Post-Cause Event*. Upon the Sub-Adviser's termination for a Cause Event, the Sub-Adviser will not be entitled to receive any further such Compensation set forth in **Exhibit B**, except any accrued but unpaid pro rata amount of Compensation (as defined in **Exhibit B**) owed for the month in which the Termination Date occurs.

4. *Relationship Between Sub-Adviser and Company*. Sub-Adviser's relationship with the Company will be that of an independent contractor and not that of an employee, agent, or representative of Company. The Sub-Adviser will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company, except for contracts that enable Sub-Adviser to fulfil its duties in providing the services to the Company as set forth in Section 1 of this Agreement. The Sub-Adviser will supervise the performance of its employees, if any, and will have control of the manner and means by which the Services are performed, consistent with the terms of this Agreement.

5. *Indemnification*. The Company will indemnify, defend and hold harmless Sub-Adviser from and against all liabilities, costs and expenses (including reasonable attorneys' fees) resulting from third party claims or suits arising out of or in connection with the Services or Sub-Adviser's role as a sub-adviser to the Company or that may otherwise be asserted against Sub-Adviser by any party relating to the Company or its business, except to the extent that such liabilities, costs and expenses result from Sub-Adviser's bad faith, gross negligence or fraud, as determined by a court or arbitrator of competent jurisdiction. Sub-Adviser will promptly notify the Company in writing of any such claim or suit and the Company will have the right to fully control the defense and settlement thereof, provided that any settlement will include a general release of Sub-Adviser and will not include any admission of liability by Sub-Adviser. If the Company fails to promptly assume control of the defense or settlement of such claim or suit, Sub-Adviser will have the right to do so on such terms as Sub-Adviser deems appropriate and the Company will indemnify Sub-Adviser therefor.

6. *Indemnification of Legal Fees*. The company will indemnify the sub-Advisor for legal fees incurred when an attorney needs to be appointed to assist with the collection of receivables.

7. *Confidential Information*. The parties agree that all non-public records, information, contacts, and data relating to the business of the other (including, without limitation, any and all non-public, personal information regarding the Company, the investments held by the Company (the "**Investments**"), any of the investors participating in such Investments (each, an "**Investor**")) that are exchanged or negotiated pursuant to this Agreement or in carrying out this Agreement (the "Confidential Information") are, and will remain, confidential. The parties agree: (a) not to disclose or use such Confidential Information except (i) as

necessary to perform the services and obligations under this Agreement, or (ii) as required by law or by an order of a court, governmental agency, or regulatory body; and (b) to cooperate with each other and provide reasonable assistance in ensuring compliance with all securities and privacy laws, whether state or federal, to the extent applicable to either or both of the parties.

8. *Other Activities*. The Services of the Sub-Adviser to the Company are not to be deemed to be exclusive, and the Sub-Adviser and any persons controlled by or under common control with the Sub-Adviser are free to render similar services to others. The Sub-Adviser and its affiliates may give advice and take action in the performance of duties to others that may differ from Services provided to the Company under this Agreement.

9. *Communications and Electronic Delivery*.

(a) Unless otherwise specified herein, all communications contemplated by this Agreement will be deemed to be duly given: (i) when received by the Company from the Sub-Adviser orally or electronically; (ii) when received by the Sub-Adviser from the Company in writing at the Sub-Adviser's address if delivered in-person or through U.S. mail or overnight courier; (iii) when deposited by the Sub-Adviser if sent by first class mail or overnight courier addressed to the Company at the Company's address listed herein; or (iv) when delivered to the Company at an e-mail address specified by the Company from time to time (the "*Email Address*"). All notices delivered to the Company will be delivered to the address, Email Address or facsimile number set forth in Section 9(c) of this Agreement, as amended from time to time. Either party may change its contact information by delivering written notice to the other delivered in accordance with this Section 9(a).

(b) Notwithstanding any other provisions of this Agreement, the parties hereby acknowledge and agree that, consistent with Section 9(a) above, the parties may deliver communications and documents by electronic means rather than orally or by traditional mailing of paper copies. The consent granted herein will last until revoked by the Adviser.

(c) All written communications will be addressed as follows:

**If to the Company:**

Tecumseh-Infinity Medical Receivables Fund, LP
Attn: Tecumseh Alternatives, LLC
5668 Morris Hunt Drive
Fort Mill, South Carolina 29708
cmeyer@tecumsehalts.com

**If to the Sub-Adviser:**

Infinity Capital Management
1700 W. Horizon Ridge Parkway
Suite 206
Henderson, NV 89012
Anne@infinitycapital.com

10. *Assignment*. This Agreement may not be assigned by either party without the written consent of the other party.

11. *General Provisions*.

