ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
**AKERMAN LLP**
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Telephone: (702) 634-5000
Facsimile:  (702) 380-8572
Email: ariel.stern@akerman.com

MICHAEL D. NAPOLI, ESQ.
*PRO HAC VICE*
**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 720-4360
Facsimile:  (214) 720-8116

*Attorneys for party in interest Tecumseh – Infinity Medical Receivables Fund, L.P.*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No.:    21-14486-abl<br>Chapter       7 |
|---|---|

**DECLARATION IN SUPPORT OF JOINT MOTION OF CHAPTER 7 TRUSTEE AND PARTY IN INTEREST TO REJECT SUB-ADVISORY AGREEMENT TECUMSEH – INFINITY MEDICAL RECEIVABLES FUND, LP**

I, Chad Meyer, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Chad Meyer. I am over the age of twenty one years, of sound mind, and fully competent to testify in this cause. I have personal knowledge of the facts stated herein, all of which are true and correct.

2.     I am a principal of Tecumseh – Infinity Medical Receivable Fund, LP, ("Tecumseh"), a party interest, in the above referenced bankruptcy matter. In my role as a principal of Tecumseh, I am responsible for Tecumseh's investments in medical receivables including its sub-advisory agreement with Infinity Capital Management Inc. (the "Debtor").

3.     Tecumseh is engaged in the business of purchasing receivables from medical providers (the "Receivables"). The Receivables generally arise from medical treatment provided to individuals

who were injured in accidents and have asserted personal injury claims. The Receivables are generally secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.

4. In effort to expand its Receivables portfolio, Tecumseh sought to engage individuals which could procure highly profitable Receivables. Tecumseh could not do so on its own because procuring viable Receivables requires an extensive and reliable network from which to source receivables, particularized skill in identifying which are commercially viable, and the ability to negotiate a favorable price for the them. Once acquired, the Receivables have to be tracked and managed to collect on them. On the closing end, it is not unusual for the person servicing the Receivable to negotiate with the plaintiff's lawyer regarding the amount to be paid. As such, the profitability of Receivables is driven by the skill and reputation of the persons procuring and servicing the Receivables as well as their relationships with plaintiff's attorneys.

5. Debtor and its principals were uniquely situated to provide Tecumseh these services. They had a high degree of skill in their profession and an excellent reputation. Moreover, the principals had a strong personal relationships with a network of plaintiff's lawyers which enhanced their ability to acquire medical receivables in connection with personal injury cases. These same relationships enabled the Debtor to service the receivables ensuring that they were collected timely and any required discounts were minimized. and sourcing of receivables from various medical service providers and pharmacies, and law firms, within the United States.

6. As such, Tecumseh formally engaged Debtors on June 18, 2020, under a Sub-Advisory Agreement (as amended) (the "Sub-Advisor Agreement") attached hereto as **Exhibit A**.

7. Because Tecumseh exclusively engaged Debtor's in reliance of the skill set of its principals it is not amenable to receiving the these services from any other individual. It specifically selected Debtor as its sub-advisor because of the reputation and skill of Debtor and its principals. Tecumseh relied heavily on the skill of Debtor and its principals. If the Debtor's principals were to form a new servicing entity, Tecumseh would strongly consider retaining them to take over the servicing of the Receivables it acquired through the Debtor and to advise it in acquiring additional receivables.

2

60260014;1

8.  For these reasons, Tecumseh made the agreement terminable on the death or incapacity of the Debtor's owners. Sub-Advisor Agreement at § 3(b). "Cause" for termination includes (i) the conviction of one of Debtor's owners for a felony or crime of moral turpitude; and (ii) an act by the Debtor's owners in reckless disregard of Tecumseh's rights. *Id*. at § 3(c). The Sub-Advisor Agreement also forbids assignment. *Id*. at § 10.

9.  Since the filing of the instant matter, Debtor has ceased all business operations and, thus, cannot provide the services required under the Sub-Advisor Agreement. As such, Debtor is currently breaching the Sub-Advisor Agreement. Particularly, the Sub-Advisor Agreement calls for the Debtor to provide services to Tecumseh, including the management and collection of outstanding receivables. New contracts are not being acquired. Existing receivables are not being serviced. Plaintiff's lawyers seeking to negotiate payment terms have no one to speak with. The lack of current servicing simply cannot be undone.

10. Critically, Tecumseh's ability to hire a new servicer is impeded by the existing Sub-Advisor Agreement. Until the agreement is rejected, Tecumseh cannot service its receivables.

11. I have reviewed Tecumseh's accounting records with respect to the Sub-Advisor Agreement. Tecumseh currently owes nothing to the Debtor. Pursuant to the Sub-Advisor Agreement, the Debtor may be entitled to certain deferred compensation. Whether the Debtor would be entitled to the deferred compensation cannot be determined until Tecumseh is wound up; something that is not contemplated for some years. Upon the winding up of Tecumseh, Tecumseh's administer will calculate the annualized internal rate of return for the average Tecumseh investor. If the annualized IRR exceeds 20%, then some amount of deferred compensation would be due. The amount due to the Debtor would depend on the actual IRR experienced by Tecumseh. It is not currently possible to determine when Tecumseh will wind up or what IRR the average Tecumseh investor would have received by that time. Any attempt to do so would be an exercise in speculation.

12. Because of Tecumseh's relative newness, its IRR is currently well below 20%.

I declare under penalty of perjury that the foregoing is true and correct.



Chad Meyer

3

60260014;1