Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
        kwyant@shea.law

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7<br><br>Hearing Date:  November 17, 2021<br>Hearing Time:  9:30 a.m. |

**OBJECTION TO MOTION OF PARTY IN INTEREST TECUMSEH – INFINITY MEDICAL RECEIVABLES FUND, LP TO (1) ABANDON PROPERTY AND (2) LIFT THE AUTOMATIC STAY**

Creditor HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect"), by and through its undersigned counsel, hereby files its Objection (the "Objection") to Creditor Tecumseh – Infinity Receivables Fund, LP's ("Tecumseh") Motion to (1) Abandon Property and (2) Lift the Automatic Stay filed on October 5, 2021 [ECF No. 57] (the "Motion"). In support of this Objection, HASelect respectfully represents as follows:

## PRELIMINARY STATEMENT

1. HASelect is a secured creditor that holds a perfected senior security interest[1] in substantially all personal property of Infinity Capital Management, Inc. ("Infinity" or "Debtor"), including but not limited to, all of Infinity's accounts receivable and records relating to the same.

2. Tecumseh's Motion seeks to compel Chapter 7 Trustee Robert Atkinson (the "Trustee") to abandon accounts receivable worth as much as $28 million that are both property of

---

[1] *See* ECF No. 18 at Exhibit 1 and Exhibit 2.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Infinity's estate and collateral for Infinity's indebtedness to HASelect. As such, the Motion cannot be granted.

## **FACTUAL BACKGROUND**

3.      Beginning in February 2019, HASelect made several loans to Debtor Infinity Capital Management, Inc. ("Debtor" or "Infinity") that were document through various written loan agreements and promissory notes through which Infinity pledged all of its personal property to HASelect as collateral for such loans.[2]

4.      HASelect perfected its security interest in all of Infinity's personal property through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.[3]

5.      On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all related loan documents, the "MLA").[4]

6.      The MLA superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.[5]

7.      HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral"). Specifically, Section 4.1 of the MLA states:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest int eh Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens:   All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products

---

[2] *See* Declaration of Michael Griffin in Support of Motion for Relief from Automatic Stay (the "Griffin Declaration") filed at ECF No. 18, ¶ 5.

[3] *See* UCC-1 Financing Statement, attached to Griffin Declaration [ECF No. 18] as Exhibit 2.

[4] *Id.*, ¶ 6.

[5] *Id.*, ¶ 7.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").[6]

8.      The Collateral consists primarily of accounts receivables Infinity purchased from various medical providers but also includes substantially all of Infinity's other personal property.

9.      On September 14, 2021 (the "Petition Date"), Infinity filed for chapter 7 bankruptcy, commencing the above-captioned case.  [ECF No. 1].  As of the Petition Date, Infinity owed in excess of $14 million to HASelect pursuant to the MLA.

10.      On or about September 22, 2021, HASelect and Trustee Robert Atkinson ("Trustee") filed a Joint Motion for Abandonment of Collateral [ECF No. 12] (the "Joint Motion") seeking permission for the Trustee to abandon to HASelect all of the accounts receivable listed in spreadsheets provided by Infinity's Counsel on September 21, 2021 that corresponded to HASelect's accounts (the "Undisputed Accounts").

11.      As explained further in the Joint Motion and the Supplement thereto [ECF No. 64], the Undisputed Accounts were purchased by Infinity from various medical providers with proceeds advanced by HASelect pursuant to the MLA and are unequivocally included in HASelect's Collateral under the MLA.

12.      After filing the Joint Motion, HASelect discovered documents and information establishing that, in addition to the Undisputed Accounts, Infinity purchased certain other accounts receivable from largely the same medical providers and that Infinity subsequently sold and assigned those accounts receivable (the "Disputed Accounts") to Tecumseh through various Assignments and Bill of Sale Agreements.

13.      Based on this new information, HASelect concluded that the Disputed Accounts, which were owned by Infinity prior to allegedly being assigned to Tecumseh, are also Collateral in which HASelect holds a security interest that was perfected prior to any assignment to Tecumseh.

---

[6] See MLA, attached to Griffin Declaration [ECF No. 18] as Exhibit 1.

14.     Accordingly, on October 19, 2021, HASelect filed an Adversary Complaint [Case No. 21-14486-abl, ECF No. 1] against Tecumseh through which HASelect seeks, among other things, a declaratory judgment confirming its superior interest in the Disputed Accounts.

15.     HASelect is informed and believes that the value of the Disputed Accounts is in excess of $22 million.  Although, based on the Declaration of Chad Meyer filed in support of the Motion [ECF No. 59], it appears the value of the Disputed Accounts (which are referenced in the Motion as the "Tecumseh Accounts") may worth as much as $28 million.[7]

16.     Tecumseh has provided no evidence that it perfected any purchase or assignment of accounts receivable from Infinity through the filing of a UCC-1 financing statement.  As such, any interest Tecumseh acquired in the Disputed Accounts from Infinity remains unperfected and is avoidable pursuant to the Trustee's "strong arm" powers under 11 U.S.C. § 544(a).

17.     Accordingly, to the extent that the value of the Disputed Accounts (together with the value of the Undisputed Accounts and other Collateral) exceed Infinity's indebtedness to HASelect, that excess value, which may be substantial, would benefit the Estate.

## ARGUMENT

### A.     Tecumseh's Requested Relief Is Improper and Cannot Be Granted.

18.     Tecumseh's Motion seeks relief that should rarely, if ever, be granted.  Unlike HASelect's Joint Motion in which the Trustee also sought to abandon the Undisputed Accounts, the Trustee has not joined in Tecumseh's Motion.  Thus, the Motion is more properly framed as a request that the Court compel the Trustee to abandon the Disputed Accounts pursuant to 11 U.S.C. § 554(b), in contrast with the joint request by the Trustee and HASelect under the Joint Motion which was made pursuant to 11 U.S.C. § 554(a).

