GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
E-mail: wnoall@gtg.legal
GABRIELLE A. HAMM
Nevada Bar No. 11588
E-mail: ghamm@gtg.legal
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000 / Fax: (725) 777-3112

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC. dba INFINITY HEALTH CONNECTIONS,<br><br>Debtor. | Case No.: 21-14486-abl<br>Chapter 7<br><br>Date:    December 22, 2021<br>Time:   3:00 p.m. |

**OPPOSITION TO TRUSTEE'S MOTION TO: (I) APPROVE
SALE OF CERTAIN ASSETS; (II) SET SALE/AUCTION
PROCEDURES; AND (III) SET AUCTION HEARING DATE**

Party in interest Tecumseh–Infinity Medical Receivable Fund, LP, ("**Tecumseh**") respectfully submits this opposition (the "**Opposition**") to the *Trustee's Motion to (I) Approve Sale of Certain Assets; (II) Set Sale/Action Procedures; and (III) Set Auction Hearing Date* [ECF No. 145] (the "**Motion**") filed by Robert E. Atkinson, Chapter[1] 7 trustee ("**Trustee**") of the bankruptcy estate of Infinity Capital Management, Inc. dba Infinity Health Connections ("**Debtor**").

---

[1] All references to "Chapter" and "Section" shall be to title 11 of the U.S. Code (the "**Bankruptcy Code**"); all references to a "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure; and all references to "LR" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

This Opposition is made and based upon the following Memorandum of Points and Authorities, the Declarations of Mike Belotz (the "**Belotz Declaration**") and Michael Napoli (the "**Napoli Declaration**"), filed contemporaneously herewith, the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Motion must be denied because the Trustee cannot sell what the estate does not own. Notwithstanding his insistence that he is only seeking to sell whatever interest the estate may have and that Tecumseh's rights will not be affected, the Trustee is seeking to sell property that he does not have the power to sell under Sections 363 and 541(d) of the Bankruptcy Code—cash proceeds of the Tecumseh receivables, documents relating to Tecumseh's receivables, and the right to enforce and collect any future payments on Tecumseh's receivables.

Though Trustee contends that Tecumseh's rights will be preserved, the terms of the proposed sale do nothing to protect Tecumseh's interest. Instead, the Trustee seeks to give the buyer unfettered discretion to use or dispose of Tecumseh's receivables as it sees fit, including by selling collection rights to third parties, and imposes no obligation upon the buyer to prudently administer the receivables or to segregate, preserve, or account for the proceeds to Tecumseh.

The proposed sale does not maximize the value of estate assets and has not been proposed in good faith.  By providing HAS the right to credit bid a claim of unknown value for the purchase of assets that are not subject to its lien, the proposed auction procedures grant HAS an unfair advantage and freeze out any potentially competitive bidders.  The Trustee seeks to effect this *coup d'état* in favor of HAS on less than one week's notice, during the Holidays, with no attempt to market the assets or permit potential bidders to conduct a modicum of diligence.  In exchange, the Trustee has negotiated a release for himself, the potential value of which is

undisclosed, while the estate receives a mere $100,000 for receivables in the face amount of approximately $28 million.

## II.
## JURISDICTION

This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 1001(b)(1). Pursuant to LR 9014.2, Tecumseh consents to the entry of final orders and judgments by the bankruptcy judge on the matters presented in the Motion.

## III.
## BACKGROUND

A.   **The Receivables.**

1.   Prior to commencing the above-captioned bankruptcy case, the Debtor was in the business of purchasing receivables from medical providers, which receivables typically arose from medical treatment provided to individuals who were injured in accidents and then asserted personal injury claims (the "**Receivables**"). The Receivables are secured by liens against the personal injury claims and are paid at the time the personal injury claims are settled.

2.   Prior to the Petition Date, HASelect-Medical Receivables Litigation Finance Fund International SP ("**HAS**") made various loans to the Debtor, who used the funds to purchase Receivables and fund operations. The HAS loan was secured by, among other things, the Debtor's Receivables. According to HAS, the Debtor was indebted to HAS in the aggregate amount of $14,126,860 as of May 31, 2021. See HAS's *Motion for Relief from Stay* [ECF No. 17] ("**HAS Motion for Relief from Stay**"), ¶ 9.

3.   However, the Debtor also arranged for the purchase of certain Receivables by Tecumseh (the "**Tecumseh Receivables**")[2] pursuant to a sub-advisory agreement between

---

[2] The "Tecumseh Receivables" were defined in this Court's Order granting the Joint Motion to Abandon Real/Personal Property [ECF No. 12] filed by HAS and the Trustee ("HAS Motion to Abandon") as those receivables "identified in Exhibit A and, to the extent marked as assigned to Tecumseh, Exhibit B to the Meyer Declaration [ECF No. 59] as well as any records relating exclusively thereto or any proceeds thereof." ECF No 97, ¶ 4.

