# Exhibit A

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 163

1                 UNITED STATES BANKRUPTCY COURT

2                      DISTRICT OF NEVADA

3

4

     In re:                          )
5                                    )   CASE NO.:
                                     )   21-14486-abl
6    INFINITY CAPITAL MANAGEMENT,    )
     INC.; dba INFINITY HEALTH       )   Chapter 7
7    CONNECTIONS,                    )
                                     )   Volume II
8         Debtor.                    )   Pages 163 - 219
     _____)

9

10

11

12        CONTINUED REMOTE FRCP 2004 EXAMINATION

13                  OF OLIVER HEMMERS

14            Taken on November 18, 2021

15       By a Stenographic Certified Court Reporter

16                   At 9:05 a.m.

17        Location of Witness:  Las Vegas, Nevada

18        Via Zoom Web-Based Videoconferencing

19

20

21

22

23   Reported by:  Janet C. Trimmer,
     NV CCR 864, RPR, CRR
24   Location of Reporter:  Las Vegas, Nevada

25   Job No. 47158

Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 170

1    the road, the record is there?

2              MR. NAPOLI:  Yeah, but I would note that I

3    think this line of questioning and testimony is going

4    to bear on this proposed sale.

5              MR. LARSEN:  Understood.  Like I said, I

6    don't want to have to object every time we go that

7    direction.

8              MR. NAPOLI:  No.

9              MR. LARSEN:  So, I mean, if you prefer that I

10   do it question by question, that's fine too.

11             MR. NAPOLI:  No, Bart, I prefer that you

12   didn't.  I understand what you are saying.  In all

13   candor, I don't agree with you on that and I think --

14             MR. LARSEN:  Understood.

15             MR. NAPOLI:  -- you kicked the door open

16   pretty wide in your direct.

17             MR. LARSEN:  Yes, and I get that.  Like I

18   said, I want to preserve the record here so that if it

19   comes up down the road, the objection is preserved.

20             MR. NAPOLI:  I get it, and we may be doing

21   this again in our case, and that's fine.

22             MR. LARSEN:  Okay.  All right.  Thank you.

23   BY MR. NAPOLI:

24        Q.  Infinity's internal records denote which

25   receivables belong to Infinity and which belong to



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 171

1   Tecumseh; correct?

2        A.   Yes.

3        Q.   So somebody reviewing Infinity's records

4   would be able to tell the difference between the two

5   categories?

6        A.   Yes.

7        Q.   How would they do that?  Where would they

8   look?

9        A.   In the database.

10       Q.   Which field would show that?

11       A.   The field for a thing that's called "Fund."

12       Q.   I'm going to show you a couple of

13   spreadsheets, one of which I think you saw on the

14   first day, one of which is similar to one you saw, and

15   again, because there are Excel documents, they are not

16   going into the Dropbox.

17            Okay.  The first one I'm showing you is a

18   spreadsheet called "TIFDumpWithIncomeFinal."  Do you

19   see that?  Is it visible on your screen?

20       A.   Yes, it is.

21       Q.   And if I understand your testimony from last

22   time, you created this spreadsheet for purposes of the

23   bankruptcy.  Is that correct?

24       A.   That's correct.

25       Q.   And you did so using information from



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 172

```
 1    Infinity's case management database?

 2        A.  Yes.

 3        Q.  And this spreadsheet shows the receivables

 4    that were owned by Tecumseh that Infinity serviced; is

 5    that correct?

 6        A.  Yes.

 7        Q.  Let me show you a second spreadsheet.  This

 8    spreadsheet is called

 9    "ESDVerifiedHASOverlapDumpWithIncome."  Is that

10    visible on your screen, sir?

11        A.  Yes.

12        Q.  Now, this one -- and you can see column A

13    which I've highlighted.  Is this the fund field you

14    were --

15        A.  Yes.

16        Q.  Okay.  So the fund -- so HAS -- and this

17    refers to HA Select; is that correct?

18        A.  Yes.

19        Q.  And let me just sort it real quick.  And TIF

20    refers to what?

21        A.  That's a Tecumseh fund.

22        Q.  So the TIF denotes the receivables that were

23    being serviced by Infinity; correct?

24        A.  Yes.

25        Q.  And HAS marks the receivables that Infinity
```



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 173

1  owned but which served as collateral for HA Select's

2  loan; correct?