(a) Unless otherwise agreed upon in writing by the Parties, this Agreement will be governed by and interpreted under the laws of the State of South Carolina without giving effect to its conflicts of law principals. The Company and the Sub-Adviser agree that any appropriate state court located in York County, South Carolina or any federal court located in United Stated District Court for the District of South

3

53296167.3

Carolina will have exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and will be a proper forum in which to adjudicate such case of controversy. The parties hereto consent to the jurisdiction of such courts.

(b) Each provision of this Agreement is intended to be severable. If any term or provision is held to be invalid, void or unenforceable by a court of competent jurisdiction for any reason whatsoever, such ruling will not affect the validity of the remainder of this Agreement, unless to do so would defeat an essential purpose of this Agreement.

(c) This Agreement, including any exhibits attached hereto, embodies the entire Agreement of the parties hereto with respect to the subject matter hereof, and all prior agreements, understandings and negotiations are merged herein and superseded hereby.

(d) This Agreement, including any Exhibits attached hereto, may not be amended unless the amendment is in writing and signed by the parties sought to be bound.

(e) This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same Agreement.

(f) The Company represents and warrants that the Company is authorized and empowered to enter into this Agreement. If this Agreement is being signed on behalf of a corporation, partnership, trust or other business or legal entity, the Company further represents and warrants that applicable law and the Company's governing documents authorize and permit this Agreement.

[*Signature page follows*]

53296167.3

4

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

"COMPANY"

**Tecumseh-Infinity Medical Receivables Fund, LP**

By: Tecumseh Alternatives, LLC, its General Partner

By: *[signature]*

Name: Chadwick M. Meyer

Title: Principal

"SUB-ADVISER"

**Infinity Capital Management**

By: ANNE PANTELAS

Name: *[signature]*

Title: PRESIDENT

## EXHIBIT A

## SERVICES

1. **General Services**.

    (a)  The Sub-Adviser agrees to assist the Company in acquiring an interest in medical receivables in connection with personal injury cases in the U.S. (the "**Receivables**"). The Sub-Adviser will source the Receivables from various medical service providers and pharmacies (the "**Medical Service Providers**") and law firms (each, a "**Law Firm**") within the United States (the "**Territory**") in connection to services rendered to plaintiffs (each, a "**Plaintiff**") for treatment relating to personal injury claims (each, a "**Claim**") within the Territory.

    (b)  After a thorough review of the identified Receivable by the Sub-Adviser, the Sub-Adviser will liaise directly with the Medical Service Provider to negotiate the purchase of the Receivable by the Company at a discount rate (the "**Purchase Price**") for purchase by the Company.

    (c)  In connection to each Receivable approved for purchase by the Company, the Sub-Adviser will arrange for the Company to simultaneously secure a lien or equivalent legal security or other document that is determined as satisfactory by the Sub-Adviser at its sole discretion (the "**Lien**") from the Plaintiff and/or Plaintiff's attorney against any settlement the Plaintiff receives upon resolution of their Claim ("**Settlement Proceeds**"). Each Lien or its equivalent, as stated herein, secures for the Company the total retail cost of all Receivables for medical services provided to the Plaintiff during the life of their Claim (the "**Retail Cost**").

2. **Types of Receivables**.  Unless otherwise directed by the Company in writing, the Receivables sourced by the Sub-Adviser will generally be related to medical services provided to Plaintiffs by Medical Service Providers in the following sectors (each, a "**Receivable Sector**"):

    (a)  Medical treatments ranging from primary care physician ("**PCP**") office visits, specialist office visits, and complex surgeries and therapies.

    (b)  Medical imaging, including medical resonance imaging ("**MRI**"), X-rays, CT-scans, and radio frequency analysis.

    (c)  Pain management procedures, focusing on alternatives to surgery such as physical or chiropractic therapy, interventional procedures, acupuncture and other alternative therapies, and medication management; and

    (d)  Pharmaceutical prescriptions.

    (e)  Funding for Medical Record deferred payment plans.

3. **Duties and Responsibilities**.  In furtherance of, and in addition to, the Services described above, the Sub-Adviser will:

    (a)  Use reasonable efforts to utilize its network of attorney's and service providers to identify commercially viable Receivables for purchase by the Company.

(b)     Liaise directly with the Medical Service Provider to negotiate a favorable Purchase Price for the Receivable and facilitate purchase of the Receivable by the Company directly from the Medical Service Provider.

(d)     Include a contract which may involve an assignment of interest in a Receivable, between the Company and Medical Service Provider to evidence the sale of the Receivable to the Company by the Medical Service Provider.

(e)     Track and manage for the Company in a log (the "**Receivables Log**") (i) all Receivables purchased by the Company, and (ii) any collections of Settlement Proceeds for each Receivable; and

(f)     The Sub-Adviser will provide a copy of the Receivables Log to the Company no less than weekly.