19.     Section 554(b) provides that "on request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." *Vu v. Kendall (In re Vu)*, 245 B.R. 644, 647 (9th Cir. 2000).  In order to approve a motion to abandon property, the bankruptcy

[7] ECF No. 59, ¶ 9.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

court must find either that (1) the property is burdensome to the estate or (2) of inconsequential value and inconsequential benefit to the estate. *Id.*

20.     However, unlike requests made by a trustee pursuant to Section 554(a), requests by parties-in-interest under Section 554(b) should rarely, if ever be granted. "[A]n order compelling abandonment is the exception, not the rule. Abandonment should only be compelled in order to help creditors by assuring some benefit in the administration of each asset…. Absent an attempt by the trustee to churn property worthless to the estate just to increase fees, ***abandonment should rarely be ordered.***" *Vu*, 245 B.R. at 647 (citing *Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mac. & Tool Co.)*, 816 F.2d 238, 245 (6th Cir. 1987)) (emphasis supplied); *In re Acarregui*, 527 B.R. 247, 255 (Idaho Bankr. Ct. 2017) (same).

21.     Here, Tecumseh's Motion cannot be granted because Tecumseh offers no evidence to suggest that the Trustee has acted improperly in his handling of the Disputed Accounts or any other asset of the estate. Indeed, this case was filed less than two months ago. This is not a situation where a trustee has taken no action regarding the assets at issue or has attempted to churn worthless assets to drive up fees. In other words, this is clearly not the rare situation where abandonment should be ordered.

22.     Additionally, the Disputed Accounts are likely to be of substantial value to the estate. Tecumseh admits that the Disputed Accounts may be worth as much as $28 million.[8] Even a much lower value could be worth substantially more than the outstanding indebtedness of approximately $15 million owed to HASelect under the MLA, which is likely to be reduced considerably as HASelect liquidates other Collateral. As such, Tecumseh cannot show that the Disputed Accounts are of inconsequential value or benefit to the estate. Similarly, Tecumseh offers no evidence to show that the Disputed Accounts would be burdensome to the estate. Therefore, Tecumseh cannot meet its burden under Section 554(b), and the Motion should be denied.

---

[8] ECF No. 59, ¶ 9.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**B.    The Disputed Accounts Are HASelect's Collateral.**

23.    As set forth in the Adversary Complaint [Case No. 21-14486-abl, ECF No. 1] filed by HASelect against Tecumseh, the Disputed Accounts were owned by Infinity prior to any assignment to Tecumseh[9] and, consequently, are part of the Collateral securing the indebtedness owed to HASelect under the MLA.  HASelect's claimed security interest in the Disputed Accounts alone is good reason to deny the Motion.

24.    Further, Tecumseh admits in the Motion that the Disputed Accounts were purchased by Infinity from the medical providers that supplied the services from which these accounts receivables arose.[10]  Tecumseh also admits that it purchased many of these accounts receivables from Infinity.[11]

25.    As such, it is beyond dispute that (1) Infinity held an ownership interest in at least some of the Disputed Accounts before such Disputed Accounts were assigned to Tecumseh, (2) those Disputed Accounts in which Infinity held an ownership interest became part of HASelect's Collateral under the MLA in which HASelect held (and continues to hold) a perfected security interest notwithstanding any subsequent assignment to Tecumseh, and (3) any interest in such Disputed Accounts that was assigned to Tecumseh is subordinate and junior to the prior perfected security interest of HASelect.

26.    Tecumseh claims to have made direct payment to some of the medical provides from whom the Debtor purchased the Disputed Accounts.[12]  But Tecumseh provides no evidence that any account receivable was ever assigned directly to Tecumseh by any medical provider.  Tecumseh also offers no evidence that any Disputed Account for which it claims it paid directly was not assigned first to Infinity before being assigned to Tecumseh.[13]

---

[9] The Sub-Advisory Agreement pursuant to which Tecumseh claims to have acquired its interests in the Disputed Accounts is dated June 18, 2020 – long after HASelect perfected its security interest in all of Infinity's accounts and other personal property under the MLA.

[10] *See* Motion, p. 2, ¶ 2 ("The Debtor purchases certain Receivables pursuant to a sub-advisory agreement (the "Sub-Advisor Agreement") with Tecumseh (the "Tecumseh Receivables") …").

[11] *See* Motion, p. 4, ¶ 15 ("In most cases, Tecumseh paid the medical provider directly. In other cases, it purchased the Receivable from the Debtor.").

[12] *See* Motion, p. 4, ¶ 15.

[13] In fact, Tecumseh has produced no document showing that any interest in any account receivable was actually

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

27.      Rather, the evidence that has come to light at this early stage of the case plainly indicates that Disputed Accounts continued to be purchased by and assigned directly to Infinity through at least August 2021.

28.      On October 15, 2021, the Court entered orders granting the Joint Motion [ECF No. 97] and a related motion for relief from the automatic stay filed by HASelect [ECF No. 96] by which (1) the Collateral, subject to certain limited carveouts, was abandoned to HASelect and (2) HASelect was granted relief from the automatic stay to take possession of the Collateral.  Shortly thereafter, Infinity and the Trustee granted HASelect access to Infinity's former business offices.

29.      HASelect entered Infinity's former business offices on or about October 20, 2021 and began reviewing records related to the collateral.  Although its review of those records is far from complete, HASelect has located several documents evidencing Infinity's purchase of the Disputed Accounts.

30.      For example, Infinity entered into a Partial Purchase and Sale Agreement on January 6, 2021 with Viking Pain Management, LLC ("Viking") that provides for the sale of existing and future accounts receivable by Viking to Infinity.[14]  This agreement makes no mention whatsoever of Tecumseh.[15]  Further, HASelect located several subsequent statements that identify specific accounts purchased by Infinity pursuant to the Viking agreement.[16]  Again, these statements, the latest of which is dated August 12, 2021, make no mention whatsoever of Tecumseh.

31.      The only documents Tecumseh has offered to date in support of its claim to ownership of the Disputed Accounts are a series of purchase orders issued by Tecumseh to Infinity, not to any medical provider.[17]  Those purchase orders, which Tecumseh omitted from the evidence filed in support of the Motion, further confirm that the Disputed Accounts were sold by Infinity to Tecumseh.

---

transferred to Tecumseh by Infinity or any other person.

[14] A copy of the January 6, 2021 Partial Purchase and Sale Agreement is attached hereto as Exhibit 1.