Debtor and Tecumseh dated June 18, 2020 (the "**Sub-Advisor Agreement**").[3] In contrast to the Receivables that Debtor purchased for its own account, the Tecumseh Receivables were purchased by or for Tecumseh.

4. The purpose of the Sub-Advisor Agreement was for the Debtor to arrange a purchase by Tecumseh "directly from the Medical Service Provider." *See* Hemmer Dep., Ex. 17 (Sub-Advisor Agreement), at Exhibit A, ¶ 3(b); *see also* Hemmer Dep. Vol. II at 185:15-20 (testifying that the purpose of the Sub-Advisor Agreement was to facilitate a sale between the medical service providers and Tecumseh).

5. The Sub-Advisor Agreement provided (at Exhibit A) that the Debtor would (i) assist Tecumseh in acquiring medical receivables [¶ 1(a)]; (ii) identify receivables for purchase by Tecumseh [¶ 3(a)]; (iii) negotiate the purchase [¶ 1(b), ¶ 3(b)]; (iii) arrange for Tecumseh to secure a lien or equivalent security against plaintiff's recovery [¶ 1(c)]; and (iv) arrange for documentation to "evidence the sale of the Receivable to the Company by the Medical Service Provider" [¶ 3(d)]. The Debtor was not to acquire an interest in the Tecumseh Receivables or to be part of the chain of title. Hemmer Dep. Vol. II at 186:3-8.

6. In addition to serving as an advisor for the purchase of the Tecumseh Receivables, Debtor acted as a servicer. Servicing the Tecumseh Receivables generally entailed keeping track of the underlying personal injury claims, managing communications with plaintiff's lawyers, coordinating payment, negotiating any reductions in the amount to be paid, and accounting for all payments and transferring the proceeds to Tecumseh. *See* Hemmer Dep. Vol. II at 180:1-181:11.

7. Consistent with the Sub-Advisor Agreement, the Debtor's internal records denote which Receivables belong to the Debtor and were pledged to HAS and those that belong to Tecumseh. *See* Hemmer Dep. Vol. II at 170:24-171:6. As Mr. Hemmer testified, the Tecumseh Receivables belong to Tecumseh and were serviced by the Debtor on Tecumseh's behalf. *Id*. at

---

[3] The Sub-Advisor Agreement is attached as Exhibit 17 to the Deposition of Oliver Hemmer ("**Hemmer Dep.**"), and is attached to the Napoli Declaration as Exhibit B.

171:17-173:3.[4]  Accordingly, the Debtor did not claim an ownership interest in the Tecumseh Receivables on its Schedules.  *See id*. at 173:18-174:4, 174:15-175:3; ECF No. 47 (Debtor's Schedules).

8. As Mr. Hemmer expressly testified, the Debtor does not own an interest in the Tecumseh Receivables.  Hemmer Dep. Vol. II at 173:18-174:4, 174:15-175:3.  The Debtor was not buying and reselling the Receivables, but merely servicing the Tecumseh Receivables on Tecumseh's behalf.  *Id*. at 186:9-17.

9. The funds to purchase the Tecumseh Receivables came from Tecumseh, not the Debtor, and were paid directly to medical service providers from Tecumseh's funds in a Bank of America account owned by Tecumseh.  *Id*. at 185:21-186:2; 188:6-11; 188:14-189:6; 189:8-15; 189:20-22.  None of the funds that Tecumseh used to purchase the receivables flowed through any of the Debtor's accounts.  *Id*. at 189:16-19.  As the servicer, the Debtor paid all funds collected on the Tecumseh Receivables directly to Tecumseh.  *Id.* at 186:18-23.

10. Tecumseh's reconciliation of its bank records to those of the Debtor corroborates Mr. Hemmer's testimony.[5]  Tecumseh's records reflect that it purchased 4,190 Receivables with a face value of $19.8 million from various medical providers by paying them directly.  Belotz Decl., at ¶¶ 8-10 and Exhibit 2.  Tecumseh paid about $3.2 million for these Receivables, exclusive of the Debtor's servicing fee.  *Id*.[6]  All of the funds paid for these Receivables came from Tecumseh's Bank of America account.  *Id*.[7]

---

[4] Mr. Hemmer identified the Tecumseh Receivables serviced by the Debtor on Tecumseh's behalf as 1) the Receivables reflected on the Debtor's spreadsheet, TIFDumpWithIncomeFinal.xlsx and 2) the Receivables marked "TIF" on the Debtor's spreadsheet, ESDVerifiedHASOverlapDumpWithIncome.xlsx, attached as Exhibits A and B to the Declaration in Support of Motion of Party in Interest Tecumseh-Infinity Medical Receivables Fund, LP to (1) Abandon Property and (2) Lift the Automatic Stay of Chad Meyers [ECF No. 59] (the "**Meyers Declaration**").