3      A.  Yes.

4      Q.  All right.  So I'm going to define a term

5  with you that we can use for the next several

6  questions.  I'm going to define the term "Tecumseh

7  receivables" to be the receivables listed on the TIF

8  dump spreadsheet that I showed you first, and that's

9  marked TIF on the overlap spreadsheet.  Does that make

10  sense?

11      A.  Yes.

12      Q.  And if I say "Tecumseh receivables" you'll

13  know what I'm talking about?

14      A.  Yes.

15          (Previously designated Exhibit 1 for

16  identification in Volume I referred to as follows:)

17  BY MR. NAPOLI:

18      Q.  I'm now going to show you the schedule that

19  was part of your deposition or the first day of your

20  deposition, and this, I believe, was Exhibit 1 as

21  marked by Mr. Larsen.  Do you see that, sir?

22      A.  Yes.

23      Q.  I want to direct your attention to page 4 of

24  49 which I have up on your screen.  Do you see items

25  10 and 11 under part 3?



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 174

```
 1      A.   Yes.o

 2      Q.   Okay.  This refers to accounts receivable in
 3  the amount of 5.78 million; is that correct?
 4      A.   Yes.
 5      Q.   It says "face amount" but really, as I
 6  recall, that's cost; is that correct?
 7      A.   That's the purchase cost.
 8      Q.   And remind me what purchase cost is.
 9      A.   It's the amount paid to the medical providers
10  that originally owned those receivables.
11      Q.   It does not -- therefore, it does not include
12  the 20 percent or so that represents Infinity's
13  overhead?
14      A.   That's correct.
15      Q.   Does this 5.78 million include any of what we
16  have defined as the Tecumseh receivables?
17      A.   No, it does not.
18      Q.   Why not?
19      A.   Because they are on a different schedule.
20      Q.   Are the Tecumseh -- go ahead.  I interrupted
21  you, sir.  Go ahead and finish your answer.
22      A.   It's distinguished in the database that who
23  paid for which receivables, and the Tecumseh
24  receivables were not paid by the forum Infinity and,
25  therefore, they don't show up in our accounting.
```



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

                                                                      Page 175

1          Q.  Is that because, in your view, Infinity does
2     not own an interest in those receivables?
3          A.  That's correct.
4               (Previously designated Exhibit 17 for
5     identification in Volume I referred to as follows:)
6     BY MR. NAPOLI:
7          Q.  All right.  I want to move now to what was
8     marked as Exhibit 17 to -- on the first day of your
9     deposition, which is the Tecumseh/Infinity
10    sub-advisory agreement.  This is Exhibit 17, the
11    Tecumseh/Infinity sub-advisory agreement.  Is that
12    visible on your screen, sir?
13         A.  Yes.
14         Q.  I want to direct your attention to exhibit A.
15         A.  Yeah.
16         Q.  Does exhibit A set forth the particular
17    services that Infinity was to provide to Tecumseh?
18         A.  Yes.
19         Q.  All right.  I'd like to go through this.  So
20    in this agreement "sub-advisor" refers to Infinity; is
21    that correct?
22         A.  Yes.
23         Q.  And "company" refers to Tecumseh?
24         A.  Yes.
25         Q.  So under item 1(a), Tecumseh or Infinity is



Oliver Hemmers                                In re: Infinity Capital Management, Inc.

Page 180

1  do to take care of these receivables on Tecumseh's

2  behalf?

3      A.  Yes.

4      Q.  Can you describe to me generally what

5  servicing a medical litigation receivable entails?

6      A.  Yes.

7      Q.  Would you?

8      A.  We go into the detail.  The case status needs

9  to be followed up on every -- usually every 60 days in

10  the beginning until the attorneys identify that they

11  are getting closer to a settlement, and then the

12  follow-up will be every 30 days on the status of the

13  case, and at that point it gets closer to settling.

14         It also includes the settlement amount and

15  the time frame of payment, and then usually within the

16  last, you know, months of the case there might be a

17  weekly follow-up on case status, on settlement status

18  in this case, and payment arrangements.  So it's a

19  process, it's a constant contact and communication on

20  the case with the attorney.

21      Q.  Now, if you have a receivable with a face

22  value of $1,000, you are not necessarily going to

23  collect the full $1,000; correct?