4.    ***Due Diligence Process***.  Utilizing a proprietary due diligence process, the Sub-Adviser, in conjunction with qualified legal professionals and Law Firms selected by the Sub-Adviser, will conduct a thorough review of all Receivables to help identify only those most suitable for purchase. Such a review typically considers a number of factors, including but not limited to:

(a)     the strength of the claim and likelihood of success;

(b)     the potential value of a claim both following adjudication and for settlement purposes;

(c)     enforceability of an ultimate award;

(d)     financial condition of the respondent or defendant;

(e)     the likely cost of litigating the claim;

(f)     regulatory and ethical risks, if any, in the relevant jurisdiction;

(g)     timing to get through arbitration or trial and final judgment; and

(h)     timing and likelihood of settlement.

53296167.3

## EXHIBIT B

## COMPENSATION

In exchange for the Services described in Exhibit A, the Company will pay to the Sub-Adviser:

(a) an acquisition fee (the "**Acquisition Fee**") equal to twenty percent (20%) of the Purchase Price of each Receivable purchased by the Company. At any time, where Company has available funds to purchase Receivables, Company will advise Sub-Adviser by issuing a Purchase Order in the amount that is available to purchase Receivables and Sub-Adviser will use 100% of those funds to purchase Receivables, as set forth in this Agreement. Upon the completion of the purchase of the Receivables by the Company, an invoice will be generated by the Sub-Adviser for the Twenty Percent Sub-Advisory fee that is owed and payable on demand to Sub-Adviser by the Company for the services provided by Sub-Adviser under this Agreement; and

(b) to the extent (i) a Plaintiff's case is settled, and *provided that* (ii) the Company's portion of the Settlement Proceeds subject to the Lien exceeds the Purchase Price of the Receivable, the Sub-Adviser will receive a fee equal to fifteen percent (15%) of the Receivable Spread. The Receivable Spread is defined as the difference between the amount received from the attorney or insurance company for the settlement of a receivable and the Cost paid for that Receivable, less associated legal fees, and less the Acquisition Fee that was previously paid to the Sub-Adviser (the "**Final Sub-Advisory Fee**"), gross of any other fees or expenses paid by the Company as provided in the Company's private placement memorandum (the "**Memorandum**"); the limited partnership agreement (the "**Partnership Agreement**"); or the subscription booklet (the "**Subscription Booklet**" and together with the Memorandum and the Partnership Agreement, the "**Offering Documents**"). These documents are all outside the terms of this Sub-Advisory Agreement.

## ADDENDUM A

Modification to Sub-Advisory Agreement

This ADDENDUM A modifies "EXHIBIT B: COMPENSATION" in the original, executed "Sub-Advisory Agreement/Tecumseh-Infinity Medical Receivables Fund, LP" dated June 18, 2020 in the following ways:

(a) Infinity will continue to earn, and be paid immediately, an acquisition fee (the "Acquisition Fee") equal to twenty percent (20%) of the Purchase Price of each Receivable purchased by the Company when new investor cash is being used. When Settlement Proceeds from a Receivable held by the Company is used to purchase Receivables, Infinity will earn also earn an Acquisition Fee of twenty percent (20%) of the Purchase Price of each Receivable purchased, but will be paid out as follows: half (ten percent '10%') paid immediately, and half (ten percent '10%') paid according to the contingency schedule below ("Contingency Payments").

(b) Infinity will continue to earn 15% of the Receivable Spread on any Receivable purchased by the Company and it will all be paid according to the contingency schedule below ("Contingency Payments").

## Contingency Payments

Upon the termination of the Company, or 60 days after December 23, 2023, whichever is later, the Company's third-party administrator will calculate an average Investor annual internal rate of return "IRR", over the life of the Company, net of all fees and expenses, but not net of expenses considered "Contingency Payments" per this section.

If the IRR is between 20% and 21%, then 10% of the total of what had not yet been paid in (a) and (b) above will be paid by the Company to Infinity, and 90% will be forgiven by Infinity and will no longer be payable by the Company to Infinity, and will be distributed to Investors.

For each additional IRR percentage point, another 10% of the total of what had not yet been paid in (a) and (b) above will be paid by the Company to Infinity, and 10% less will be forgiven by Infinity and no longer considered payable by the Company to Infinity, and distributed to Investors.

If the IRR reaches or exceeds 30%, then 100% of what had not yet been paid in (a) and (b) above will be paid by the Company to Infinity.

[*Signature page follows*]

IN WITNESS WHEREOF, the Parties hereto have executed this ADDENDUM A to the "Sub-Advisory Agreement/Tecumseh – Medical Receivables Fund, LP".

"COMPANY"

**Tecumseh-Infinity Medical Receivables Fund, LP**

By: Tecumseh Alternatives, LLC, its General Partner

By: _[signature]_

Name: _Chadwick M. Meyer_

Title: _Principal_

Date: _1/5/21_

"SUB-ADVISER"

**Infinity Capital Management**

By: _[signature]_

Name: _Anne Pantelas_

Title: _President_

Date: _1/5/2021_