[15] In fact, it contains anti-assignment language at § 21 that prohibits Infinity from assigning any rights under the agreement to any other person without Viking's written consent.

[16] Copies of several such statements are attached hereto as Exhibit 2.

[17] See ECF 54-4.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

32.    Aside from the unsupported and conclusory statements set forth in the Chad Meyer Declaration [ECF No. 59], Tecumseh has offered no credible evidence to establish that it holds any ownership interest in any of the Disputed Accounts.  Moreover, Tecumseh cites no authority in its Motion that would allow for the abandonment to Tecumseh of Collateral in which HASelect holds a perfected security interest.  The Motion must be denied.

**C.    The Disputed Accounts that Tecumseh Seeks to Have Abandoned Are Property of the Estate.**

33.    Notwithstanding Tecumseh's claims to the contrary, the Disputed Accounts are property of the estate in which HASelect hold a perfected security interest.

34.    Perfection of the purchase of an interest in accounts receivable requires the filing of a UCC financing statement.  Tecumseh did not file any UCC financing statement to perfect its alleged purchase of the Disputed Accounts from Infinity.  Consequently, any interest Tecumseh may claim in the Disputed Accounts (in addition to being subordinate and subject to HASelect's prior perfected security interest under the MLA) can be avoided by the Trustee pursuant to § 544(a).

**i.    The Disputed Accounts are Accounts under the UCC.**

35.    The term "account" is broadly defined under Nevada's UCC to include a right to payment for property sold, leased or licensed, or services rendered.  NRS 104.9102(1)(b).  The Disputed Accounts arose from services provided by various medical professionals.  Accordingly, the Disputed Accounts are "accounts" within the meaning of NRS 104.9102(1)(b).

**ii.    Sales of Accounts Fall Plainly within the Scope of the UCC.**

36.    The term "security interest" includes the interest of an outright buyer of "accounts." *See* NRS 104.1201(ii)[18]; s*ee also Dellamargio v. B-Line, LLC (In re Barker)*, 306 B.R. 339, 349 (Bankr. E.D. Cal. 2004) ("The scope of Revised Article 9 extends to: 'A sale of accounts....'").  Dovetailing with the inclusive definition of "security interest," NRS 104.9102(1)(bb) defines "debtor" to include "[a] seller of accounts," while NRS 104.9102(1)(ttt) defines "secured party" to include "[a] person to which accounts ... have been sold." Likewise, "collateral" is defined in NRS

---

[18] "'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. 'Security interest' includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible or a promissory note …" NRS 104.1201(ii).

104.9102(1)(l) to include "[a]ccounts ... that have been sold," while NRS 104.9109(1), which sets forth the scope of Article 9, provides that "this Article applies to ...(3) [a] sale of accounts..." *See Netbank, FSB v. Kipperman (In re Commercial Money Center, Inc.)*, 350 B.R. 465, 475 (9th Cir. BAP 2006) ("[T]he UCC uses lending terminology in provisions that are applicable to sales.").

37.   The definitions discussed above demonstrate that UCC Article 9 is equally applicable to the sale of accounts as to the use of accounts as security for repayment of an obligation.  Any notion to the contrary is quickly dispelled by Assembly Committee Comment 5 to UCC § 9109:

> [N]either this Division nor the definition of "security interest" in Section 1201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation. ***This Division applies to both types of transactions. The principal effect of this coverage is to apply this Division's perfection and priority rules to these sales transactions.*** Use of terminology such as "security interest," "debtor," and "collateral" is merely a drafting convention adopted to reach this end, and its use has no relevance to distinguishing sales from other transactions. (Emphasis supplied).

38.   Thus, under the UCC, it makes no difference whether Infinity assigned or sold the Disputed Accounts to Tecumseh.  Both transactions are subject to the same perfection and priority requirements under the UCC.  Moreover, the same consequences of failing to perfect apply regardless of Tecumseh's claimed purchase of Assigned Accounts.

### iii.   Tecumseh Failed to Perfect Any Security Interest in the Disputed Accounts.

39.   Perfection of a security interest in accounts is governed by NRS 104.9310(1), which provides that "a financing statement must be filed to perfect all security interests" unless the transaction falls into one of the specific exceptions set forth in NRS 104.9310(2).  None of those exceptions apply to the Disputed Accounts.

40.   So far as can be determined, Tecumseh did not file a UCC-1 Financing Statement referencing any of the Assigned Accounts.  Consequently, any interest that Tecumseh may claim in the Assigned Accounts is unperfected, and, therefore, avoidable by the Trustee pursuant to 11 U.S.C. § 544(a).

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89101
(702) 471-7432

### iv. The Trustee Has the Power to Avoid Tecumseh's Unperfected Security Interest in the Disputed Accounts.

41.     The Trustee's "strong arm" powers under 11 U.S.C. § 544(a) give the Trustee priority over and allow him to avoid Tecumseh's unperfected security interest in the Disputed Accounts:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

11 U.S.C. § 544(a)(1).

42.     As the Ninth Circuit Court of Appeals has explained, "[s]ection 544 of the Bankruptcy Code, the 'strong-arm clause,' grants a trustee in bankruptcy 'the rights and powers of a hypothetical creditor who obtained a judicial lien on all of the property in the estate at the date the petition in bankruptcy was filed.'" *Neilson v. Chang (In re First T.D. & Investment, Inc.)*, 253 F.3d 520, 526 (9th Cir. 2001) (citation omitted).  In particular, "[o]ne of these powers is the ability to take priority over or 'avoid' security interests that are unperfected under applicable state law ...." *Id.* (internal quotations and citations omitted).  By operation of § 544(a), the Trustee may avoid any unperfected security interest Tecumseh may claim or hold in the Disputed Accounts.

43.     Nev. Rev. Stat. § 104.9317(1)(b) likewise confirms that the Trustee takes priority over Tecumseh's unperfected interest in the Disputed Accounts: "[a] security interest ... is subordinate to the rights of ... a person that becomes a lien creditor before ... the time the security interest ... is perfected...."  The term "lien creditor" is defined in Nev. Rev. Stat. § 104.9102(1)(yy) to include "[a] trustee in bankruptcy from the date of the filing of the petition."  The Trustee, on behalf of Debtor, obviously qualifies as a "lien creditor" under this subsection.