[5] As set forth in the Belotz Declaration, Tecumseh began a process of reconciling its bank records to the Debtor's records regarding the Tecumseh Receivables after the Trustee and HAS claimed that Tecumseh's ownership of the Tecumseh Receivables was disputed.  That reconciliation is not yet complete, and will likely require access to the Debtor's records.  *Id.* at ¶ 10.

[6] Each of these receivables is included within the Tecumseh Receivables and is one of the two spreadsheets supplied by the Debtor.

[7] Tecumseh is still working to reconcile additional Tecumseh Receivables in the face amount of $6.2 million.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

**B.    The Bankruptcy Case and Neglect of the Tecumseh Receivables.**

11.    Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court on September 14, 2021 (the "**Petition Date**"), commencing the above-captioned case (the "**Case**").

12.    The Debtor ceased all business operations upon commencement of the Case, including the servicing and collection of the Receivables. As a result, there has been no oversight, management, or administration of the Tecumseh Receivables for almost three months. *See* Motion at p. 5 (stating that "the Tecumseh Receivables have not been served by the Debtor since the Petition Date.").

13.    As the Trustee, HAS, and Tecumseh have all acknowledged, medical receivables require regular servicing and collection, without which there is a substantial risk that the receivables will quickly dissipate in value. *See* Joint Motion to Abandon Real/Personal Property [ECF No. 12] ("**HAS Motion to Abandon**"), ¶ 15; Hemmer Dep. Vol. II at 181:12-185:14 (describing the negative consequences of failing to service the Tecumseh Receivables; *see also* Meyers Declaration (ECF No. 59), ¶ 12 (stating that receivables lose value if someone is not tracking the underlying litigation, maintaining contact with the plaintiff's lawyers, and negotiating final payment).

**C.    The Dispute Regarding Ownership of the Tecumseh Receivables.**

14.    On September 22, 2021, HAS and the Trustee filed the HAS Motion to Abandon, seeking an order authorizing the Trustee to abandon the HAS Receivables and all other personal property of Debtor purportedly subject to its first-priority security interest, including "all books and records relating to medical lien receivables and any other personal property" (together with the HAS Receivables, the "**HAS Collateral**"). On the same day, HAS filed the HAS Motion for Relief from Stay, seeking an order authorizing HAS to immediately take possession of the HAS Collateral, including the HAS Receivables. *See* HAS Motion to Abandon, ¶ 6; HAS Motion for Relief from Stay, ¶ 6.

15.    On October 5, 2021, Tecumseh filed its own *Motion to (1) Abandon Property and (2) Lift the Automatic Stay* [ECF No. 57] (the "**Tecumseh Motion to Abandon**"), seeking the

abandonment and release of the Tecumseh Receivables and all documents and checks issued to Debtor in connection with the Tecumseh Receivables. *See* Tecumseh Motion to Abandon, ¶ 13.

16. The Court entered an order authorizing the abandonment of the Debtor's interest in certain of the HAS Collateral on October 15, 2021. ECF No. 97. The Court's order excluded the Tecumseh Receivables, as follows:

> The Tecumseh Receivables as defined in Tecumseh – Infinity Medical Receivable Fund, LP's Objection to Joint Motion to Approve Abandonment of Collateral [ECF No. 82] and as identified in Exhibit A and, to the extent marked as assigned to Tecumseh, Exhibit B to the Meyer Declaration [ECF No. 59], as well as any records relating exclusively thereto or any proceeds thereof.

ECF No. 97 at ¶ 4.

17. On October 21, 2021, the Court entered an order granting the HAS Motion for Relief from Stay, permitting HAS to immediately take possession of the HAS Collateral and otherwise enforce its security interest and rights in the HAS Collateral. ECF No. 106. Again, the Tecumseh Receivables were excluded:

> The termination of the automatic stay ordered and directed and the relief granted herein shall specifically exclude the Tecumseh Receivables as defined in Party in Interest Tecumseh – Infinity Medical Receivable Fund, LP's ("<u>Tecumseh</u>") *Objection to Joint Motion to Approve Abandonment of Collateral* [ECF No. 82] ("<u>Tecumseh Objection</u>") and as identified in Exhibit A and, to the extent marked as assigned to Tecumseh, Exhibit B to the Meyer Declaration [ECF No. 59] as well as any records relating exclusively thereto or any proceeds thereof, and, to the extent that there are records that relate both to the [HAS] Collateral and to the Tecumseh Receivables, the Trustee will retain a copy of such records pending further order of this Court.

*Id.* at ¶ 4. The Court's order also excluded cash, providing:

> HASelect shall not, without further court order, take possession or control of the money in deposit accounts held in the name of the Debtor on the Petition Date (which is now in the possession of the Trustee, and held in estate accounts).

*Id.* at ¶ 5.