24      A.  Correct.

25      Q.  Why not?



Oliver Hemmers                                      In re: Infinity Capital Management, Inc.

Page 181

```
 1        A.   Because the case is dependent on the outcome

 2   of the settlement either between the attorney and the

 3   insurance company or, if it goes to litigation, there

 4   might be a jury verdict that determines the outcome of

 5   the case.

 6             And in most cases the awarded amounts are not

 7   at the level that would allow a full payment of all

 8   medical costs at face value, and then usually there is

 9   a negotiation, attorneys then negotiate with all the

10   creditors how much they are willing to take in order

11   to settle the case.

12        Q.   And doing that servicing requires some skill

13   and experience; correct?

14        A.   Yes.

15        Q.   And to a certain extent it requires

16   familiarity with the plaintiffs' lawyers?

17        A.   Yes.

18        Q.   What happens if receivables are not serviced?

19        A.   Well, let me broadly assume the attorneys

20   still have to -- that work for the clients, they don't

21   work for us, so they still have to make sure that

22   their clients' case gets settled and, and in order to

23   do so without the input of the lienholder, the voice

24   of the lienholder is not heard in the settlement

25   arrangements.
```



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 182

1            And what can happen is that the payout for

2    those lienholders might come out shorter than in an

3    actual settlement negotiation where you actually talk

4    to the attorney directly and negotiate a more

5    favorable settlement outcome for the lienholder.

6        Q.  If no one is servicing the receivable, how

7    would someone know if a settlement is even being

8    negotiated or finalized?

9        A.  Nobody knows that because the whole process

10   depends on communication.  As I mentioned before, once

11   a settlement is getting closer, you have more frequent

12   communication, almost on a weekly basis, with the

13   law firm on the case status and settlement amounts.

14   And without communicating with any of those law firms,

15   there is no knowledge what's going on.

16       Q.  If -- isn't there a significant risk that you

17   will recover nothing on the receivable if the owner

18   doesn't know about the settlement?

19       A.  Well, it is a general risk that you lose out

20   substantially, but in the end it depends on the

21   law firm, the relationship that the company has with

22   those law firms.  If there is some kind of good

23   relationship, the law firms would not kind of send you

24   nothing; they would just send you what they think is

25   fair; right?



Oliver Hemmers                                In re: Infinity Capital Management, Inc.

Page 183

1           But, you know, in other cases they might not

2    send you anything, they might send it to -- I don't

3    know.  They might just hold the funds or start an

4    interplead.  You know, there are different ways of

5    kind of going about that.

6           But none of those cases would be kind of

7    favorable for anybody who wants to collect these

8    amounts.

9       Q.  Or they could just send the money to the

10   client; right?

11      A.  That's another option.

12      Q.  Because that would make the client happy,

13   that would make the lawyer happy; correct?

14      A.  It would -- the lawyer would tell the client

15   you have to deal with the medical bills now, yes, the

16   money; right.  So that --

17      Q.  Right and --

18      A.  -- can happen.

19      Q.  -- in the situation we find ourselves in

20   right now, though, there is no -- Infinity is out of

21   business; correct?

22      A.  That's correct.

23      Q.  So there is no longer any relationship

24   between the lawyer and the company; correct?

25      A.  That's correct.



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 184

1      Q.  The lawyers don't have any particular reason

2   to want to keep, for example, the bankruptcy trustee

3   happy; correct?

4      A.  I don't know.  In general I don't think so.

5   That's the first time I've been in this situation.  So

6   probably they wouldn't even get far with contacting

7   the trustee, right, I would think.

8      Q.  And if the trustee -- even if they contact

9   the trustee and the trustee tells them I can't talk to

10  you about this, what's the effect?

11      MR. LARSEN:  Objection.  Calls for

12  speculation.

13  BY MR. NAPOLI:

14      Q.  Based on you being in the industry for

15  30 years, what do you understand to be the effect if

16  calls to lawyers are unanswered?

17      A.  They will not consider you for payment in

18  general.  There's always exceptions.  I don't say

19  every lawyer is that way.  But, yeah, I think you

20  would lose a lot in those cases.

21      Q.  Speaking generally, the servicing aspect of

22  these receivables is an important aspect; is that

23  correct?