44.     Tecumseh's claimed purchase of the Disputed Accounts is irrelevant.  *See* NRS 104.9318(2) ("For purposes of determining the rights of creditors of ... a debtor that has sold an account ..., while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account ... identical to those the debtor sold.").  *See also, In re Vigil Bros. Construction,*

*Inc.*, 193 B.R. 513 (9th Cir. B.A.P. 1996) (holding that the position of unperfected buyer of accounts was subordinate to subsequent chapter 7 trustee's position as lien creditor); *In re Cripps*, 31 B.R. 541 (Bankr. W.D. Okla. 1983) (same).

45.    Tecumseh's unperfected interest in the Disputed Accounts is subordinate to both HASelect's position as perfected secured creditor and the Trustee's position as a "lien creditor" under § 544(a).

**D.    Based on the Foregoing, Tecumseh's Request to Lift the Stay Should Be Denied.**

46.    Tecumseh's Motion requests relief from stay pursuant to 11 U.S.C. § 362(d)(1) without any analysis outside of its arguments relating to abandonment of the Disputed Accounts. Thus, to the extent that Tecumseh's claims for abandonment fail, so too must Tecumseh's request for relief from stay.  Indeed, Tecumseh should not be permitted to take any action with the Disputed Accounts prior to the resolution of all competing claims to the Disputed Accounts.

## CONCLUSION

Based on the foregoing, the HASelect respectfully requests that the Court deny Tecumseh's Motion.

DATED this 3rd day of November 2021.

**SHEA LARSEN**


/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1.      On November 3, 2021, I served the following document(s): **OBJECTION TO MOTION OF PARTY IN INTEREST TECUMSEH – INFINITY MEDICAL RECEIVABLES FUND, LP TO (1) ABANDON PROPERTY AND (2) LIFT THE AUTOMATIC STAY**

2.      I served the above document(s) by the following means to the persons as listed below:

☒       a.      ECF System:

ROBERT E. ATKINSON
Robert@ch7.vegas, TrusteeECF@ch7.vegas;ecf.alert+atkinson@titlexi.com

CLARISSE L. CRISOSTOMO on behalf of Plaintiff ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

CLARISSE L. CRISOSTOMO on behalf of Trustee ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

BRADFORD IRELAN on behalf of Creditor HEALTHPLUS IMAGING OF TEXAS, LLC
birelan@imtexaslaw.com, jstephens@imtexaslaw.com;dhall@imtexaslaw.com;ynguyen@imtexaslaw.com

DAVID MINCIN on behalf of Creditor HEALTHPLUS IMAGING OF TEXAS, LLC
dmincin@mincinlaw.com, cburke@mincinlaw.com

MICHAEL D. NAPOLI on behalf of Creditor TECUMSEH - INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com, cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;masterdocketlit@akerman.com

TRENT L. RICHARDS on behalf of Creditor THE INJURY SPECIALISTS
trichards@sagebrushlawyers.com

ARIEL E. STERN on behalf of Creditor TECUMSEH - INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

U.S. TRUSTEE - LV - 7
USTPRegion17.LV.ECF@usdoj.gov

MATTHEW C. ZIRZOW on behalf of Debtor INFINITY CAPITAL MANAGEMENT, INC.
mzirzow@lzlawnv.com, carey@lzlawnv.com;trish@lzlawnv.com;jennifer@lzlawnv.com;zirzow.matthewc.r99681@notify.bestcase.com

☐       b.      United States mail, postage fully prepaid:

☐       c.      Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐      For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐      For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.      By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.      By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐    f.      By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 3, 2021.

By: /s/ *Bart K. Larsen, Esq,*

# __EXHIBIT 1__

## PARTIAL PURCHASE AND SALE AGREEMENT

THIS PARTIAL PURCHASE AND SALE AGREEMENT (this "Agreement") dated as of January 6, 2021 ("Effective Date"), by and between **Infinity Capital Management**, a Nevada corporation ("Infinity" or "Purchaser/Buyer") and **Viking Pain Management LLC**, a Texas Limited Liability Company ("Viking" or "Seller"). Any reference herein to the "Parties" shall mean both Seller and Buyer.

A.   Viking Pain Management is a business entity operating in the State of Texas; and

B.   In conducting its business operations, Viking Pain Management has certain accounts receivable that it desires to sell to Buyer; and

C.   Buyer desires to purchase said accounts receivable from Seller; and

D.   Seller desires to sell to Buyer and Buyer desires to purchase from Seller the accounts receivable identified herein on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of mutual covenants, conditions and agreements contained herein, the Parties agree as follows:

1.   TERM. The term of this Agreement shall be twelve (12) months from the Effective Date ("Initial Term"). The Initial Term shall automatically renew for successive twelve (12) month terms unless earlier terminated by one of the Parties in accordance with this Agreement. Any term after the Initial Term shall be referred to as a "Successive Term." Any reference herein to the "Term" shall mean the Initial Term and all Successive Terms.

2.   THE EXISTING ACCOUNTS. Seller shall provide Buyer the right to purchase all rights, title and interest of Seller in and to Seller's existing accounts listed on the attached Exhibit "A" (the "Existing Accounts"), including, but not limited to, the rights to payments which Seller has or may acquire in the future regarding said Existing Accounts. The Existing Accounts that Buyer desires to purchase from Seller as identified by Buyer pursuant to the terms of this Agreement shall be referred to herein as the "Purchased Existing Accounts."

3.   THE FUTURE ACCOUNTS. On an ongoing basis, during the Term, Seller may offer for sale to Buyer, any accounts receivable it desires and if Buyer so chooses to purchase said accounts, such accounts shall be referred to herein as the "Purchased Future Accounts."

4.   PURCHASED ACCOUNTS. All payments made on a Purchased Account shall collectively be referred to as the "Purchase Price" for said Purchased Account. The Parties agree that purchases of Accounts are to be completed on a monthly basis.

5.   PURCHASE PRICE FOR FACILITY INJECTION ACCOUNTS RECEIVABLES. The purchase price for the Purchased Accounts relating to charges from injections at a Surgery Center/Facility shall be a base amount of One Thousand Eight Hundred Dollars ($1,800.00) per injection.