18. On October 19, 2021, HAS commenced an adversary proceeding against Tecumseh, Adversary No. 21-01167 (the "**Adversary**"), seeking an adjudication that Tecumseh's alleged lien in the Tecumseh Receivables is subordinate to HAS's lien. HAS contends that Tecumseh purchased the Tecumseh Receivables from the Debtor without filing a

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

UCC-1 financing statement to perfect its interest and, as a result, any interest of Tecumseh in the Tecumseh Receivables is subordinate and subject to HAS's prior, perfected security interest. *See* First Amended Adversary Complaint [Adv. No. 21-01167, ECF No. 19, at ¶¶ 60, 53-56].

19. On November 3, 2021, the Trustee filed an opposition [ECF No. 117] to the Tecumseh Motion to Abandon, representing to the Court that, notwithstanding the Trustee's continued failure to service the Tecumseh Receivables, the estate "may possess *significant* equity in the Tecumseh Receivables" (emphasis added) and asserting that "[b]ecause the subject as to whether the Tecumseh Receivables is (or is not) property of the Bankruptcy Estate is a contested matter, the Motion [to Abandon] is not ripe." Trustee's Opposition, at pp. 1-2.

20. HAS likewise objected to the Tecumseh Motion to Abandon, arguing that the Tecumseh Receivables "may [be] worth as much as $28 million" (sic) and that "[e]ven a much lower value could be worth *substantially* more than the outstanding indebtedness of approximately $15 million owed to HASelect under the MLA, which is likely to be reduced considerably as HASelect liquidates other Collateral. " [ECF No. 118, at ¶¶ 15 and 22].

21. On November 19, 2021, the Court entered an order [ECF No. 133] denying the Tecumseh Motion to Abandon without prejudice for the reasons stated on the record.

22. On November 19, 2021, Tecumseh filed counterclaims against HAS and the Trustee, also seeking declaratory relief concerning ownership of the Tecumseh Receivables. *See Tecumseh–Infinity Medical Receivables Fund, LP's Answer, Affirmative Defenses, and Counterclaim* [Adv. No. 21-01167, ECF No. 12] (the "**Counterclaim**").

23. As set forth in the Counterclaim, the Debtor served as an intermediary with respect to some of the Receivables, remitting Tecumseh's funds to the medical service providers on behalf of Tecumseh, and a small number of Receivables were purchased directly from the Debtor, rather than the medical providers.[8]  However, the vast majority of the Tecumseh Receivables were purchased directly from medical service providers, with payments made

---

[8] HAS had knowledge of the business relationship between the Debtor and Tecumseh and authorized the payments to Tecumseh from funds received by the Debtor. Hemmer Dep. Vol. II at 195:24-198:7.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

directly to the providers from Tecumseh's bank account. *See supra*, § III.A. Tecumseh is not asserting a security interest against the Debtor for these Receivables, but owns them outright.

## IV.
## LEGAL ARGUMENT

### A. Standard Governing Sales Under Section 363(b).

Under Section 363(b)(1) of the Bankruptcy Code, a trustee "may use, sell, or lease, other than in the ordinary course of business, ***property of the estate***" after notice and hearing. 11 U.S.C. § 363(b)(1) (emphasis added).

It is axiomatic that a trustee may only sell property that the estate owns.[9] Property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a). However, equitable or beneficial interests of third parties are excluded from the estate under Section 541(d), which provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d); *see also In re Magna Entertainment Corp.*, 438 B.R. 380, 386–87 (Bankr. D. Del. 2010) (funds held in trust are not property of the estate) (citing *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994)). "Therefore, the bankruptcy estate retains legal title over a trust, 'but the beneficiaries of the trust may reclaim their equitable interests in the trust fund so created through bankruptcy court proceedings.'" *In re Magna Entertainment*, 438 B.R. at 386-87 (quoting *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 372 (3d Cir.1992)).[10]

---

[9] Qualified exceptions for co-ownership and community interests found in subsections (h), (i), and (j) of Section 363 do not apply.

[10] Likewise, bare possession is insufficient to bring property into the estate. *In re Krick*, 373 B.R. 593 (Bankr. N.D. Ind. 2007) (on conversion of Chapter 13 case to one under Chapter 7, debtor's bare possession of property as tenant of her parents, without any legal propriety ownership interest, was insufficient to bring her alleged co-tenancy interest into property of Chapter 7 estate as property that was part of Chapter 13 estate on petition date that "remain[ed] in the possession of or [wa]s under the control of the debtor on the date of conversion.").

When another entity holds an interest in estate property that a trustee proposes to use, sell, or lease, "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest" upon request. 11 U.S.C. § 363(e).

In determining whether to approve a proposed sale, courts require a trustee or debtor in possession to demonstrate that a valid business purpose exists for a sale outside of the ordinary course of business. *See Matter of VCR I, L.L.C.*, 922 F.3d 323, 326–27 (5th Cir.2019) (sale under § 363 'requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons.'") (quoting *The Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 257 (5th Cir. 2010)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-1071 (2d Cir.1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").

" 'A trustee has a duty to maximize the value of the estate,' and he 'must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal.'" *VCR I*, 922 F.3d at 327 (quoting *In re Moore*, 608 F.3d at 263); *see also Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir.2004); *In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir.1997).