24      A.  That's one of the biggest things of the

25  receivable funding, is its servicing.



Oliver Hemmers                                                In re: Infinity Capital Management, Inc.

Page 185

1      Q.  The owner's ability to realize on the

2   receivables is impacted by the servicing; is that

3   correct?

4      A.  Yes.

5      Q.  Better servicing will lead to better

6   outcomes?

7      A.  Yes.

8      Q.  Or servicing will lead to worse servicing --

9   I'm sorry.  Worse servicing will lead to worse

10   outcomes; correct?

11      A.  Yes.

12      Q.  And no servicing will lead to even worse

13   outcomes; is that correct?

14      A.  Yes.

15      Q.  Going back to the sub-advisory agreement

16   generally, the purpose of this agreement was for

17   Infinity to assist Tecumseh in purchasing receivables

18   directly from the medical service providers; is that

19   correct?

20      A.  Yes.

21      Q.  The dollars to purchase these receivables

22   were to come from Tecumseh and not Infinity; is that

23   correct?

24      A.  Yes.

25      Q.  Certainly the dollars to pay for this were



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 186

1    not to come from HA Select; is that correct?

2        A.  Yes.

3        Q.  Infinity was not to acquire any interest in

4    the receivable; correct?

5        A.  Yes.

6        Q.  And Infinity was not supposed to be part of

7    the chain of title; correct?

8        A.  Yes.

9        Q.  Infinity was not buying or selling, it was

10   brokering; is that fair?

11       A.  Yes.

12       Q.  So Infinity acquired no interest in the

13   receivable?

14       A.  Yes.

15       Q.  It merely serviced the receivables on

16   Tecumseh's behalf?

17       A.  Yes.

18       Q.  And all of the dollars were to go directly to

19   Tecumseh; is that correct?

20       A.  Yes.

21       Q.  And that's because it was Tecumseh's money,

22   not Infinity's money?

23       A.  Yes.

24       Q.  All right.  On the first day of your

25   deposition, do you recall discussing a purchase of



Oliver Hemmers                              In re: Infinity Capital Management, Inc.

Page 188

1        A.   Yes.

2        Q.   And then what would happen?

3        A.   Just to make sure, before the Tecumseh deal

4    or after?  Is that related to the Tecumseh purchases

5    or HAS purchases?

6        Q.   I'm talking about the purchases that Tecumseh

7    made through the sub-advisory agreement.  If I'm not

8    being clear, let me know.

9        A.   Well, once the receivables were identified,

10   verified through due diligence, the receivables was

11   paid for by Tecumseh.

12       Q.   All right.  Let's talk a little bit about how

13   that worked.

14            So when you, Infinity, had a receivable or a

15   batch of receivables that it believed Tecumseh wanted

16   to purchase, how did it notify Tecumseh?

17       A.   Well, we identified those on a list and said

18   those are the receivables that we identified, here is

19   the necessary document, was the due diligence.

20   Tecumseh verified those through another sub-advisor,

21   and when they said, yeah, all these receivable check

22   out, they have, you know, all the documents needed and

23   everything, then we would issue either check payments

24   for Tecumseh to the providers or ACH or wire payments.

25       Q.   When you say "we would issue," the funds came



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 189

1    out of Tecumseh's Bank of America account; is that

2    correct?

3        A.   Yes, Tecumseh was paying from their account.

4        Q.   And none of the dollars to purchase these

5    receivables came from an Infinity bank account;

6    correct?

7        A.   Correct.

8        Q.   And the funds in the Tecumseh BofA account,

9    those were Tecumseh's funds?

10       A.   Yes.

11       Q.   Yes?

12       A.   Yes.

13       Q.   Infinity had no interest in any of the funds

14   in Tecumseh's BofA account; correct?

15       A.   Yes, correct.

16       Q.   So none of the dollars to purchase these

17   receivables flowed through Infinity's bank account;

18   correct?

19       A.   Yes.

20       Q.   It was a direct payment from Tecumseh to the

21   medical service provider?

22       A.   Yes.

23       Q.   And did this happen monthly?  weekly?  daily?

24       A.   You know, I would say maybe on a weekly basis

25   rather than monthly.



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 195

1    Q.   And to your knowledge, no calls are being

2    made or received on these receivables; is that

3    correct?