6.   PURCHASE PRICE FOR PROFESSIONAL FEES RELATED TO INJECTION ACCOUNT RECEIVABLES: The purchase price for Purchased Accounts relating to charges from injections by a medical provider shall be a base amount of Three Hundred Dollars ($300.00).

7.   COLLECTION OF AND PAYMENT FOR PURCHASED ACCOUNTS. All monies collected regarding the Purchased Accounts shall be deposited in a bank account for which Buyer has "read only" access. For each Purchased Account that is associated with a case that settles, and Buyer has funded any portion of said case, provider is to provide a copy of the check received from the attorney of record for said Account together with documentation from the attorney that may be needed to properly identify how to apply the payments.

As to any Purchased Account, Seller shall pay to Buyer any and all funds received from any settlement involving such Purchased Accounts, within ten (10) business days of Seller receiving such funds.

The Parties agree that the Buyer shall be paid the following:

1

A.  For each Injection Fee from the Facility: The Purchase Price of One Thousand Eight Hundred Dollars ($1,800.00) and a per Injection fee of Seven Hundred Dollars ($700.00)

B.  For each Injection Fee from the Medical Provider: The Purchase Price of Three Hundred Dollars ($300.00) and a per professional Injection fee of Two Hundred and Fifty Dollars ($250.00).

C.  For Purchased Accounts where the recovery from a settlement is not enough to repay the purchase price paid by Buyer and the fee owed for that Account; Seller will make up the difference using funds from other sources.

D.  For Purchased Accounts where Seller has been advised by an attorney that Seller will not receive any recovery (or insufficient recovery to cover the Purchase Price paid by Buyer) in relation to a Third-Party Claim, Buyer will write off amounts not to exceed $5,000.00 per month per location of the Purchase Price paid by Buyer to Seller. This monthly limit on amounts to be written off by Buyer shall not exceed a maximum amount of $60,000.00 during any 12-month period. In the event that there are additional Purchased Accounts where there is no recovery; Seller shall pay Buyer ninety-five percent (95%) of the Purchase Price for that Account within ten (10) days of receiving the notification of no payment. No additional fee will be charged for these Accounts where the Seller has received written notification from the attorney of non-representation or no recovery. Such written notification to be provided to Buyer.

8.  **BUYER'S DUE DILIGENCE.** Based on the information provided by Seller, Buyer has determined that the average collection amount for single level injections is approximately _____. For Accounts to qualify for inclusion in a purchase, Seller shall provide to Buyer the following information regarding each of those accounts:

A.  A copy of the HCFA or invoice for each Account;

B.  A medical note for the Injection associated with the Account.

C.  The LOP or Patient Responsibility Form for the personal injury case involving such Account. This LOP or other Form is to be identified as having been "assigned to Seller" as collateral;

All documents provided for each account must be accurate with congruent names and dates. Should any corrections need to be made on any Account, these corrections can be made by Seller and such accounts can be submitted for purchase with the next scheduled upload, so that payment can be timely on the current uploads. Upon Buyer receiving the documentation provided by Seller outlined herein, Buyer shall notify Seller of which accounts Buyer chooses to purchase and Buyer will make payment for such accounts as outlined in Section 4 and Section 5 of this Agreement..

9.  **REPRESENATATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to Buyer that:

(a) **Power and Authority.** Seller has full power and authority to enter into this Agreement and to perform this Agreement. Seller has valid right, interest, and title to all the Accounts and no third party has any right, interest, or title to such Accounts. This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(b) **No Conflict.** Neither the execution, delivery or performance by Seller of this Agreement, nor compliance with the terms and provisions hereof, conflicts or will conflict with or will result in a breach or violation of any contract or other agreement or instrument to which Seller is a party, or constitutes or will constitute a default thereunder.

(c) **Status Checks.** Seller agrees to perform regular status checks, (in no event, no later than every ninety (90) days), with each attorney of record for each case involving a Purchased Existing Account or Purchased Future Account. Seller also agrees to provide a report regarding such status check to Buyer within five (5) days of the occurrence of said status check. Such status checks shall continue until Buyer receives payment of said funds for each account as detailed in Section 8.

(d) **Survival of Representations and Warranties of Seller.** Seller's representations and warranties set forth herein shall survive the termination of this Agreement.

2

Scanned with CamScanner

10. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

(a) Power and Authority. Buyer is a corporation validly existing under the laws of the State of Nevada with full power and authority to enter into this Agreement and to perform this Agreement. This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws from time to time in effect which affect the rights of creditors generally or by limitations upon the availability of equitable remedies.

(b) No Conflict. Neither the execution, delivery or performance by Buyer of this Agreement, nor compliance with the terms and provisions hereof, conflicts or will conflict with or will result in a breach or violation of any contract or other agreement or instrument to which Buyer is a party, or constitutes or will constitute a default thereunder.

(c) Attorney Contact by Buyer. Buyer will not contact an attorney representing a party on a case involving a Purchased Account, regarding Buyer's interest in the LOP, provided that all terms and conditions of this Agreement are met by Seller. If the terms and conditions are not met, Buyer will inform Seller of the breach and give Seller thirty (30) days to remedy the breach before contacting the attorney. All reduction requests and case follow ups for Purchased Accounts will be done by Seller and Seller will communicate this information to the Buyer.

11. INDEMNIFICATION. Seller, on behalf of itself, its officers, directors, shareholders, employees, agents, successors and assigns, agrees to indemnify, defend and hold harmless Buyer from and against any and all costs, expenses, losses, damages, fines, penalties, or liabilities (including, without limitation, interest which may be imposed in connection therewith, court costs, litigation expenses, and reasonable attorneys' and accounting fees) (collectively, "Losses") incurred by Buyer, directly or indirectly, with respect to, in connection with, arising from, or alleged to result from, arise out of, or be in connection with Buyer's purchase of the Purchased Accounts, provided such Losses are incurred due to negligence of the Seller including but not limited to, a breach by Seller of any of the representations and warranties set forth herein.