Courts recognize that procedures intended to enhance competitive bidding serve the goal of maximizing the value received by the estate. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (a full and fair price is presumed to have been obtained for assets sold following a court-approved auction process, as the best way to determine value is exposure to the market); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir.1999); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

B. **The Trustee Is Attempting To Sell Assets That Are Not Property of the Estate.**

The Motion provides that the Trustee has agreed to sell the following assets:

1. "Whatever interest the Bankruptcy Estate has (if any) in the Tecumseh Receivables," including $88,802.85 in proceeds of the Tecumseh Receivables held in two segregated accounts (the "**Cash Proceeds**"),[11] "subject to the rights, title, and interests that Tecumseh may have in this property, if any";

2. All claims and causes of action that could be brought by the Trustee or the estate against any third party relating in any way to the Tecumseh Receivables, including claims pursuant to Sections 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code (the "**Claims**");

3. "All books and records related to the foregoing that the Bankruptcy Estate currently has in its possession."

Motion, at ¶ 8.

The Trustee's vague description of the assets leaves parties in interest and potential bidders with more questions than answers about what is being sold and the possible value of the subject assets. He fails to describe what interest the estate may have in the Tecumseh Receivables or the potential value of such interest. Potential bidders have no way of discerning what claims and causes of action could be brought by the estate against third parties relating to the Tecumseh Receivables as the Trustee fails to identify them, none are listed in the Debtor's schedules, and none have been asserted by the Trustee, whether under Chapter 5 of the Bankruptcy Code or otherwise. *See generally* ECF No. 47 (Debtor's schedules and statements).

Further study of the Motion suggests that the Trustee's ambiguity is designed to gloss over the fact that while the Trustee contends that he is merely conveying "[w]hatever interest the Bankruptcy Estate has (if any) in the Tecumseh Receivables" subject to "whatever rights, title, and interests that Tecumseh may have in the Tecumseh Receivables," he is actually attempting to convey the Tecumseh Receivables as he seeking to sell the Cash Proceeds of Tecumseh Receivables currently held by the estate along with future proceeds. *See* Motion, at p. 7 (providing that "Debtor (inclusive of Debtor's principals) shall have a continuing obligation to

---

[11] The "TIF Checks," which total $75,402.85, are proceeds of Receivables that are exclusively Tecumseh Receivables. The TIF+HAS Checks, which total $13,400.00, are proceeds of the Overlap Receivables. *See* Motion, at ¶ 7.

remit any funds that it may possess arising from the Tecumseh Receivables, or come into possession of at any time in the future, to the Winning Bidder.") In other words, the Trustee is attempting to sell the current and future proceeds of the Tecumseh Receivables, which is nothing less than the Tecumseh Receivables themselves.

Proceeds are well beyond the scope of "whatever interest" the estate may have if the estate does not own the Tecumseh Receivables. And notwithstanding HAS's spurious Adversary, neither the Trustee nor HAS have asserted a colorable argument challenging Tecumseh's ownership of the Tecumseh Receivables. With the limited exception of the small number of Receivables purchased from the Debtor, the Debtor has never held an interest in the Tecumseh Receivables.[12] *See* Hemmer Dep. Vol. II at 186:12-17. The Debtor's books and records denote the Receivables that constitute Tecumseh Receivables and those that belonged to the Debtor and served as HAS Collateral. *Id*. at 170:24-171:6. The Debtor did not list the Tecumseh Receivables in its schedules. *Id*. at 173:18-174:4, 174:15-175:3; ECF No. 47. Tecumseh transferred funds from its own account directly to providers to purchase the Tecumseh Receivables. Hemmer Dep. Vol. II at 185:21-186:2; Belotz Decl. at ¶¶ 8-10 & Exh. 2. Indeed, the purpose of the Sub-Advisor Agreement was to arrange purchases by Tecumseh "directly from the Medical Service Provider." Hemmer Dep. Vol. II at 185:15-20. Sub-Advisor Agreement at Exh. A.

Though HAS has attempted to manufacture a dispute by framing Tecumseh's interest as a lien, Tecumseh has never asserted a lien. It is not a secured creditor, but the owner of the Tecumseh Receivables. Indeed, the Trustee has never even attempted to establish that estate owns the Tecumseh Receivables. He has asserted no claims the Adversary, nor has he asserted, much less proved, that the estate has an interest in the Tecumseh Receivables. As such, the Trustee has failed to meet a fundamental element of Section 363(b) because he has not