4    A.   That's correct.

5    Q.   All right.  Prior to the bankruptcy, going

6    back to the Tecumseh receivables, Infinity did all the

7    collecting and the servicing for those receivables;

8    correct?

9    A.   Correct.

10   Q.   And any dollar -- what happened to the money

11   that was received from the plaintiffs' lawyers?  Where

12   did it go?

13   A.   For the last -- after filing or before?

14   Q.   No, no, sir.  I'm asking you prior to the

15   bankruptcy.

16   A.   Prior.  It was deposited into either the Bank

17   of America account or, if there was overlap receivable

18   that had assets from Tecumseh and HAS, they were

19   deposited into an account at First Savings Bank, and

20   on a monthly basis the Tecumseh portion of those

21   settlement amounts was then sent back to Infinity to

22   be then sent to the Bank of America account for

23   Tecumseh.

24   Q.   So that I understand, can you tell me what an

25   overlap account was?



Oliver Hemmers                                          In re: Infinity Capital Management, Inc.

Page 196

1    A.   When an account had medical treatments for a

2  patient where the medical bills were paid by the HAS

3  fund, one of the draws, and by Tecumseh.  For example,

4  you can have a patient who has maybe 50 different

5  medical bills, so some of those bills were paid by

6  either of those funds, and we had to then determine,

7  okay, how much was the settlement, how much was paid

8  from each fund and how much of the settlement would go

9  to each of those funders.  And we provided reports,

10  detailed reports on that to HAS so they could verify,

11  and we also then provided similar reports to Tecumseh,

12  and we made sure that those -- the settlement check

13  got split up correctly.

14        But we needed to deposit that check

15  somewhere; right?  So -- and since we kind of

16  historically started depositing those settlement

17  checks into the First Savings Bank, we continued to do

18  so for the overlap checks, and then HAS approved the

19  wires to send the overlap funds that are Tecumseh's

20  portion back to us and then we sent it to the Bank of

21  America account.

22    Q.   When you say HAS approved the amount to be

23  sent out of the -- well, actually, let me back up.

24        The First Savings account you are referring

25  to, that's an Infinity account, yes?



Oliver Hemmers                                   In re: Infinity Capital Management, Inc.

Page 197

1      A.  Yes.

2      Q.  And Infinity's intent in putting the overlap

3   money in there was not to exercise any ownership

4   interest over Tecumseh's share of the money; is that

5   correct?

6      A.  That's correct.

7      Q.  It simply put those in the account as a way

8   to -- because it received a single check, yes?

9      A.  Yes.

10      Q.  And in order to divide up the money between

11   the two groups, it had to deposit it somewhere, yes?

12      A.  Yes.

13      Q.  And you elected to deposit it in this First

14   Savings account?

15      A.  Yes.

16      Q.  All right.  You said that HAS approved the

17   split.  How did that happen?  I mean, what was the

18   process?

19      A.  The process was that we provided weekly

20   reports to HAS with the breakdown of everything

21   collected that involves their collateral, and with the

22   overlap it also included details on the receivables

23   that were non-HAS collateral.

24          And that was then agreed upon between HAS and

25   Infinity that those numbers are correct, and the First



Oliver Hemmers                                    In re: Infinity Capital Management, Inc.

Page 198

1    Savings bank account had a requirement that in order

2    to send funds out from there through wire transfer

3    needed the approval from HAS as well.

4           So usually we sent on a monthly basis three

5    wire payments.  One was HAS collateral cost, one was

6    HAS interest, and one was for the other funds that

7    included Tecumseh.

8        Q.  Was all of the communication back and forth

9    between Infinity and HAS regarding splitting the

10   proceeds of the overlap receivables via e-mail?

11       A.  Yes.

12       Q.  Who at Infinity would send those e-mails?

13       A.  I would.

14       Q.  So they would be in your sent box on your

15   e-mail?

16       A.  Yes.

17       Q.  Did -- from a recordkeeping perspective, was

18   it Infinity's practice to keep all of the sent e-mails

19   in each individual's sent e-mail box?

20       A.  Yes.

21       Q.  In other words, there was not a repository

22   of -- a general repository of e-mail communications?

23       A.  That's correct.

24       Q.  So if I want to -- so if I want to see all

25   the e-mails, I've got to look at everybody's e-mail