12. DEFAULT AND REMEDIES-TERMINATION.

A. Buyer's Events of Default. The occurrence of any of the following shall be a "Buyer Default" hereunder:

i) The failure by Buyer to timely deliver, in the manner required herein, any payment to Seller due hereunder.

ii) The filing of a petition or the institution of proceedings of, by, or against Buyer pursuant to the Bankruptcy Reform Act of 1978, as amended, or any successor statute or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws, and, in the case of any involuntary proceeding, such petition or proceeding is not dismissed within 90 days; or Buyer's making a general assignment for the benefit of its creditors or the entering by Buyer into any compromise or arrangement with its creditors generally; or Buyer's becoming insolvent in the sense that Buyer is unable to pay its debts as they mature or in the sense that Buyer's debts exceed the fair market value of Buyer's assets;

iii) The failure of Buyer (i) to perform any material act to be performed by it, including the execution and delivery of any document; (ii) to refrain from performing any material prohibited act; or (iii) to fulfill any material condition to be fulfilled by it under this Agreement or under any agreement referred to herein or attached hereto as an exhibit, which failure is not cured by Buyer within the relevant cure period set forth below. Buyer shall cure any default which can be cured by the payment of money (a "Monetary Default") within ten (10) business days after receipt of written notice from Seller. Buyer shall cure any other curable default (a "Nonmonetary Default") within 30 days after receipt of written notice from Seller; provided, however, that in the event that such Nonmonetary default is of a nature that it cannot be cured within such 30 day period, then Buyer shall commence to cure such failure within such thirty (30) day period, and shall diligently prosecute such cure to its completion.

iv) Any of Buyer's representations and warranties set forth in this Agreement shall be untrue in any

3

material way.

B. **Seller Defaults.** The occurrence of any of the following, prior or subsequent to a Closing, shall be a "Seller Default" hereunder:

i) The failure of Seller (i) to perform any material act to be performed by it, including but not limited to timely providing all documentation in Seller's possession set forth in Section 7; (ii) to refrain from performing any material prohibited act; or (iii) to fulfill any material conditions to be fulfilled by it under this Agreement, which failure is not cured by Seller within the relevant cure period. Seller shall cure any Monetary Default within ten (10) business days after receipt of written notice from Buyer. Seller shall cure any Nonmonetary Default within 30 days after receipt of written notice from Buyer; provided however, that in the event that such default is of a nature that it cannot be cured within such 30 day period, then Seller shall commence to cure such failure within such 30 day period and shall diligently prosecute such cure to its completion; or

ii) Any of Seller's representations and warranties set forth in this Agreement shall be untrue in any material way.

C. **Remedies.** In the case of a Default (either Buyer Default or Seller Default) hereunder, the non-defaulting party shall be entitled to any and all remedies available to it at law or in equity. Buyer's remedies may include but are not limited to specific performance of this Agreement.

D. **Termination.** Either party may terminate the Agreement in the event of an uncured payment breach upon ten (10) days written notice to the other Party. Either Party may terminate the Agreement in the event of an uncured non-monetary breach upon sixty (60) days written notice to the other Party. Furthermore, if a Party that has committed a non-monetary breach is attempting to cure such breach in good faith, then the Agreement may not be terminated unless such non-monetary breach remains uncured due to fault on the part of the breaching Party or remains uncured for a period of at least ninety (90) days. Either party may terminate this agreement for any reason upon giving notice to the other party of at least 90 days.

13.     MEDIATION. The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement (a "Dispute"). Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the Dispute and the relief requested. The recipient of such notice will respond in writing within seven (7) business days with a statement of its position on and recommended solution to the Dispute. If the Dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within fifteen (15) business days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the Dispute. If the Dispute is not resolved by these negotiations, the matter will be submitted to J.A.M.S ("JAMS"), or its successor, for mediation. The mediation shall take place at a location chosen by the mediator in the County of Harris, State of Texas. Any information provided to the mediator shall be concurrently supplied to the parties involved in the mediation and the parties shall be given an opportunity to comment to the mediator on the information. Each party shall present the mediator and each other party with a written statement of the party's position and all copies of supporting documentation, at least two (2) business days prior to the mediation. Each party shall have an opportunity to orally present its position to the mediator and the other party. Each party agrees to designate one or more representatives, having authority to bind that party, who will participate in the mediation process including attending all mediation hearings. If the mediation results in a mutually acceptable resolution of all or some of the matters in Dispute, then the parties shall memorialize such resolution in a settlement agreement. Each party shall bear its own costs incurred in connection with the mediation. The costs of the mediator shall be shared equally between the parties regardless of the outcome. If mediation fails, venue for any dispute arising from this Agreement shall rest exclusively in the State and Federal Courts of Harris County, Texas.

14.     ENTIRE AGREEMENT. This Agreement is the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect to the matters contained in this Agreement. Any waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be set forth in writing and duly executed by or on behalf of the party to be bound thereby.

15.     COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

16.     NOTICES. Any communication, notice or demand of any kind whatsoever which either party may be required or may desire to give to or serve upon the other shall be in writing and delivered by personal service (including express or courier service such as Federal Express, Airborne, or other overnight delivery service), or by registered or certified mail, postage prepaid, return receipt

4

Scanned with CamScanner

requested, or by facsimile (with confirmation of receipt thereof), addressed as follows:

Seller:                    Viking Pain Management LLC
                           1229 Creekway Dr.
                           Sugar Land, TX 77478


Buyer:                     Infinity Capital Management, Inc.
                           c/o Anne Pantelas
                           1700 Horizon Ridge Pkwy #206
                           Henderson, NV 89012

With a copy to:            Borg Law Group, LLC
                           Attn: Brooke M. Borg, Esq.
                           8988 W. Cheyenne Ave. #150
                           Las Vegas, Nevada 89129
                           Telephone: (702) 318-8808
                           Email: brooke@borglawgroup.com

Either party may change its address for notices by notice given to the other in the manner provided in this Agreement. Any such communication notice or demand shall be deemed to have been duly given or served on the date personally served, if by personal service, or on the date shown on the return receipt or other evidence of delivery, if mailed.