---

[12] HAS's allegation that the Debtor "periodically sold and assigned to Tecumseh certain accounts receivable that [Debtor] had purchased from medical providers," is factually incorrect except for a small subset of the Tecumseh Receivables that were purchased by Tecumseh from the Debtor. HAS has set forth no basis whatsoever for challenging Tecumseh's ownership of the at least $19.8 million (face) in Receivables that were purchased directly by Tecumseh from medical service providers.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

established that the property he intends to dispose of is property of the Debtor's bankruptcy estate. *See Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 266-70 (B.A.P. 9th Cir. 2005) ("Section 363(b), as interpreted by [the Ninth Circuit in] *Rodeo,* requires that the estate demonstrate that the property it proposes to sell is 'property of the estate.'") (citing *Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 608 (9th Cir. 2004) *opinion withdrawn and superseded*, 126 F. App'x 353 (9th Cir. 2005), *as amended on denial of reh'g* (Apr. 1, 2005); *see also In re Air Beds, Inc.*, 92 B.R. 419, 424–25 (B.A.P. 9th Cir. 1988) (remanding for the taking of testimony relative to ownership of patent where there was no evidence presented on whether debtor or debtor's president owned patent).

In *Rodeo*, the Court of Appeals for the Ninth Circuit distinguished between a *bona fide* dispute over the validity of the nondebtor party's interest in the property and a dispute over the *debtor's* interest. *Id.*, 362 F.3d at 608–09; 3 Collier on Bankruptcy ¶ 363.06[6] (2021). Where an interest in the debtor's property is at issue, Section 363(f) permits the estate to sell such property free and clear of that interest if certain conditions are met. *Id.* at 608. However, where there is a dispute regarding the debtor's interest, the court may not authorize a sale under Section 363 until the court resolves the dispute and determines that the debtor has an interest that can be sold. Until that occurs, Section 363 does not even apply. *Id.* at 608-09. ("A bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property.") (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. BAP 2001) (holding that "[t]he threshold question, is [the property] still property of the estate, must ... be decided" before it can be sold free and clear under § 363(f)); *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 863 (5th Cir.2000) (the trustee lacked authority to sell separate property of a nondebtor that was not included or owned in indivision with the property of the estate under Section 363(f)...."); *In re Coburn,* 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (finding it necessary to determine whether an asset is property of the estate in order to decide whether the trustee is entitled to sell the asset pursuant to § 363(f)).

Further, it is inappropriate to make a summary adjudication of the parties' respective interests in the Tecumseh Receivables while HAS is seeking a resolution of that issue in the

Adversary. Courts "must seek to promote consistent and unfragmented decision making when faced with the need to determine predicate issues such as property ownership in the Section 363 context." *In re Popp*, 323 B.R. at 270.

*Popp* involved a sale of property similar to the one proposed by the Trustee here. In that case, a dispute between the trustee and various interested parties as to the ownership of real property was at issue in a pending adversary proceeding when the trustee sought to sell the property pursuant to a deed in which the buyer assumed the risk that the estate would not ultimately be found to own the property. *Id.* at 263-64, 270. The bankruptcy court approved the sale but allowed the parties to continue litigating ownership in the adversary. *Id*. at 264. The Ninth Circuit Bankruptcy Appellate Panel (the "**BAP**") reversed, holding that the bankruptcy court's failure to resolve the ownership issue prior to the sale was error. *Id*. at 272. The BAP concluded that the bankruptcy court's factual determination in the contested matter that Popp had "some interest in the property," without resolving the adversary, effectively resolved nothing. *Id.* at 270. Further, the BAP concluded that reversal was consistent with the "equities of the underlying litigation," which required the bankruptcy court to insist that the trustee finish determining ownership in the pending adversary to avoid piecemeal litigation. *Id.*

Ownership of the Tecumseh Receivables must be determined as a predicate to any sale and the equities of the litigation mandate that no sale proceed before resolution of the Adversary. Should the sale be approved, HAS will possess all Cash Proceeds collected on the Tecumseh Receivables to date (approximately $90,000), all documents related to the Tecumseh Receivables, and the right to collect any future payments on the Tecumseh Receivables. Contrary to the Trustee's contention that Tecumseh's rights will be preserved, the terms of the proposed sale would give HAS unfettered discretion to use or dispose of the Tecumseh Receivables (including by selling collection rights to third parties) and impose no obligation upon HAS to prudently administer the receivables or to segregate, preserve, or account for the proceeds to Tecumseh, all while prosecuting an adversary proceeding on the premise that ownership is disputed.

**C.      The Proposed Sale Process Is Defective.**

The Trustee also fails to demonstrate that the proposed sale price is the highest and best offer for whatever interest the Trustee claims to be selling or that the proposed sale procedures will promote active bidding from interested parties and elicit the highest or otherwise best offers available for the assets.[13] The procedures allow for no marketing and provide insufficient time for potential bidders to perform the diligence necessary to submit a timely and well-informed bid.

Aside from the complete absence of any real description of the assets he plans to sell, the proposed sale procedures do not allow interested parties to conduct due diligence. Moreover, the Trustee does not even plan to advertise the sale or to otherwise market the assets to be sold. In any event, a mere week between the entry of the order approving the sale and the proposed auction effectively precludes any meaningful marketing or the solicitation of any other potential bidders. That the proposed sale will occur during the week between Christmas and New Year's Day simply highlights the blatant inadequacies of the proposed sale process.