17.      RECORDING. Neither this Agreement nor any memorandum thereof shall be recorded or filed in the public land or other public records of any jurisdiction by Buyer and any attempt to do so may be treated by Seller as a material breach of this Agreement.

18.      GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. Notwithstanding the foregoing, venue for any dispute arising from this Agreement shall rest exclusively in the State and Federal Courts of Harris County, Texas.

19.      BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors, and assigns. Neither party shall be permitted to assign its interests in this Agreement without the prior written consent of the other party, other than to wholly owned subsidiaries, affiliates or parent entities.

20.      INVALID PROVISIONS. If any one or more of the provisions of this Agreement, or the applicability of any such provisions to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

21.      ASSIGNMENT AND AMENDMENT. Neither Party may assign this Agreement or any of its rights hereunder without the prior written consent of the other Party. This Agreement may not be amended without the written consent of both Parties.

22.      MISCELLANEOUS

21.1     It is agreed that time is of the essence in the performance of and compliance with each provision of this Agreement.

21.2     If the final date of any period that is set forth in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States of the State of Nevada, then and in such event, the duration of such period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

21.3     If any legal action, arbitration or other proceeding is commenced to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to an award of its actual expenses, including without limitation, expert witness fees and reasonable attorneys' fees and disbursements. The phrase "prevailing party" shall include a party that receives substantially the relief desired, whether by settlement, dismissal, summary judgment, judgment or otherwise.

21.4     Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements

5

Scanned with CamScanner

between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**SELLER:**                                             **BUYER:**

Viking Pain Management LLC                              Infinity Capital Management, a Nevada Corporation

By: _____ , its _MANAGER_                    By: _____
Tery Rotondo                                               Anne Pantelas, President

6

Scanned with CamScanner

EXHIBIT A

ACCOUNTS

Scanned with CamScanner

# EXHIBIT 2



**Infinity Capital Management™ dba Infinity Health Connections**

August 12, 2021

Viking Pain Management LLC
1229 Creek Way Dr. Ste. 104
Sugar Land, TX 77478

Dear Viking Pain Management,

Pursuant to our Agreement dated **January 6, 2021**, we advise that Fifty-Three Thousand One Hundred Dollars **($53,100.00)** was sent to your account on **08/12/2021**, as payment for the below-named receivables with a Gross Fee Billing amount of $956,486.40 for **21** patients. The confirmation number for this payment is ACH ▮▮▮▮▮▮.

| Patient | Firm Name | DOS | Paid |
|---|---|---|---|
| | NMW Law Firm | 7/9/2021 | $ 1,800.00 |
| | Mukerji Law Firm | 7/9/2021 | $ 1,800.00 |
| | NMW Law Firm | 7/27/2021 | $ 3,600.00 |
| | NMW Law Firm | 7/27/2021 | $ 600.00 |
| | JKZ Law Firm | 7/27/2021 | $ 3,600.00 |
| | JKZ Law Firm | 7/27/2021 | $ 600.00 |
| | Callahan Law Firm | 7/27/2021 | $ 1,800.00 |
| | Callahan Law Firm | 7/27/2021 | $ 300.00 |
| | NMW Law Firm | 7/23/2021 | $ 1,800.00 |
| | The Law Office of Tarek Fahmy PLLC | 7/27/2021 | $ 1,800.00 |
| | The Law Office of Tarek Fahmy PLLC | 7/27/2021 | $ 300.00 |
| | Callahan Law Firm | 7/9/2021 | $ 1,800.00 |
| | Callahan Law Firm | 7/9/2021 | $ 300.00 |
| | NMW Law Firm | 7/23/2021 | $ 1,800.00 |
| | NMW Law Firm | 7/23/2021 | $ 1,800.00 |
| | NMW Law Firm | 7/9/2021 | $ 1,800.00 |
| | NMW Law Firm | 7/9/2021 | $ 1,800.00 |
| | KGS Attorneys at law | 7/9/2021 | $ 3,600.00 |
| | KGS Attorneys at law | 7/9/2021 | $ 600.00 |
| | Bernsen Law Firm | 7/23/2021 | $ 1,800.00 |
| | Jimmy Ardoin & Associates | 7/27/2021 | $ 3,600.00 |
| | Jimmy Ardoin & Associates | 7/27/2021 | $ 600.00 |
| | NMW Law Firm | 7/23/2021 | $ 1,800.00 |
| | Rees Law Firm | 7/9/2021 | $ 1,800.00 |
| | Bernsen Law Firm | 7/9/2021 | $ 1,800.00 |
| | NMW Law Firm | 7/23/2021 | $ 1,800.00 |
| | The Smith Firm | 7/20/2021 | $ 3,600.00 |
| | The Smith Firm | 7/20/2021 | $ 600.00 |
| | NMW Law Firm | 7/20/2021 | $ 3,600.00 |
| | NMW Law Firm | 7/20/2021 | $ 600.00 |
| | | **Total:** | **$ 53,100.00** |

| Viking Batch #9 Totals | Total Units: | | 42 |
|---|---|---|---|
| Type of Fee | Quantity | | Total |
| ESI @ $1800 | 27 | $ | 48,600.00 |
| Joint Injections @ $400 | 0 | $ | - |
| ESI Professional Fee @ $300 | 15 | $ | 4,500.00 |
| Joint Injection Professional Fee @ $125 | 0 | $ | - |
| | **Total Funded** | **$** | **53,100.00** |

**Patients: 21    Invoices: 30**

Kind Regards,

*Anne Pantelas*
Anne Pantelas, CEO
Infinity Capital Management | Infinity Health Connections

1700 W. Horizon Ridge Parkway • Suite 206 • Henderson, NV 89012 • USA☎: (702) 228-3499🖷: (702) 383-5079
Email: info@infinityhealth.com • URL: http://www.infinityhealth.com



**Infinity Capital Management™ dba Infinity Health Connections**

July 27, 2021

Viking Pain Management LLC
1229 Creek Way Dr. Ste. 104
Sugar Land, TX 77478

Dear Viking Pain Management,

Pursuant to our Agreement dated **January 6, 2021**, we advise that Thirty-Nine Thousand Five Hundred Twenty-Five Dollars (**$39,525.00**) was sent to your account on **07/27/2021**, as payment for the below-named receivables with a Gross Fee Billing amount of $792,076.40 for **14** patients. The confirmation number for this payment is ACH ▇▇▇▇.