In addition, the proposed procedures provide HAS a credit bid right that is wholly improper. Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

Thus, Section 363(k) only permits a lender to credit bid its claim against property that is subject to its lien. Here, the HAS Collateral has already been abandoned by the estate and relief from the stay has already been granted as to the HAS Collateral. What remains are assets that are not subject to HAS's lien, including Chapter 5 causes of action, and assets which HAS has not established are part of its collateral—the Tecumseh Receivables and their proceeds. Further, neither the amount of HAS's allowed claim nor the value of the HAS Collateral recovered by HAS have been established. As such, HAS's claim may already be satisfied in full or be reduced

---

[13] The net payment to the estate is only $10,000. Upon sale, HAS will transfer $100,000 in cash to the estate in exchange for approximately $90,000 in cash that is currently held by the estate.

1  to substantially less than the $14,126,860 claim scheduled by the Debtor.  *See* ECF No. 47, at p.
2  9.
3        Even if a credit bid was not improper under Section 363(k), the Court should find cause
4  to preclude a credit bid in this case because allowing HAS to credit bid an amount that may
5  exceed its actual claim by millions of dollars dissuades potential bidders from participating.  *See*
6  *In re Fisker Automotive Holding, Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014) (limiting creditor's
7  right to credit bid to $25 million where "credit bidding would prevent any other bidding, the
8  creditor did not have a lien on all the assets being sold, and the creditor insisted on a rushed,
9  unfair process"); *In re The Free Lance-Star Publishing Co. of Fredericksburg, Va.*, 512 B.R. 798
10 (Bankr. E.D. Va. 2014) (stating that "[c]ause includes a need to advance another policy of the
11 Code, such as to ensure a successful reorganization, to facilitate a fully competitive auction, or to
12 undo the effect of a creditor's inequitable conduct" and limiting the amount of the creditor's
13 claim that it may bid because the creditor did not have a lien on all assets, its loan-to-own
14 strategy was inequitable, and because its misconduct had an adverse effect on the auction).

15 **D.**     **Tecumseh Is Not Adequately Protected for the Loss of its Property.**

16 Section 363(e) of the Bankruptcy Code provides:

17 > Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to
18 > be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide
19 > adequate protection of such interest.

20 11 U.S.C. § 363(e).

21       Courts have long recognized that a party with an interest in property to be sold pursuant
22 to section 363(b) has a right to receive adequate protection of such interest. *See In re PW, LLC*,
23 391 B.R. 25, 45 n.24 (B.A.P. 9th Cir. 2008) ("A sale under § 363(f) is subject to § 363(e), which
24 also conditions the sale on the provision of adequate protection.").  For adequate protection to be
25 sufficient, the relevant party must receive "as nearly as possible under the circumstances . . . the
26 value of [their] bargained for rights."  *See In re Amer. Mariner Indus., Inc.*, 734 F.2d 426, 435
27 (9th Cir. 1984) (overruled on unrelated grounds by *United States Say. Ass'n of Texas v. Timbers*
28 *of Ironwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)).

As the adequacy of protection is sensitive to the nature of the bargained-for rights, determining the sufficiency of adequate protection requires a fact-specific, case-by-case analysis. *In re WRB West Assocs. Joint Venture*, 106 B.R. 215, 219 (Bankr. D. Mo. 1989) (quoting *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) (collecting cases)). Determining adequate protection requires an analysis of the impact of the proposed action on the party whose interest is threatened. *See In re Bear River Orchards*, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) (holding that the relevant considerations for determining adequate protection were the nature of the collateral and the nature of the debtor's proposed use of the collateral).

Here, the analysis is a simple one. The proposed sale provides no protection, much less adequate protection, for Tecumseh's ownership interest. Tecumseh does not merely assert an interest in estate property that may be adequately protected by a replacement lien or the like. Rather, it isn't estate property at all. There is nothing the Trustee can provide Tecumseh that would adequately protect Tecumseh for the loss of its property.

Further, the Motion proposes to convey to HAS all Cash Proceeds collected on the Tecumseh Receivables to date (approximately $90,000), all documents related to the Tecumseh Receivables, and the right to collect any future payments on the Receivables—all for $100,000 in cash and releases of the Trustee. Contrary to the Trustee's contention that Tecumseh's rights will be preserved, the terms of the proposed sale would give HAS unfettered discretion to use or dispose of the Tecumseh Receivables, including by selling collection rights to third parties, and impose no obligation upon HAS to prudently administer the receivables or to segregate, preserve, or account for the proceeds to Tecumseh. As the HAS Collateral has already been abandoned by the estate, the estate will have nothing left with which it can adequately protect Tecumseh's interest upon a sale of the Tecumseh Receivables. Worse, the Trustee is seeking a good faith finding, which would leave Tecumseh unable to recover the Tecumseh Receivables or their proceeds even after adjudication of Tecumseh's ownership interest, leaving Tecumseh with no remedy. Accordingly, Tecumseh cannot be adequately protected by anything short of denial of the Motion.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

### E. A Finding of Good Faith Is Not Warranted.

Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to a sale under Section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchased or leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that "the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir.1986); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.,* 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

The proposed sale epitomizes unfair advantage. The Trustee and HAS seek approval of the sale on one week's notice, during the Holidays, without marketing the assets, providing potential bidders an opportunity to conduct due diligence, or determining the amount of HAS's remaining claim, premised on a dispute regarding ownership that HAS manufactured by filing the Adversary.