| Patient | Firm Name | DOS | Paid |
|---|---|---|---|
| | NMW Law Firm | 7/6/2021 | $ 4,000.00 |
| | NMW Law Firm | 7/6/2021 | $ 725.00 |
| | JKZ Law Firm | 6/29/2021 | $ 3,600.00 |
| | JKZ Law Firm | 6/29/2021 | $ 600.00 |
| | JKZ Law Firm | 7/6/2021 | $ 1,800.00 |
| | JKZ Law Firm | 7/6/2021 | $ 300.00 |
| | Callahan Law Firm | 7/6/2021 | $ 3,600.00 |
| | Callahan Law Firm | 7/6/2021 | $ 600.00 |
| | JKZ Law Firm | 6/29/2021 | $ 3,600.00 |
| | JKZ Law Firm | 6/29/2021 | $ 600.00 |
| | AK Law Firm | 5/21/2021 | $ 1,800.00 |
| | Law Office of Jermaine L. Hayden | 4.23.2021 | $ 1,800.00 |
| | Callahan Law Firm | 7/6/2021 | $ 1,800.00 |
| | Callahan Law Firm | 7/6/2021 | $ 300.00 |
| | JKZ Law Firm | 6/29/2021 | $ 1,800.00 |
| | JKZ Law Firm | 6/29/2021 | $ 300.00 |
| | Callahan Law Firm | 7/6/2021 | $ 1,800.00 |
| | Callahan Law Firm | 7/6/2021 | $ 300.00 |
| | JKZ Law Firm | 6/29/2021 | $ 3,600.00 |
| | JKZ Law Firm | 6/29/2021 | $ 600.00 |
| | Rees Law Firm | 5/21/2021 | $ 1,800.00 |
| | JKZ Law Firm | 6/29/2021 | $ 1,800.00 |
| | JKZ Law Firm | 6/29/2021 | $ 300.00 |
| | Rosen Law Group | 7/6/2021 | $ 1,800.00 |
| | Rosen Law Group | 7/6/2021 | $ 300.00 |
| | | **Total:** | **$ 39,525.00** |

| Viking Batch #8 Totals | Total Units: | | 37 |
|---|---|---|---|
| Type of Fee | Quantity | | Total |
| ESI @ $1800 | 19 | $ | 34,200.00 |
| Joint Injections @ $400 | 1 | $ | 400.00 |
| ESI Professional Fee @ $300 | 16 | $ | 4,800.00 |
| Joint Injection Professional Fee @ $125 | 1 | $ | 125.00 |
| | **Total Funded** | **$** | **39,525.00** |

Patients: 14
Invoices: 25

Kind Regards,

*Anne Pantelas*
Anne Pantelas, CEO
Infinity Capital Management | Infinity Health Connections

1700 W. Horizon Ridge Parkway • Suite 206 • Henderson, NV 89012 • USA ☎: (702) 228-3499 🖷: (702) 383-5079
Email: info@infinityhealth.com • URL: http://www.infinityhealth.com



**Infinity Capital Management™ dba Infinity Health Connections**

July 13, 2021

Viking Pain Management LLC
1229 Creek Way Dr. Ste. 104
Sugar Land, TX 77478

Dear Viking Pain Management,

Pursuant to our Agreement dated **January 6, 2021**, we advise that Fifty-Six Thousand Seven Hundred Dollars **($56,700.00)** was sent to your account on **07/12/2021,** as payment for the below-named receivables with a Gross Fee Billing amount of $1,026,370.30 for 24 patients. The confirmation number for this payment is **ACH** ▉▉▉▉▉

| Patient | Firm Name | DOS | Paid |
|---|---|---|---|
| ▉ | NMW Law | 5/4/2021 | $ 3,600.00 |
| | NMW Law | 5/4/2021 | $ 600.00 |
| | Mukerji Law Firm | 6/19/2021 | $ 1,800.00 |
| | NMW Law | 6/19/2021 | $ 3,600.00 |
| | Haque Law Firm | 6/22/2021 | $ 1,800.00 |
| | Haque Law Firm | 6/22/2021 | $ 300.00 |
| | John K. Zaid | 6/22/2021 | $ 1,800.00 |
| | John K. Zaid | 6/22/2021 | $ 300.00 |
| | NMW Law | 6/22/2021 | $ 3,600.00 |
| | NMW Law | 6/22/2021 | $ 600.00 |
| | John K. Zaid | 6/22/2021 | $ 3,600.00 |
| | John K. Zaid | 6/22/2021 | $ 600.00 |
| | NMW Law | 6/22/2021 | $ 3,600.00 |
| | NMW Law | 6/22/2021 | $ 600.00 |
| | Nguyen Loc Law Firm P.C. | 6/22/2021 | $ 1,800.00 |
| | Nguyen Loc Law Firm P.C. | 6/22/2021 | $ 300.00 |
| | Rosen Law Group | 6/22/2021 | $ 1,800.00 |
| | Rosen Law Group | 6/22/2021 | $ 300.00 |
| | John K. Zaid | 6/22/2021 | $ 1,800.00 |
| | John K. Zaid | 6/22/2021 | $ 300.00 |
| | NMW Law | 6/22/2021 | $ 1,800.00 |
| | NMW Law | 6/22/2021 | $ 300.00 |
| | Rosen Law Group | 6/22/2021 | $ 1,800.00 |
| | Rosen Law Group | 6/22/2021 | $ 300.00 |
| | Stewart J. Guss | 6/25/2021 | $ 1,800.00 |
| | NMW Law | 6/25/2021 | $ 1,800.00 |
| | Rees Law | 6/25/2021 | $ 1,800.00 |
| | Houston Law Group | 6/25/2021 | $ 1,800.00 |
| | Merick Nepomuceno Law Office | 6/25/2021 | $ 1,800.00 |

1700 W. Horizon Ridge Parkway • Suite 206 • Henderson, NV 89012 • USA☎: (702) 228-3499🖷: (702) 383-5079
Email: info@infinityhealth.com • URL: http://www.infinityhealth.com