Furthermore, a good faith finding is improper where the estate's interest in the subject property is undetermined because Section 363 is not properly invoked in the first place, particularly where the buyer assumes the risk that the estate does not own what it is purporting to sell. *See In re Popp*, 323 B.R. at 271-72. Having initiated the Adversary challenging Tecumseh's ownership, HAS is fully aware that the estate's alleged interest is in dispute. HAS expressly assumed the risk that the assets the Trustee is proposing to sell may not be estate property in the APA, which states:

> **For avoidance of doubt, litigation of the dispute in the AP Case as to whether the Assets are property of the Bankruptcy Estate is not resolved by the Sale**. [HAS's] claims and causes of action relating to the Tecumseh Receivables in the AP Case, along with any related counterclaims of Tecumseh regarding title to the Assets on the Petition Date, shall survive the Sale.

*See* Motion, at Exhibit 1 (APA), ECF No. 145 at p. 22 of 23.

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

Furthermore, the Motion does not set forth facts that support a finding of good faith, but that HAS and the Trustee have engineered an outcome that serves the best interests of HAS and the Trustee, rather than the estate. If the Trustee had any credible basis for asserting an interest in the Tecumseh Receivables, without which there is no legal basis for selling the Cash Proceeds of the Tecumseh Receivables), a purchase price of $100,000 for Receivables in the face amount of over $28 million is patently absurd. If the Trustee had any credible basis for asserting an interest in the Tecumseh Receivables, selling almost $90,000 in cash for $100,000 would mean a negligible return for the estate and its creditors.

Yet, in exchange for allowing HAS to effectively extend its lien to assets that were never property of the Debtor or its estate, the Trustee has negotiated for himself a release of claims for failing to preserve the Tecumseh Receivables. Though the Motion provides no disclosure regarding the claims being released or their value, there is little question that the Trustee failed to carefully preserve the estate's assets from deterioration or dissipation in this case. *See* 11 U.S.C. § 704(1); *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357, n.26 (9th Cir. 1983) (holding bankruptcy trustee may be held liable for negligent as well as intentional conduct pertaining to duties placed on him by law); *In re Reich*, 54 B.R. 995,1004 (Bankr. E.D. Mich. 1985) (trustee must make an early decision to either: administer or abandon; administration imposes a duty to preserve under both statutory and common law).

Rather, as he expressly acknowledges in the APA, the Trustee failed to service the Tecumseh Receivables for almost three months, despite Tecumseh's request that he abandon the Tecumseh Receivables to permit Tecumseh to service them and despite the "substantial risk that the receivables will quickly dissipate in value." *See* HAS Motion to Abandon, ¶ 15.

Ultimately, the benefits to HAS and the Trustee of the proposed sale would come at the expense of Tecumseh, who cannot be adequately protected for the loss of its property. A good faith finding should be denied because it would render Tecumseh's harm irreparable. *See, e.g.*, *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015) (finding balance of harms weighed in favor of lessee where statutory mootness under Section 363(m) would lead to irreparable harm).

Garman Turner Gordon
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

# V.
# CONCLUSION

The Motion should be denied in its entirety because the Trustee has not established that the estate owns what it is selling. Were that not sufficiently problematic to warrant denial, the Trustee and HAS have structured a transaction that provides little benefit to the estate but grants a windfall to HAS and a release to the Trustee at the expense of Tecumseh, who is not adequately protected, then proposed auction procedures that ensure no competitive bidding process or accompanying due diligence will occur. Accordingly, Tecumseh respectfully requests that the Court deny the Motion in its entirety.

Dated December 13, 2021.

GARMAN TURNER GORDON LLP

By: /s/ Gabrielle A. Hamm
GERALD M. GORDON, ESQ.
WILLIAM M. NOALL, ESQ.
GABRIELLE A. HAMM, ESQ.
7251 Amigo St., Suite 210
Las Vegas, Nevada 89119

and

MICHAEL D. NAPOLI, ESQ.
*Pro hac vice*
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4360 / Fax: (214) 720-8116

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Tel: (702) 634-5000 / Fax: (702) 380-8572
Email: ariel.stern@akerman.com

*Attorneys for Tecumseh–Infinity Medical Receivable Fund, LP*

4876-0576-9734, v. 3