Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
          kwyant@shea.law

*Attorneys for HASelect-Medical Receivables
Litigation Finance Fund International SP*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7<br><br>Hearing Date:  OST Requested<br>Hearing Time:  OST Requested |

### HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S MOTION TO ENFORCE COURT ORDERS AND TO COMPEL SURRENDER OF COLLATERAL

HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") to enforcement this Court's prior order approving Chapter 7 Trustee Robert Atkinson's (the "Trustee") abandonment of HASelect's collateral [ECF No. 97] (the "Abandonment Order") and this Court's prior order granting HASelect relief from stay pursuant to 11 U.S.C. § 362[1] [ECF No. 106] (the "Relief Order" and together with the Abandonment Order, the "Orders") against TPL Claim Management, LLC ("TPL") and Tecumseh-Infinity Medical Receivables Fund, LP ("Tecumseh").

In support of this Motion, HASelect respectfully represents as follows:

---

[1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## I.    PRELIMINARY STATEMENT

As of the filing of Debtor Infinity Capital Management, Inc.'s ("Infinity" or "Debtor") Chapter 7 petition on September 14, 2021 (the "Petition Date"), HASelect held a perfected, first-position security interest in substantially all Infinity's personal property, including but not limited to, all accounts, instruments, general intangibles, chattel paper, documents, books and records, etc., and all proceeds thereof (as further defined below, HASelect's "Collateral").[2]

In entering the Abandonment Order and Relief Order, this Court instructed that "[a]ny person that is or may come into possession of any of the Collateral is hereby authorized and directed to turnover such Collateral to HASelect" and retained jurisdiction to enforce this mandate.[3]   TPL, which was jointly engaged by HASelect and Tecumseh to service and collect the disputed accounts at issue in the adversary proceeding pending between HASelect and Tecumseh, is in possession of at least $462,519.37 in proceeds it received in payment of accounts that Tecumseh plainly acknowledges are part of HASelect's undisputed Collateral.  Despite an Agreement to the contrary, Tecumseh continues to assert improper objections to the release of those proceeds to HASelect and is blocking TPL's release of said proceeds to HASelect.

Accordingly, through this Motion, HASelect respectfully requests that the Court order that TPL comply with the Abandonment Order and Relief Order by immediately releasing such funds to HASelect and further order that Tecumseh immediately cease and refrain from interfering in TPL's remittance of proceeds of the Collateral to HASelect.

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    Every federal court, including this Court, has jurisdiction to enforce its own orders. *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that the "Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior order."); *In re United States*

---

[2] "Collateral" is defined in full below.

[3] *See* Abandonment Order [ECF No. 97] and Relief Order [ECF No. 106], ¶ 8.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

*Commer. Mortg. Co.*, Case No. 06-10725, 2007 Bankr. LEXIS 5126 (D. Nev. July 2, 2007) ("Clearly, a court retains jurisdiction to interpret and enforce its own orders.").

3.       Furthermore, the Orders expressly state that the Court retained jurisdiction regarding enforcement of the Orders.[4]

## III.    RELEVANT FACTS

### A.    Case Background

4.       Beginning in February 2019, HASelect made several loans to Infinity that were documented through various loan agreements and promissory notes through which Infinity pledged substantially all of its assets to HASelect as collateral for such loans.[5]

5.       HASelect perfected its security interest in Infinity's assets through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.[6]

6.       On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (the "MLA"), which superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.[7]

7.       Pursuant to Section 4.1 of the MLA, HASelect holds a perfected, first-priority security interest in all of Infinity's assets.[8]  Specifically, Section 4.1 states:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest int eh Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens:  All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession

---

[4] *See* Abandonment Order [ECF No. 97], ¶ 11, and Relief Order [ECF No. 106], ¶ 11.

[5] *See* Declaration of Michael Griffin filed in support of the Motion (the "Griffin Declaration"), ¶ 5.

[6] Griffin Declaration, ¶ 6.  A copy of the UCC-1 filed by HASelect is on file at ECF No. 14.

[7] Griffin Declaration, ¶ 7.  A copy of the MLA is on file at ECF No. 14.

[8] Griffin Declaration, ¶ 8.

(including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").

8.      Pursuant to the MLA, Infinity agreed to use the loan proceeds it received from HASelect to purchase accounts receivable from medical providers.[9]

9.      Such accounts receivable generally arose from medical treatment or prescription medication provided to individuals who were injured in accidents and had asserted personal injury claims against third parties.  These accounts are typically paid at discount at the time the personal injury claims are settled.[10]

10.      As of the Petition Date, Infinity owed indebtedness in excess of $16 million to HASelect pursuant to the terms of the MLA.[11]

11.      On September 22, 2021, HASelect and the Trustee filed a joint motion through which the Trustee requested the Court approve the abandonment of the Collateral to HASelect.[12]  On October 15, 2021, the Court entered the Abandonment Order approving the Trustee's abandonment of the Collateral to HASelect.[13]

12.      Among other things, the Abandonment Order instructs that any person who "is or may come into possession of any of the Collateral is hereby authorized and directed to turn over such Collateral to HASelect."[14]

13.      On September 22, 2021, HASelect also filed a motion for relief from automatic stay, requesting that the stay be terminated to allow HASelect to take possession and control of the

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

---

[9] *See* MLA, § 3.2; Griffin Declaration, ¶ 9.

[10] Griffin Declaration, ¶ 9.

[11] *See* Claim No. 8.

[12] ECF No. 12.

[13] ECF No. 97.

[14] *Id.* at ¶ 8.

Collateral.[15]  On October 21, 2021, the Cout entered the Relief Order terminating the automatic stay as requested by HASelect.[16]

14.    Similar to the Abandonment Order, the Relief Order instructs that any person who "is or may come into possession of any of the Collateral is hereby authorized and directed to turn over such Collateral to HASelect."[17]

15.    In entering the Orders, the Court retained jurisdiction regarding matters pertaining to the enforcement of the Orders.[18]

16.    HASelect subsequently engaged a third partyto service and collect the accounts included in the Collateral whose efforts are ongoing.

**B.    The Disputed Accounts and the Overlap Accounts**

17.    Shortly after the Petition Date, a dispute arose between HASelect and Tecumseh regarding their respective claims to certain accounts receivable acquired by Infinity from various third parties (the "Disputed Accounts").[19]  HASelect generally claims that the Disputed Accounts are part of its Collateral and are subject to its perfected security interest under the MLA.  Tecumseh, in turn, generally claims to have purchased the Disputed Accounts free and clear of HASelect's perfected security interest.  The Disputed Accounts are identified at ECF Nos. 201-1 and 201-2.

18.    The personal injury claimants obligated as to payment of the Disputed Accounts often received multiple medical treatments from multiple medical providers over a period of several months.  Accordingly, Infinity often purchased accounts relating to treatments provided to a single personal injury claimant from multiple medical providers in separate transactions occurring over several months.[20]

---

[15] *See* ECF No. 17.

[16] *See* ECF No. 106.

[17] *Id.* at ¶ 8.

[18] *See* Abandonment Order [ECF No. 97] and Relief Order [ECF No. 106], ¶ 11.

[19] The Disputed Receivables are alternatively referenced in certain documents filed by Tecumseh in the Bankruptcy Case and this Adversary Proceeding as the "Tecumseh Receivables."

[20] Griffin Declaration, ¶ 10.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

19.     The Disputed Accounts include a subset of accounts receivable that consists of accounts Tecumseh claims to have purchased relating to specific dates of treatment for certain personal injury claimants for whom Infinity also purchased accounts relating to other dates of treatment that are indisputably included in the Collateral and were abandoned to HASelect pursuant to the Orders (collectively, the "Overlap Accounts").[21]

20.     For example, Exhibit 3 attached hereto shows certain accounts purchased by Infinity relating to multiple dates of treatment for four separate personal injury claimants (identified by PatientID). PatientID 1206 includes 11 dates of treatment purchased by Infinity that are included in the Collateral and a single date of treatment that Tecumseh claims to have purchased that is included within the Disputed Accounts. Likewise, PatientID 1960 includes 52 dates of treatment purchased by Infinity that are included in the Collateral and 10 dates of treatment that Tecumseh claims to have purchased that are included in the Disputed Accounts.

21.     Tecumseh's claimed portion of Overlap Accounts, including those accounts identified in yellow in Exhibit 3, are identified at ECF No. 201-2 and were specifically carved out of the Orders. However, the remaining Overlap Accounts that are not identified at ECF No. 201-2 were abandoned to HASelect pursuant to the Orders, are included in the Collateral, and are currently being serviced and collected by HASelect's servicer.

## C.     The TPL Servicing Agreement

22.     On October 19, 2021, HASelect filed an adversary complaint[22] against Tecumseh through which it seeks, among other things, a declaratory judgment determining that the Disputed Accounts are subject to HASelect's perfected security interest under the MLA and that any interest Tecumseh might hold in the Disputed Accounts is subordinate and subject to HASelect's perfected security interest.

23.     On December 6, 2021, the Trustee filed a motion to sell the bankruptcy estate's interest in the Disputed Accounts that included a proposed stalking horse bid from HASelect in the amount of

---

[21] Griffin Declaration, ¶ 11.

[22] Adversary Case No. 21-01167 (the "Adversary Case").

$100,000.[23]  On January 21, 2022, the Court entered an order granting the Trustee's request to sell the bankruptcy estate's interest in the Disputed Accounts and scheduling an auction to take place on February 8, 2022.[24]  On February 11, 2022, the Court entered an order approving the sale of the bankruptcy estate's interest in the Disputed Accounts to HASelect for a purchase price of $100,000.[25]

24.    In light of the then-pending sale of the bankruptcy estate's interests in the Disputed Accounts, and to provide for the ongoing servicing and collection of the Disputed Accounts during the adjudication of the Adversary Proceeding, HASelect and Tecumseh (with the consent and approval of the Trustee) entered into a Servicing Agreement and an Escrow Agreement on or about January 31, 2022 under which they jointly engaged TPL Claims Management, LLC ("TPL") to service and collect the Disputed Accounts and to hold the proceeds of the Disputed Accounts in escrow pending the final resolution of the Adversary Proceeding.[26]

25.    Under the Servicing Agreement, HASelect and Tecumseh expressly authorized TPL, in its "sole and absolute discretion and judgment" to enforce and collect the Disputed Accounts "including, without limitation, the exclusive and irrevocable right to negotiate and compromise, if necessary, the amount of final payment in full satisfaction" thereof.[27]

26.    In negotiating and entering into the Servicing Agreement, the parties were mindful of the likelihood that payments intended to satisfy accounts included in the Collateral, including HASelect's undisputed portion of the Overlap Accounts, might inadvertently be sent to TPL as a result of its servicing and collection efforts relating to the Disputed Accounts.  As such, the Servicing Agreement expressly states, "[i]n the event [TPL] receives any payment intended to satisfy any account receivable not included within the [Disputed Accounts] for which HASelect is entitled to payment, [TPL], within five (5) days following receipt thereof, shall notify HASelect of the receipt of such payment and shall, at HASelect's election, (i) promptly deliver such payment to HASelect or (ii)

---

[23] ECF No. 145.

[24] ECF No. 175.

[25] ECF No. 184.

[26] Griffin Declaration, ¶ 13.  A copy of the Servicing Agreement is attached hereto as Exhibit 1.

[27] Servicing Agreement, § 4(c).

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

promptly return such payment to the sender with instructions to contact HASelect directly regarding settlement of the relevant account receivable."[28]

### D. The HAS Payments Being Improperly Withheld from HASelect in Violation of the Orders

27.    In or around April 2022, TPL notified both HASelect and Tecumseh that it had received six (6) payments intended to satisfy accounts included within HASelect's Collateral (the "HAS Payments").[29]  Two (2) of the HAS Payments [PatientID 276 and 1571] relate to accounts that are strictly HASelect's Collateral in which Tecumseh claims no interest.  The remaining four (4) HAS Payments [PatientID 1206, 1960, 2624, and 2963] relate to Overlap Accounts that include dates of treatment that are included in the Collateral as well as other dates of treatment that Tecumseh claims to have purchased that are included in the Disputed Accounts.[30]

28.    As is common in collecting accounts relating to personal injury claims, the amounts of each of the six (6) HAS Payments received by TPL were less than the gross face amount of the corresponding accounts.  However, the amounts received were within the typical range of discounted payment that is generally acceptable to HASelect and commonly approved by TPL in its "sole and absolute discretion and judgment"[31] with respect to the Disputed Accounts.[32]

29.    In notifying HASelect and Tecumseh of its receipt of the HAS Payments, TLP proposed to send the full amount of the two (2) HAS Payments that relate strictly to HASelect's collateral to HASelect and to split the four (4) HAS Payments relating to Overlap Accounts on a pro rata basis according to the gross face amounts billed for the dates of service Tecumseh claims to have purchased as compared to the gross face amounts billed for the dates of service that are indisputably included in HASelect's Collateral.  TPL's representative later describe this method as "the appropriate

---

[28] Griffin Declaration, ¶ 14.  Servicing Agreement, § 5(a).

[29] The HAS Payments are identified by PatientID in the May 20, 2022 email from Michael Stone that is attached hereto as Exhibit 2.

[30] Griffin Declaration, ¶ 16.  The specific Overlap Accounts and dates of service to which these four (4) HAS Payments relate are identified in Exhibit 3 attached hereto.

[31] See Servicing Agreement, § 4(c).

[32] Griffin Declaration, ¶ 17. On average, the HAS Payments were approximately 82% of the gross face value of the corresponding accounts.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

approach."[33] This proposed split would result in the release of $462,519.37 to HASelect as proceeds of its Collateral and the deposit of $40,880.63 in proceeds of Disputed Accounts into escrow to be held by TPL pending the resolution of the Adversary Proceeding.[34]

30.     HASelect approved the split proposed by TPL and requested that TPL immediately forward its portion of the HAS Payments to HASelect's servicer.[35]

31.     Notwithstanding the language in the Servicing Agreement granting TPL "sole and absolute discretion and judgment" and "the exclusive and irrevocable right to negotiate and compromise" as to amount of final payment of the Dispute Accounts[36], Tecumseh instructed TPL that it could not release the HAS Payments to HASelect as proposed until Tecumseh agreed to a formula for calculating how payments relating to Overlap Accounts would be split between HASelect's Collateral and the Disputed Accounts.[37]

32.     HASelect, either directly or indirectly through its servicer, has made several requests to TPL that the HAS Payments be released as proposed by TPL and approved by HASelect. Tecumseh, however, continues to object to the release of the HAS Payments.[38]  As a result of Tecumseh's objections, TPL is unwilling to release any part of the HAS Payments to HASelect.[39]

33.     Both this Court's Orders and the Servicing Agreement explicitly require that the HAS Payments, which are HASelect's Collateral, be turned over to HASelect.

34.     Through this Motion HASelect request that the Court (i) order TPL to comply with the Orders and its obligations under the Servicing Agreement by immediately releasing HAS Payments totaling $462,519.37 to HASelect and (ii) order that Tecumseh immediately cease and refrain from interfering in TPL's remittance to HASelect of proceeds of HASelect's Collateral.

---

[33] See Exhibit 2 attached hereto.

[34] Griffin Declaration, ¶ 18.  The calculation of this proposed split is explained in the May 20, 2022 email from Michael Stone that is attached hereto as Exhibit 2.

[35] Griffin Declaration, ¶ 19.

[36] See Servicing Agreement, § 4(c).

[37] Griffin Declaration, ¶ 19.

[38] See Exhibit 2 attached hereto.

[39] Griffin Declaration, ¶ 20.

## IV.   ARGUMENT

### A.   TPL and Tecumseh Are in Violation of this Court's Orders Requiring Surrender of Collateral to HASelect.

35.   Every federal court, including this Court, has jurisdiction to enforce its own orders. *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that the "Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior order."); *In re United States Commer. Mortg. Co.*, Case No. 06-10725, 2007 Bankr. LEXIS 5126 (D. Nev. July 2, 2007) ("Clearly, a court retains jurisdiction to interpret and enforce its own orders.").

36.   This Court's Orders expressly state that any person who "is or may come into possession of any of the Collateral is hereby authorized and directed to turn over such Collateral to HASelect."[40]  Both TPL and Tecumseh are subject to these Orders.

37.   There is absolutely no dispute that accounts and dates of service to which the HAS Payments relate, excluding only those dates of service that Tecumseh claims to have purchased (as identified in yellow in Exhibit 3), are part of HASelect's Collateral.  As such, the HAS Payments that correspond to such Collateral must be turned over to HASelect pursuant to both the Abandonment Order and the Relief Order.  Moreover, the parties' own Servicing Agreement expressly requires that such funds be promptly released to HASelect.[41]

38.   As set forth above, the Servicing Agreement grants TPL "sole and absolute discretion and judgment" and "the exclusive and irrevocable right to negotiate and compromise" as to amount of final payment of the Dispute Accounts.[42]  As expressly authorized under the Servicing Agreement, TPL accepted discounted payment of the dates of service that Tecumseh Claims to have purchased based on the gross face value of the same.[43]  Tecumseh has no right (under the Servicing Agreement or otherwise) to second guess TPL's decision.

---

[40] *See* Abandonment Order [ECF No. 97] and Relief Order [ECF No. 106], ¶ 8.

[41] *See* Servicing Agreement, § 5(a).

[42] *See* Servicing Agreement, § 4(c).

[43] TPL has no corresponding authority to accept discounted payment of accounts included in HASelect's collateral. However, as to the accounts to which the HAS Payments relate, HASelect has approved the amounts of the discounted HAS Payments received by TPL.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

39.    There is no good faith basis for Tecumseh to interfere in TPL's remittance to HASelect of payments received in satisfaction of accounts included in the Collateral regardless of whether such payments relate to Overlap Accounts.  TPL has determined in its "sole and absolute discretion and judgment" that such payments should be applied to Disputed Accounts on a pro rata basis according to gross face value, which results in the Disputed Accounts receiving the same percentage of gross face value (per PatientID) as the accounts included in HASelect's collateral.[44]

**B.    Tecumseh Should Be Held in Contempt and Ordered to Pay HASelect's Attorney Fees and Costs Incurred in Bringing this Motion.**

40.    If not for Tecumseh's unreasonable interference, HASelect believes TPL would willingly comply with its obligations under the Abandonment Order and Relief Order to turn over the HAS Payments to HASelect.  Because Tecumseh is directly and solely responsible for the HAS Payments being withheld from HASelect in violation of the Abandonment Order and Relief Order, the Court should hold HASelect in contempt and order that it pay HASelect's reasonable attorney fees and costs incurred in bringing this Motion.

41.    Bankruptcy courts undoubtedly have the power to impose civil contempt. *In re Smith*, 462 B.R. 783, 791-92 (Bankr. D. Nev. 2011) (*citing Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284–85 (9th Cir. 1996); *Stasz v. Gonzalez (In re Stasz)*, 387 B.R. 271, 276 (B.A.P. 9th Cir. 2008); 11 U.S.C. § 105(a)). This civil contempt authority allows bankruptcy courts to remedy a violation of a specific order. *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th Cir. 2003). Additionally, Bankruptcy Rule 9020 provides that Rule 9014, which pertains to contested matters, governs a motion for an order of contempt and clearly contemplates a bankruptcy court's authority to issue contempt orders. *See* Fed. R. Bankr. P. 9014, 9020, and comments thereto.

42.    To issue an order of contempt, a court must determine: (1) that the party violated a court order; (2) beyond substantial compliance; (3) not based on a good faith and reasonable interpretation of the order; (4) by clear and convincing evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litig. Go-Video, Inc.*, 10 F.3d 693, 695 (9th Cir. 1993); *see also FTC v.*

---

[44] *See* Exhibit 2 attached hereto.

*Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (stating that "[t]he standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.").

43.    Here, the Abandonment Order and Relief Order clearly mandate that any person in possession of any of the Collateral turn the same over to HASelect.  It is undisputed that the portions of the HAS Payments that TPL proposed to release to HASelect in compliance with the Orders (and the parties' Servicing Agreement) are included in the Collateral.  Moreover, Tecumseh is directly and solely responsible for the HAS Payments being withheld from HASelect in violation of the Abandonment Order and Relief Order.  HASelect has attempted for several weeks to resolve Tecumseh's objections without Court intervention.  As there is no reasonable or sensible basis for Tecumseh to continue to object to the release of the HAS Payments to HASelect, Tecumseh should be held in contempt and ordered to pay HASelect's reasonable attorney fees and costs.

## V.    CONCLUSION

For the reasons stated above, the HASelect respectfully requests that the Court (i) order TPL to comply with the Abandonment Order, Relief Order, and Servicing Agreement by immediately releasing the HAS Payments to HASelect in the amounts proposed by TPL and approved by HAS, (ii) order that Tecumseh immediately cease and refrain from interfering in TPL's remittance of proceeds of the Collateral to HASelect, and (iii) hold HASelect in contempt and order that it pay HASelect's reasonable attorney fees and costs incurred in bringing this Motion.

Dated this 23rd day of May 2022.

SHEA LARSEN

/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1

## CERTIFICATE OF SERVICE

2   1.   On May 23, 2022, I served the following document(s): **CREDITOR HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S MOTION TO ENFORCE COURT ORDERS [ECF NOS. 97 AND 106] FOR TURNOVER OF COLLATERAL POSSESSED BY TPL CLAIMS MANAGEMENT, LLC AND BEING INTERFERED WITH BY TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP ON ORDER SHORTENING TIME**

6   2.   I served the above document(s) by the following means to the persons as listed below:

7   ☒   a.   ECF System:

8   ROBERT E. ATKINSON
Robert@ch7.vegas, TrusteeECF@ch7.vegas;ecf.alert+atkinson@titlexi.com

9

10  CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

11  GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

12  ggordon@gtg.legal, bknotices@gtg.legal

13  GABRIELLE A. HAMM on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

14  ghamm@Gtg.legal, bknotices@gtg.legal

15  MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

16  michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerm

17  an.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

18  ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

19  ariel.stern@akerman.com, akermanlas@akerman.com

20  BRADFORD IRELAN on behalf of HEALTHPLUS IMAGING OF TEXAS, LLC
birelan@imtexaslaw.com,

21  jstephens@imtexaslaw.com;dhall@imtexaslaw.com;ynguyen@imtexaslaw.com

22

23  DAVID MINCIN on behalf of HEALTHPLUS IMAGING OF TEXAS, LLC
dmincin@mincinlaw.com, cburke@mincinlaw.com

24

25  TRENT L. RICHARDS on behalf of THE INJURY SPECIALISTS
trichards@sagebrushlawyers.com, hdaniels@sagebrushlawyers.com

26  U.S. TRUSTEE - LV - 7
USTPRegion17.LV.ECF@usdoj.gov

27

28  MATTHEW C. ZIRZOW on behalf of Debtor INFINITY CAPITAL MANAGEMENT, INC. mzirzow@lzlawnv.com, carey@lzlawnv.com; trish@lzlawnv.com;

*(left margin)* **SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

jennifer@lzlawnv.com; zirzow.matthewc.r99681@notify.bestcase.com

U.S. TRUSTEE - LV - 7
USTPRegion17.LV.ECF@usdoj.gov

☐      b.      United States mail, postage fully prepaid:

☐      c.      Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐      For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐      For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐      d.      By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐      e.      By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐      f.      By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 23, 2022.

By: /s/ *Bart K. Larsen, Esq,*

# EXHIBIT 1

## SERVICING AGREEMENT

This Servicing Agreement (the "**Agreement**") is entered into as of January 31, 2022 (the "**Effective Date**"), by and among Tecumseh-Infinity Medical Receivables Fund, LP, a Delaware Limited Partnership ("**Tecumseh**"), and HASelect-Medical Receivables Litigation Finance Fund International SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company ("**HASelect**"); each, a "**Holder**" and, together, "**Holders**"), and TPL Claims Management, LLC, a Delaware limited liability company ("**Administrator**"). Administrator and Holders are sometimes individually referred to as a "**Party**" and collectively referred to as the "**Parties**."

The purpose of this Agreement is to set forth the terms and conditions on which Administrator shall provide the Designated Services (as defined below) on an exclusive basis to Holders and assist Holders in the servicing of the portfolio of medical lien receivables described on Schedule 3.1(a) attached hereto (collectively, the "**Portfolio**").

### RECITALS

A.  The Holders are currently parties to an adversary proceeding styled *HASelect-Medical Receivables Litigation Finance Fund International SP v. Tecumseh-Infinity Medical Receivables Fund, LP v. HASelect-Medical Receivables Litigation Finance Fund International SP and Robert Atkinson, Trustee*; Adversary Case No. 21-01167-abl (the "**Adversary**") pending in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"). The Adversary arises in connection with the Chapter 7 bankruptcy of Infinity Capital Management, Inc. ("**Debtor**").

B.  In the Adversary, HASelect seeks, *inter alia*, a declaration that the Portfolio is subject to its security interest in the Debtor's assets and related relief. Tecumseh opposes HASelect's action and seeks, *inter alia*, declarations that the Portfolio is not subject to HASelect's lien and that the Portfolio is not and never has been the Debtor's property. The Chapter 7 Trustee opposes the relief sought by Tecumseh, seeks to avoid any interest Tecumseh holds in the Portfolio, and maintains that the Portfolio is property of the Debtor's bankruptcy estate.

C.  To provide for the servicing of the Portfolio during the pendency of the Adversary, the Parties have entered into an Escrow Agreement of even date herewith (the "**Escrow Agreement**") and to escrow the Portfolio along with any proceeds of the Portfolio pending agreement of the Parties or a final non-appealable order of a court of competent jurisdiction.

D.  Holders desire to engage Administrator to provide the servicing and collection functions described on Schedule I attached hereto with respect to the Portfolio (collectively, the "**Designated Services**") in accordance with the terms hereof.

NOW THEREFORE, in consideration of the foregoing, the provisions contained herein and the mutual benefits to be derived herefrom, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1

1.    **RECITALS.**

    1.1    The recitals are hereby incorporated by reference as fully set forth herein.

2.    **TERM.**

    2.1    <u>Term</u>. Unless earlier terminated in accordance with Section 2.2 hereof, the term of this Agreement shall commence on the Effective Date and continue until the three (3) year anniversary of the Effective Date (the "**Term**"); provided, however, that upon the expiration of such initial scheduled Term, the Term shall be extended for successive periods of one (1) year each (each, a "**Renewal Term**").

    2.2    <u>Termination</u>. This Agreement may be terminated prior to the expiration of the Term (including any Renewal Term) as follows:

        (a)    At any time, upon unanimous written agreement of the Parties;

        (b)    At any time, at the election of Holders (upon unanimous written agreement of the Holders), upon not less than thirty (30) days prior written notice by Holders to Administrator, upon the occurrence and during the continuance of an Event Default (as hereafter defined) by Administrator;

        (c)    At any time, at the election of a Holder, upon not less than ten (10) days prior written notice by such Holder to all other Parties, upon the occurrence and during the continuation of a material breach of Section 7.2 by Administrator; provided, however, that upon the occurrence of a material and either intentional or grossly negligent breach of Section 7.2(b) or a material and intentional breach of Section 7.2(c), such ten (10) day notice and cure period shall not apply;

        (d)    At any time, at the election of Administrator, upon not less than thirty (30) days prior written notice by Administrator to Holders, upon the occurrence and during the continuance of an Event of Default by a Holder; and

        (e)    At any time (i) at the election of Administrator, upon not less than ninety (90) days prior written notice to Holders, or (ii) at the election of Holders (by unanimous written agreement of Holders), upon not less than ninety (90) prior written notice to Administrator and subject to payment of the Early Termination Fee, if applicable (the termination rights described in this Section 2.2(e) being referred to herein as the "**Not-for-Cause Termination**").

As used in this Section 2.2, the terms "Event of Default" and "Early Termination Fee" shall have the following meanings:

"Early Termination Fee" means, with respect to any Not-for-Cause Termination by Holders hereunder prior to the two (2) year anniversary of the Effective Date, ███████████████████████████.

"Event of Default" means, with respect to any Party, the occurrence of any of the following: (i) fraud or willful misconduct involving the operations of such Party, (ii) the occurrence of any material breach or default by such Party hereunder, and the continuance thereof for a period of thirty (30) days following receipt of notice thereof from the non-breaching Party; provided, however, that as to any such breach or default for which the breaching Party is diligently pursing the cure thereof (and which cannot be cured solely by the payment of money), such cure period shall be extended for an additional thirty (30) day period following such notice, (iii) any representation or warranty made by such Party in this Agreement was incorrect in any material respect when made, (iv) such Party shall make an assignment for the benefit of creditors; such Party shall apply for or consent to the appointment of any receiver, trustee or similar officer for it or for all or any substantial part of its property; or such receiver, trustee or similar officer shall be appointed without the application or consent of such Party; or such Party shall institute (by petition, application, answer, consent or otherwise) any insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application or otherwise) against such Party; or any judgment, writ, warrant of attachment or execution or similar process shall be issued or levied against a substantial part of the property of such Party; or a petition naming such Party as debtor is filed under the United States Bankruptcy Code; or (v) such Party shall (A) liquidate, (B) dissolve, or (C) terminate or suspend its business operations or otherwise fail to operate its business in the ordinary course.

2.3     Effect of Termination. As of the effective date of termination of this Agreement (the "**Termination Date**"), no Party shall have any further rights or obligations hereunder, except (a) for rights and obligations accruing prior to the Termination Date (including, without limitation, all rights and obligations of the Parties with respect to payments due to Administrator pursuant to Section 5 for Designated Services provided prior to the effective date of such termination and, as applicable the, the payment of the Early Termination Fee), (b) for rights and obligations arising as a result of any breach of this Agreement by any Party, or (c) the provisions of Sections 6 through 20 hereof, each of which shall expressly survive the termination of this Agreement.

2.4     Return of Records and Final Reporting.  Within fifteen (15) days after the Termination Date, Administrator shall deliver to Holders copies of all documents, including all electronic records and communications, in Administrator's possession relating to the Portfolio.  Within thirty (30) days after the Termination Date, Administrator shall deliver to Holders a final accounting of all amounts collected and expenses incurred by Administrator in reference to the Portfolio and a final report as to the status of any receivables within the Portfolio that remain uncollected

3

at such time.  After the Termination Date, Administrator shall promptly deliver to Holders any payment received in connection with the Portfolio without deduction or offset.

2.5    Resolution of the Adversary.  Upon the entry of a final judgment in the Adversary or lawsuit covering the same subject-matter determining that a Holder holds superior rights, interest, or title with respect to the Portfolio or any portion thereof (a "**Prevailing Holder**"), this Agreement shall automatically be amended to allow such Prevailing Holder to act unilaterally under this Agreement with respect to the Portfolio or the portion thereof that is subject to such final judgment in instances in which joint action by the Holders would otherwise be required.  This Agreement, however, may not be terminated by the Prevailing Holder during the pendency of any appeal from such final judgment unless and until such time as the Holders have engaged a replacement escrow agent to serve during the pendency of any such appeal and have entered into a new escrow agreement on substantially the same terms as the existing Escrow Agreement.  If Holders are unable to reach an agreement as to the engagement of a replacement servicer or replacement escrow agent within fifteen (15) days following delivery of the termination notice, the Prevailing Holder may unilaterally apply to the Bankruptcy Court for approval to engage a replacement servicer or replacement escrow agent, as appropriate, and such engagement shall become effective upon the entry of an order by the Bankruptcy Court approving the engagement, which shall be binding on all Holders.  In addition, all Holders shall continue to receive information regarding the Portfolio in the manner set forth herein until a final, non-appealable order is entered resolving the dispute in Adversary, lawsuit covering the same subject-matter, or any appeals therefrom.

3.    **REPRESENTATIONS AND WARRANTIES.**

3.1    Each Holder represents and warrants to Administrator as follows:

(a)    As of the Effective Date, the receivables comprising the Portfolio are set forth on Schedule 3.1(a) hereto.

(b)    All receivables included in the Portfolio exist free and clear of any encumbrance, security interest, lien or claim of any other individual or entity, except for the respective rights and interests of Holders and Debtor, if any, subject to the Escrow Agreement, or as may otherwise be disclosed to and approved by Administrator in a writing signed by Administrator.

(c)    Each Holder is entering into this Agreement after having made an independent investigation of Administrator and its services and all other facts that Holders deem relevant.

(d)    Except as provided in this Agreement, no Holder has relied upon any representation made by an officer, manager, member, agent, representative,

4

independent contractor, servant or employee of Administrator, including, without limitation, the amount of payment in respect of any receivables included in the Portfolio which a Holder might realize from this Agreement.

(e)     Each Holder understands and agrees that the Designated Services contemplated under this Agreement involve a high degree of financial risk; that this Agreement does not constitute Administrator's assurance, representation or warranty of any kind whatsoever, express or implied, as to successful results or any guarantee that Administrator will be able to collect any specific amount on any receivable, and further acknowledges and agrees that such payments are contingent on many factors that are not within Administrator's control, including, without limitation, the result of any lawsuit associated with any receivable.

(f)     Each Holder has the full right and authority to enter into this Agreement and perform its obligations hereunder, and no approvals or consents of any other person, firm, entity, corporation or governmental entity are necessary in connection therewith.

(g)     Except as described in the Recitals hereto, there are currently no pending or threatened lawsuits or other legal proceedings, or administrative actions, by or before any governmental body, or outstanding judgments, against any Holder which may impact Administrator's collection of the receivables as contemplated herein.

(h)     All receivables in the Portfolio have been originated or otherwise acquired by Holder in compliance with all applicable laws. Holder is currently in compliance with all applicable laws. During the term of this Agreement, Holder will operate its business in compliance with all applicable laws.

3.2     Administrator represents and warrants to each Holder as follows:

(a)     Administrator has no prior business relationship with any Holder or Restricted Party (as defined in Section 9 below), is not a party to any contract, agreement, or other arrangement with any Holder or Restricted Party, and owes no duty or obligation to any Holder or Restricted Party except for the performance of the Designated Services as set forth herein and the obligations under the Escrow Agreement.

## 4.    PERFORMANCE OF DESIGNATED SERVICES.

(a)     Each Holder appoints and engages Administrator as its agent for the performance of Designated Services with respect to the Portfolio, with the full power and authority to perform such Designated Services for and on behalf of each Holder.

5

(b)     Administrator shall perform the Designated Services in a commercially reasonable manner and in accordance with applicable law and its customary and usual procedures and consistent with the standards and procedures employed by Administrator in the servicing and collection of medical lien receivables similar to the Portfolio held by Administrator or its affiliates for its own account.

(c)     Without limitation of the description of the Designated Services set forth on Schedule I attached hereto, Administrator is hereby expressly authorized to take any of the following actions, in Administrator's sole and absolute discretion and judgment: (i) administer any and all activities related to enforcement of any receivable including, without limitation, the exclusive and irrevocable right to negotiate and compromise, if necessary, the amount of final payment in full satisfaction of a receivable; (ii) hire or fire any and all personnel, including, but not limited to, management personnel employed by Administrator to handle the day to day operations of its business; and (iii) engage in the Designated Services in its own name on behalf of the Holders or in the name of both Holders, if appropriate.  In furtherance of the foregoing, each Holder shall furnish, or cause to be furnished, to Administrator a power of attorney in substantially the form of Exhibit A attached hereto, and upon request of Administrator shall execute and deliver such other documents as may be necessary or appropriate (in Administrator's reasonable discretion) to enable Administrator to perform the Designated Services in accordance with the terms hereof. Administrator shall not engage any outside accountant, attorney, advisor, or other third-party professional to perform any portion of the Designated Services at Holders' expense without the prior unanimous written approval of Holders.

(d)     Administrator will keep accurate books of record and account for itself pertaining to the Portfolio and the performance of the Designated Services with respect thereto and, upon request of and reasonable notice by either Holder, will permit any officer, employee, auditor, attorney or accountant for such Holder, at such Holder's sole cost and expense, to audit, review, make extracts from or copy any and all books and records (including copies of email communications with third-parties relating to the servicing and collection of the Portfolio) of Administrator relating to the Portfolio and the performance of the Designated Services, at all reasonable times during ordinary business hours (but in no event more frequently than four times per calendar year during the first twenty-four (24) months of the Term or twice per calendar year thereafter, unless an Event of Default has occurred and is continuing), and to discuss the affairs of Administrator relating to the Portfolio and the performance of the Designated Services, with any of its members, employees or agents and to conduct a review and audit of such books and records.

5.     **PAYMENT TERMS.**

(a)     In consideration for the Designated Services provided by Administrator under this Agreement, Holders, on a joint and several basis, agree to pay Administrator a monthly servicing fee (the "**Servicing Fee**") equal to the Applicable Percentage (as

hereafter defined) of gross cash collections with respect to the Portfolio during the applicable month. Provided, that for the first twenty-four (24) months, Administrator shall be entitled to receive a minimum fee payable, to the extent applicable, as described below. As used in this Section 5(a), the term **"Applicable Percentage"** shall mean



If the Servicing Fee payable to date in the aggregate is less than the aggregate minimum fee schedule below (**"Minimum Fee"**) calculated after each 3 consecutive calendar month period (**"Contract Quarter"**) during the first twenty-four (24) months of the Term, Administrator will invoice Holders for the excess amount of the aggregate Minimum Fee accrued through the end of the applicable Contract Quarter over the aggregate Servicing Fee payable to Administrator through such Contract Quarter (the **"Excess Fee"**) and shall offset such Excess Fee against amounts collected in respect of the Portfolio as hereinafter provided.

| Servicing Months-Contract Quarters | Aggregate Minimum Fee |
|---|---|
| 3-First Contract Quarter | ███ |
| 6-Second Contract Quarter | ███ |
| 9-Third Contract Quarter | ███ |
| 12-Fourth Contract Quarter | ███ |
| 15-Fifth Contract Quarter | ███ |
| 18-Sixth Contract Quarter | ███ |
| 21-Seventh Contract Quarter | ███ |
| 24-Eighth/Last Contract Quarter | ███ |

In the event that, notwithstanding the terms of this Agreement, if any Holder shall at any time receive any payment of any amount in respect of the Portfolio directly, such Holder shall provide notice thereof to both the Administrator and other Holder (including an identification of the related receivable and the amount and date of payment) within five (5) days following receipt thereof, and shall deliver such payment to Administrator for handling in accordance with this Agreement. The Servicing Fee shall be payable with respect to all such amounts.    In the event Administrator receives any payment intended to satisfy any account receivable not included within the Portfolio for which HASelect is entitled to payment, Administrator, within five (5) days following receipt thereof, shall notify HASelect of the receipt of such payment and shall, at HASelect's election, (i) promptly deliver such payment to HASelect or (ii) promptly return such payment to the sender with instructions to contact HASelect directly regarding settlement of the relevant account receivable. No Servicing Fee shall apply to any such payment. In addition to the Servicing Fee, to the extent Administrator incurs or reasonably

7

expects to incur any out-of-pocket costs and expenses in connection with the collection or enforcement of any portion of the Portfolio (including, without limitation, reasonable attorneys' fees associated with any enforcement action but excluding typical overhead expenses and other expenses associated with Administrator's regular business operations) ("**Collection Costs**"), Holders, on a joint and several basis, will reimburse such amounts to Administrator or, at Administrator's election, Administrator may require Holders to pay such amounts as a condition to Administrator performing the related Designated Services to which such Collection Costs are attributable.   For avoidance of doubt, Administrator shall not incur any Collection Costs without the approval of both Holders as provided in Section 4(c), above.

(b)      Administrator will maintain a segregated deposit account for the receipt and subsequent remittance of all collections received in respect of the Portfolio (the "**Collections Account**"), and will deposit, or cause to be deposited, all amounts collected in respect of the Portfolio into the Collections Account promptly following Administrator's receipt thereof.  In no event shall any of the funds on deposit in the Collections Account be considered part of the general funds of Administrator or comingled with any funds not constituting collections in respect of the Portfolio.  Administrator shall not disburse, release, or otherwise transfer any funds from the Collections Account except as expressly authorized under this Agreement.  Administrator will have sole access to the Collections Account for cash management purposes; provided, that Administrator will use commercially reasonable efforts to provide Holders with "view-only" access to the Collections Account as well as any lockbock account used by Administrator in connection with the Designated Services.  Such "view-only" access shall include the ability to view and download daily activity (settlement checks, settlement disbursement letters, etc.) and account statements.

(c)      Within fifteen (15) days following the end of each calendar month (the "**Collection Report Deadline**"), Administrator shall deliver to Holders a report (each, a "**Collection Report**") identifying, at a minimum, (i) all receivables on which payment was received during the calendar month then ended, (ii) the gross amounts of each such receivable prior to payment, (iii) the amount received on account of each such receivable, and (iv) with respect to the Collection Report delivered in the calendar month immediately following the expiration of a Contract Quarter, a summary of any Servicing Fee, Minimum Fee, Excess Fee, Collection Cost, or other amount for which Administrator seeks payment (collectively, "**Administrator's Fees**").  Within fifteen ten (~~15~~10) days following the ~~end of each~~Collection Report Deadline for each calendar month immediately following the expiration of a Contract Quarter, Administrator will pay over to the account identified in the Escrow Agreement, by wire transfer of immediately available funds from the Collections Account, an amount equal to all amounts collected with respect to the Portfolio during the prior Contract Quarter, less the Administrator's Fees.  Notwithstanding the foregoing, in the event any Holder shall disapprove of Administrator's calculation of the Administrator's Fees upon receipt of the related

8

Collection Report setting forth Administrator's determinations thereof, such Holder may submit an objection thereto by written notice to Administrator and the other Holder (an "**Objection Notice**"), which Objection Notice shall explain the basis for such disapproval. In the event that any Objection Notice is delivered hereunder, the disapproving Holder and Administrator shall meet, either in person or through electronic means, within thirty (30) days following disapproval and shall negotiate in good faith to resolve the disapproval. All Administrator's Fees subject to disapproval shall remain on deposit in the Collections Account until such time as the disapproval is resolved and such resolution is confirmed in writing by the disapproving Holder.

(d)     In the event the amounts collected with respect to the Portfolio during any Contract Quarter are insufficient to pay any Excess Fee or approved Collection Costs that may apply, Administrator shall, as its sole recourse prior to the entry of a Final Judgement (defined below), offset such Excess Fee or approved Collection Costs (including any interest thereon) from any amounts collected in respect of the Portfolio in a subsequent Contract Quarter that would otherwise be payable to Holders. Any Excess Fee or approved Collection Cost not paid within thirty (30) following the end of the Contract Quarter to which it applies shall bear interest at the rate of two percent (2.0%) per month from such date through the date that payment is received. Upon the entry of a final, non-appealable judgment in the Adversary, lawsuit covering the same subject-matter, or any appeals therefrom which fully and finally resolves all conflicting claims and determining the rights and interests of each Holder with respect to the Portfolio (a "**Final Judgment**"), the Prevailing Holder shall be solely responsible for payment of any Excess Fee or Collection Costs that may then be due or thereafter become due.

## 6.     CONFIDENTIALITY.

Each Party recognizes and acknowledges that, by virtue of entering into this Agreement, each Party may have access to certain information of the other Party that is confidential and constitutes valuable, special and unique property of the other Party. Each Party agrees that it shall not at any time, either during or subsequent to the term of this Agreement, disclose to others, copy or permit to be copied (without the other Party's express prior written consent), except in connection with the performance by the Parties of their duties hereunder, any confidential or proprietary information of the other Party.

Each Party shall not disclose any protected health information and individually identifiable health information, as defined in 45 CFR Part 164 (collectively, the "**Protected Health Information**"), concerning any receivable other than as permitted by this Agreement or provisions of the federal privacy regulations and the federal security standards as contained in 45 CFR Part 164. Each Party will implement appropriate safeguards to prevent the disclosure of any Protected Health Information other than as provided for by this Agreement.

The obligations of the Parties pursuant to this Section 6 shall survive any termination of this Agreement.

7.    **INDEPENDENT RELATIONSHIPS.**

7.1    <u>Independent Contractors</u>. Administrator and Holders are, and shall remain, independent contractors. This Agreement is not intended to create an employer-employee, lender-borrower, partnership or joint venture relationship between the parties. For the purpose of filing and/or asserting liens on behalf of any Holder, this Agreement gives Administrator the express, written authority from each Holder to execute and/or certify any such liens as each Holder's authorized agent.

7.2    <u>Impartial Relationship</u>.

(a)    Administrator acknowledges and agrees that it has been jointly engaged hereunder by the Holders and that, unless amended pursuant to Section 2.5 above, Administrator's duties and obligations hereunder are owed equally to each Holder.

(b)    Administrator (i) shall act neutrally with respect to the Holders in the performance of the Designated Services and those aspects of its business operations over which Administrator has control, including, but not limited to, actions by its employees, its communications to Holders, and its communications to third parties, (ii) shall not favor any Holder to the detriment or exclusion of any other Holder, including, but not limited to, in communications to third parties, and (iii) shall not interfere in or seek to influence the outcome of the Adversary.

(c)    Administrator shall use commercially reasonable efforts to simultaneously transmit (or, in any event, shall promptly transmit) to all Holders all written or electronic correspondence or distribution of information communicated to any Holder concerning the Portfolio, the Designated Services, or any other matter relating to this Agreement, shall include all Holders on all written or electronic communications to any Holder regardless of whether any such communication is made in response to a communication from a single Holder, and shall not communicate with any Holder in person or by telephone or video conference regarding the subject matter hereof in any manner unless a representative of each Holder is present to participate in such communication or Administrator shall have promptly communicated the subject matter thereof to the non-participating Holder following such communication. For purposes of this Section 7.2, 'promptly' shall mean within twenty-four (24) hours.

(d)    During the Term, and for a period of twelve (12) months after the Termination Date, Administrator shall not enter into any separate agreement or other business relationship with any Holder or Restricted Party (as

10

defined in Section 9 below) without the written approval of both Holders except as provided for under Section 2.5 above.

(e)     Administrator shall promptly advise all Holders of any attempt or solicitation by any Holder or Restricted Party which Administrator reasonably determines constitutes or is intended to constitute a breach or circumvent the provisions of this Section 7.2.

(f)     The Parties recognize and agree that the performance of the obligations under this Section 7.2 is special, unique, and extraordinary in character, and that in the event of a breach or threatened breach of the terms and conditions of this Section 7.2, the Holder that is adversely affected by such breach or threatened breach shall be entitled, if it so elects, to the specific performance thereof and to an injunction to prevent Administrator from breaching this Section 7.2, regardless of whether such excluded Holder seeks or obtains payment of damages. In the event of a breach of Subsections 7.2(a) or (c)-(e) or an intentional or grossly negligent breach of Subsection 7.2(b), the Holder that is adversely affected by such breach shall be entitled, if it so elects, to terminate this Agreement in accordance with (and subject to the appliable notice and cure periods stated in) Section 2.2(c), upon written notice to all other Parties without penalty and without regard to any unanimous agreement of all Holders otherwise required under Section 2.2. Upon delivery of any termination notice pursuant to this Section 7.2(f), all Holders shall (i) negotiate in good faith to select and engage an independent third party to replace Administrator in servicing the Portfolio on substantially the same terms as set forth herein or other commercially reasonable terms and (ii) negotiate in good faith to select and engage an independent third party to serve as a replacement escrow agent upon substantially the same terms as set forth in the Escrow Agreement or other commercially reasonable terms.   If Holders are unable to reach an agreement as to the engagement of a replacement servicer or replacement escrow agent within fifteen (15) days following delivery of the termination notice, the terminating Holder may unilaterally apply to the Bankruptcy Court for approval to engage a replacement servicer or replacement escrow agent, as appropriate, and such engagement shall become effective upon the entry of an order by the Bankruptcy Court approving the engagement, which shall be binding on all Holders.

(g)     In the event (i) this Agreement is terminated pursuant to Section 7.2(f) and (ii) it is determined by a final judgment of a court of competent jurisdiction that such termination was the result of (and validly effected on account of) a material and either intentional or grossly negligent breach of the provisions of this Section 7.2 by Administrator (such proceeding, a "Holder Enforcement Proceeding"), Administrator shall (i) forfeit all rights to payment of any Early Termination Fee and any Servicing Fee, Minimum Fee, Excess Fee, or Collection Costs that would otherwise be due under this Agreement from and after the date of termination and (ii) shall pay to the

Holders, by depositing the same in escrow for handling in accordance with the Escrow Agreement, the greater of (A) fifty percent (50%) of the Servicing Fees, Minimum Fees, Excess Fees, and Collection Costs received by Administrator pursuant to this Agreement through the date of such termination or (B) the actual damages suffered by any Holder as a result of such breach. In the event any Holder shall commence a Holder Enforcement Proceeding, the substantially prevailing party in such Holder Enforcement Proceeding shall be entitled to recover all out-of-pocket costs and expenses incurred in connection with such Holder Enforcement Proceeding, including reasonable attorneys' fees.

8. **HOLDER INDEMNIFICATION.**

Each Holder shall indemnify, reimburse and hold harmless Administrator and its officers, managers, members, employees, affiliates, subsidiaries, agents and representatives (each, an "**Administrator Indemnified Party**") against any claims, actions, liabilities, damages and expenses, including, without limitation, attorneys' fees (collectively, "**Losses**"), incurred by such Administrator Indemnified Party that result from, arise out of or relate to (a) any breach of this Agreement by such Holder, (b) any violation by such Holder or any of its officers, managers, members, employees, affiliates, subsidiaries, agents or representatives of any applicable laws or regulations, and (c) any dispute between or among Holder and any third party regarding the ownership of the Portfolio or the right to receive collections therefrom. For avoidance of doubt, any indemnification provided in this Section 8 shall only apply only to the Holder whose acts or omissions gave rise to such Losses and not to any other Holder.

9. **NO SOLICITATION**

During the Term, and for a period of twenty-four (24) months after the Termination Date, neither Holder shall, and no Holder shall permit its officers, managers, members, affiliates, subsidiaries, agents and representatives (each of the foregoing, and each Holder, a "Restricted Party" and collectively, the "Restricted Parties") to, either alone or in concert with others, directly or indirectly, (a) recruit or hire or otherwise solicit for employment or other engagement or establish a business relationship with (or assist any other person or entity in engaging in any such activities), any person or entity who, at any time during the Term or during the twenty-four month period after the Termination Date, is or was an employee, independent contractor, agent or consultant of Administrator or any of its subsidiaries or affiliates or (b) otherwise induce or attempt to induce (or assist any other person or entity in engaging in any such activities) any employee, independent contractor, agent or consultant of Administrator to terminate such person's or entity's employment or other relationship with Administrator or any of its subsidiaries or affiliates, or in any way interfere with the relationship between Administrator or any of its subsidiaries or affiliates, on the one hand, and any such employee, independent contractor, agent or consultant on the other hand.

If any Holder or any of its officers, managers, members, affiliates, subsidiaries, agents or representatives breaches its obligations under the foregoing paragraph, such Holder (on an

individual, and not on a joint and several basis) shall pay to Administrator an amount equal to $100,000 (the "**Liquidated Damages**"). The Parties intend that the Liquidated Damages constitute compensation, and not a penalty. The Parties acknowledge and agree that the harm to Administrator caused by such a breach would be impossible or very difficult to accurately estimate as of the date of this Agreement, and that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from such breach. Notwithstanding the foregoing, nothing in this paragraph shall prohibit Administrator from obtaining specific performance or an injunction as contemplated by the succeeding paragraph.

The Parties hereto recognize that the performance of the obligations under this Section 9 by the Restricted Parties is special, unique and extraordinary in character, and that in the event of a breach or threatened breach by a Restricted Party of the terms and conditions of this Section 9, Administrator shall be entitled, if it so elects, to the specific performance thereof by such Restricted Party or to an injunction to prevent such Restricted Party from breaching this Section 9, regardless of whether Administrator seeks or obtains payment of the Liquidated Damages.

The Parties hereto agree that, if a court of competent jurisdiction determines that any term of this Section 9 is invalid or unenforceable, such court shall have the power to (and the parties intend that such court shall) reduce the scope, duration or area of any such term or provision, delete specific words or phrases or replace any invalid or unenforceable term or provision in this Section 9 with a term or provision that is valid and enforceable to the maximum extent permitted by applicable law and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Section 9 shall be enforceable as so modified.

10.    **LIABILITIES TO OBLIGORS.**

No obligation or liability to any obligor or account debtor under any of the receivables comprising the Portfolio is intended to be assumed by Administrator under or as a result of this Agreement and the transactions contemplated hereby and, to the maximum extent permitted and valid under mandatory provisions of law, Administrator expressly disclaims such assumption.

11.    **SPECIFIC PERFORMANCE.**

The Parties hereby acknowledge and agree that irreparable damage would occur in the event any provision of this Agreement is not performed in accordance with the terms hereof and that each Party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity, without the necessity of demonstrating the inadequacy of money damages.

12.    **FURTHER AGREEMENTS.**

The Parties each agree to execute and deliver to the other such additional documents, instruments or agreements in a form satisfactory to the parties as may be necessary or appropriate to effectuate the purposes of this Agreement.

13.    **AMENDMENT.**

This Agreement may be amended from time to time solely upon unanimous written agreement signed by each of the Parties.

14.    **NOTICES.**

All demands, notices and communication hereunder shall be in writing and shall be deemed to have been duly given (a) immediately, if personally delivered, (b) immediately, if sent by email and confirmed by a similar mailed writing, or (c) three (3) Business Days after mailing, if mailed by registered or certified mail, postage prepaid, return receipt requested:

To Holders:          Tecumseh-Infinity Medical Receivables Fund, LP
                     C/O Tecumseh Alternatives, LLC
                     5668 Morris Hunt Dr.
                     Fort Mill, SC 29708
                     Attn: Chad Meyer
                     Email: cmeyer@tecumsehalts.com

                     HASelect-Medical Receivables Litigation Finance Fund
                     International SP
                     403 South La Grange Rd.
                     La Grange, Illinois 60525
                     Attn:   Michael E. Griffin
                             Igor Shleypak
                     Email: mike@hedgeact.com
                             ishleypak@hedgeact.com

To Administrator:    TPL Claims Management, LLC
                     10100 W. Charleston Blvd., Ste. 120
                     Las Vegas, NV 89135
                     Attn:  Michael Stone
                     Email:  mstone@provepartners.com

14

or at such other address as the party may designate by notice to the other parties hereto in accordance with the terms of this provision.

The obligations of the Parties pursuant to this Section 9 shall survive any termination of this Agreement.

**15.    MERGER AND INTEGRATION.**

Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement.  This Agreement may not be modified, amended, waived or supplemented except as provided herein.

**16.    HEADINGS.**

The headings herein are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

**17.    GOVERNING LAW; VENUE AND JURISDICTION; WAIVER OF JURY TRIAL.**

(a)    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.  The Parties hereto each agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with this Agreement may be brought exclusively in the State and United States Federal Courts located in Clark County, Nevada, and each of the Parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

(b)    The Parties hereby expressly waive any right to a trial by jury in any action or proceeding to enforce or defend any rights under this Agreement or under any amendment, instrument, document or agreement delivered or which may in the future be delivered in connection herewith or arising from any relationship existing in connection with this Agreement, and agree that any such action or proceeding shall be tried before a court and not before a jury.

15

18.    **SEVERABILITY OF PROVISIONS.**

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

19.    **SUCCESSORS AND ASSIGNS.**

This Agreement shall bind and inure to the benefit of, and be enforceable by, the Parties hereto and their respective successors and permitted assigns. Neither Party may assign or delegate any of its rights, interests or obligations hereunder without the prior written consent of the other Party; provided, however, that (a) Administrator may retain subservicers, contractors, agents or representatives to provide the Designated Services required to be provided by it hereunder, provided that such subservicers, contractors, agents and/or representatives shall also be bound to the terms of this Agreement, and (b) no such retention shall relieve Administrator of its obligations hereunder.

20.    **COUNTERPARTS.**

This Agreement may be executed in two or more counterparts (and by different Parties on separate counterparts), each of which shall be an original, but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or by electronic means shall be equally effective as the delivery of an originally executed counterpart.

*[Remainder of page intentionally left blank. Signature page follows.]*

16

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**ADMINISTRATOR**

TPL CLAIMS MANAGEMENT, LLC, a Delaware limited liability company

By: _____
Name: Michael Stone
Title: CEO

**HOLDERS:**

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company

By: _____
Name: Michael E Griffin
Title: Director

TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, a Delaware Limited Partnership

By: _____
Name:
Title:

[SIGNATURE PAGE TO SERVICING AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**ADMINISTRATOR**

TPL CLAIMS MANAGEMENT, LLC, a Delaware limited liability company

By: _____

Name: Michael Stone
Title: CEO

**HOLDERS:**

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company

By: _____
Name:
Title:

TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, a Delaware Limited Partnership

By: _____
Name:
Title:

[SIGNATURE PAGE TO SERVICING AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**ADMINISTRATOR**

TPL CLAIMS MANAGEMENT, LLC, a Delaware limited liability company

By: _____
Name: Michael Stone
Title: CEO

**HOLDERS:**

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company

By: _____
Name:
Title:

TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, a Delaware Limited Partnership

By: _____
Name: Chad Meyer
Title: President

SCHEDULE I

THE DESIGNATED SERVICES

Administrator will service the accounts in a commercially reasonable manner and with reasonable care and diligence, in accordance with its servicing policies and procedures, with a degree of skill and attention no lower than the industry standard of skill and attention exercised in connection with the servicing of similar accounts, and in compliance in all material respects with all applicable laws, rules and regulations from time to time in effect. Designated Services may include but are not limited to:

➢ Obtaining patient signature on medical lien

➢ Completing appropriate statutory filings

➢ Notifying attorneys of existing of provider lien via certified mail

➢ Obtaining lien case status updates

➢ Case negotiations and resolutions/collections

➢ Treasury management and payment posting

➢ Monthly reporting analytics

➢ Such other duties and obligations as provided for in the Servicing Agreement

EXHIBIT A-2

LIMITED POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company, together with its affiliates (collectively "**Owner**"), in connection with the servicing, by TPL Claims Management, LLC, a Delaware limited liability company ("**Administrator**" or "**attorney-in-fact**"), of certain healthcare receivables to which Owner asserts a claim or interest, has and hereby affirms that it has made, constituted and appointed, and by these presents does make, constitute and appoint Administrator, having its principal place of business at 10100 W. Charleston Blvd., Ste. 120, Las Vegas, NV 89135, Owner's true and lawful attorney-in-fact and in Owner's name, place and stead to act solely for the purpose of performing any or all of the acts described herein in connection with any healthcare receivable serviced by Administrator pursuant to the Servicing Agreement dated as of January 31, 2022 (the "**Servicing Agreement**").  Capitalized terms used herein without definition shall have the respective meanings assigned to them in the Servicing Agreement.

FIRST:        To endorse, sign, deliver and deposit any and all checks, drafts or instruments of deposits issued by obligors, attorneys, insurance companies, vendors or third parties.  Such instruments may only be executed and deposited by the attorney-in-fact if the same represent funds paid on any portion of the healthcare receivables comprising the Portfolio serviced by the attorney-in-fact pursuant to the above-referenced Servicing Agreement.

SECOND:        To execute and/or endorse any document, instrument or agreement, or any amendment, modification or supplement of any of the foregoing, and, subject to the restrictions and limitations specifically set forth in the Servicing Agreement (and without abrogating the same), perform any act and covenant in any way which Owner itself could do which is necessary or appropriate to modify, amend, renew, extend, terminate and/or extinguish any indebtedness or any right or obligation of the obligor of such indebtedness under any such healthcare receivable, in each case upon such terms and conditions deemed, in the sole discretion of said attorney-in-fact, necessary or appropriate in connection with such modification, amendment, renewal extension, termination and/or extinguishment.

THIRD:        To agree and to contract with any person, in any manner and upon terms and conditions deemed, in the sole discretion of said attorney-in-fact, necessary or appropriate for the accomplishment of any such modification, amendment, renewal, extension, termination and/or extinguishment of any such indebtedness, right or obligation with respect to healthcare receivables, to perform, rescind, reform or modify any such agreement or contract or any similar agreement or contract made by or on behalf of Owner; to execute acknowledge, seal and deliver any such contract; and to take all such other actions and steps, pay or receive such moneys and to execute, acknowledge, seal and deliver all such other certificates, documents and agreements as said attorney-in-fact may deem necessary or appropriate to consummate any such modification, amendment, renewal, extension, termination and/or extinguishment of any such indebtedness or in furtherance of any of the transactions contemplated by the foregoing.

FOURTH:    To commence a legal proceeding to enforce a receivable, or file a claim in any obligor insolvency action.  If attorney-in-fact exercises this right, and to the extent required, Owner shall thereupon be deemed to have automatically assigned such receivable to attorney-in-fact, which assignment shall be solely for the purpose of collection/recovery of the proceeds of the aforementioned receivable for the benefit of the Owner.

FIFTH:    With full and unqualified authority to delegate any or all of the foregoing powers to any person or persons whom said attorney-in-fact shall select, provided such person or persons will agree to be bound to and comply with all of the attorney-in-fact's representations, obligations, and warranties provided in the Servicing Agreement.

SIXTH:    This Power of Attorney shall not be affected by the subsequent dissolution or disability of Owner or its authorized representatives.

SEVENTH:    To induce any third party to act hereunder, Owner hereby agrees that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that any notice of revocation or termination hereof or other revocation or termination hereof by operation of law shall be ineffective as to such third party.

The rights, powers and authority of Administrator under this Limited Power of Attorney shall commence and be in full effect as of the date of this instrument and shall continue until revoked in writing by Owner, but in no event shall this Limited Power of Attorney be valid beyond the term of the Servicing Agreement.

[THE BALANCE OF THIS PAGE IS BLANK]

IN WITNESS WHEREOF, the undersigned Owner has caused this Limited Power of Attorney to be executed as of the date first written above by its officers thereunto duly authorized.

**OWNER:**

HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio of HedgeACT International SPC LTD., a Cayman Islands Exempt Company

By: _____

Name: Michael E Griffin

Title: Director

EXHIBIT A-1

LIMITED POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, a Delaware Limited Partnership, together with its affiliates (collectively "**Owner**"), in connection with the servicing, by PROVE Partners, LLC, a Delaware limited liability company ("**Administrator**" or "**attorney-in-fact**"), of certain healthcare receivables to which Owner asserts a claim or interest, has and hereby affirms that it has made, constituted and appointed, and by these presents does make, constitute and appoint Administrator, having its principal place of business at 10100 W. Charleston Blvd., Ste. 120, Las Vegas, NV 89135, Owner's true and lawful attorney-in-fact and in Owner's name, place and stead to act solely for the purpose of performing any or all of the acts described herein in connection with any healthcare receivable serviced by Administrator pursuant to the Servicing Agreement dated as of January __, 2022 (the "**Servicing Agreement**").  Capitalized terms used herein without definition shall have the respective meanings assigned to them in the Servicing Agreement.

FIRST:  To endorse, sign, deliver and deposit any and all checks, drafts or instruments of deposits issued by obligors, attorneys, insurance companies, vendors or third parties.  Such instruments may only be executed and deposited by the attorney-in-fact if the same represent funds paid on any portion of the healthcare receivables comprising the Portfolio serviced by the attorney-in-fact pursuant to the above-referenced Servicing Agreement.

SECOND:  To execute and/or endorse any document, instrument or agreement, or any amendment, modification or supplement of any of the foregoing, and, subject to the restrictions and limitations specifically set forth in the Servicing Agreement (and without abrogating the same), perform any act and covenant in any way which Owner itself could do which is necessary or appropriate to modify, amend, renew, extend, terminate and/or extinguish any indebtedness or any right or obligation of the obligor of such indebtedness under any such healthcare receivable, in each case upon such terms and conditions deemed, in the sole discretion of said attorney-in-fact, necessary or appropriate in connection with such modification, amendment, renewal extension, termination and/or extinguishment.

THIRD:  To agree and to contract with any person, in any manner and upon terms and conditions deemed, in the sole discretion of said attorney-in-fact, necessary or appropriate for the accomplishment of any such modification, amendment, renewal, extension, termination and/or extinguishment of any such indebtedness, right or obligation with respect to healthcare receivables, to perform, rescind, reform or modify any such agreement or contract or any similar agreement or contract made by or on behalf of Owner; to execute acknowledge, seal and deliver any such contract; and to take all such other actions and steps, pay or receive such moneys and to execute, acknowledge, seal and deliver all such other certificates, documents and agreements as said attorney-in-fact may deem necessary or appropriate to consummate any such modification, amendment, renewal, extension, termination and/or extinguishment of any such indebtedness or in furtherance of any of the transactions contemplated by the foregoing.

FOURTH:    To commence a legal proceeding to enforce a receivable, or file a claim in any obligor insolvency action.  If attorney-in-fact exercises this right, and to the extent required, Owner shall thereupon be deemed to have automatically assigned such receivable to attorney-in-fact, which assignment shall be solely for the purpose of collection/recovery of the proceeds of the aforementioned receivable for the benefit of the Owner.

FIFTH:    With full and unqualified authority to delegate any or all of the foregoing powers to any person or persons whom said attorney-in-fact shall select, provided such person or persons will agree to be bound to and comply with all of the attorney-in-fact's representations, obligations, and warranties provided in the Servicing Agreement.

SIXTH:    This Power of Attorney shall not be affected by the subsequent dissolution or disability of Owner or its authorized representatives.

SEVENTH:    To induce any third party to act hereunder, Owner hereby agrees that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that any notice of revocation or termination hereof or other revocation or termination hereof by operation of law shall be ineffective as to such third party.

The rights, powers and authority of Administrator under this Limited Power of Attorney shall commence and be in full effect as of the date of this instrument and shall continue until revoked in writing by Owner, but in no event shall this Limited Power of Attorney be valid beyond the term of the Servicing Agreement.

[THE BALANCE OF THIS PAGE IS BLANK]

IN WITNESS WHEREOF, the undersigned Owner has caused this Limited Power of Attorney to be executed as of the date first written above by its officers thereunto duly authorized.

**OWNER:**

TECUMSEH-INFINITY    MEDICAL    RECEIVABLES FUND, LP, a Delaware Limited Partnership

By: _____

Name: Chad Meyer

Title: Principal

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Prove Servicing Agreement |
| **FILE NAME** | 20220128 Servicing Agreement - Final.pdf |
| **DOCUMENT ID** | 4fbf327c4495e4eebf6cd9243e7e8aea83de4654 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **01 / 31 / 2022**<br>18:57:11 UTC | Sent for signature to Michael E Griffin (mike@hedgeact.com) from jamesg@hedgeact.com<br>IP: 73.22.150.89 |
| **VIEWED** | **01 / 31 / 2022**<br>18:57:52 UTC | Viewed by Michael E Griffin (mike@hedgeact.com)<br>IP: 73.50.34.126 |
| **SIGNED** | **01 / 31 / 2022**<br>18:58:31 UTC | Signed by Michael E Griffin (mike@hedgeact.com)<br>IP: 73.50.34.126 |
| **COMPLETED** | **01 / 31 / 2022**<br>18:58:31 UTC | The document has been completed. |

# EXHIBIT 2

**From:** Mike Belotz <mbelotz@tecumsehalts.com>
**Sent:** Friday, May 20, 2022 7:06 PM
**To:** Michael Stone <mstone@provepartners.com>
**Cc:** michael.napoli@akerman.com; Bart Larsen <blarsen@shea.law>; Chad Meyer <cmeyer@tecumsehalts.com>;
Maggie Jenkins <MJenkins@tplcmgmt.com>; Alison Francis <afrancis@tplcmgmt.com>; Igor Shleypak
<ishleypak@hedgeact.com>; Andre Bahbah <abahbah@provepartners.com>; Steven Pelosi
<SPelosi@provepartners.com>; John Gordon <jgordon@provepartners.com>
**Subject:** RE: Infinity Capital Management/Preva Advanced Surgicare

Michael,

Thank you for providing the information.  However, no offense, as I said before, it is not your place to decide how these
receivables are to be split.  That is between the parties.  Once we decide on a formula you may apply it but until that
time we are not asking for your opinion.  So please refrain.

Best,
MB

**From:** Michael Stone <mstone@provepartners.com>
**Sent:** Friday, May 20, 2022 8:40 PM
**To:** Mike Belotz <mbelotz@tecumsehalts.com>
**Cc:** michael.napoli@akerman.com; Bart Larsen <blarsen@shea.law>; Chad Meyer <cmeyer@tecumsehalts.com>;
Maggie Jenkins <MJenkins@tplcmgmt.com>; Alison Francis <afrancis@tplcmgmt.com>; Igor Shleypak
<ishleypak@hedgeact.com>; Andre Bahbah <abahbah@provepartners.com>; Steven Pelosi
<SPelosi@provepartners.com>; John Gordon <jgordon@provepartners.com>
**Subject:** RE: Infinity Capital Management/Preva Advanced Surgicare

Mike et al –

Please find attached (and pasted in-line below) a breakdown of the amounts held on deposit for dates of service that are
not part of the Holders' portfolio as well as the (proposed) calculations of pro rata splits. To the extent that you disagree
with the pro rata calculation using outstanding gross billed charges (*which we view as the appropriate approach*), please
confirm how you'd like us to proceed.

Michael Stone

1

**TPL Claims Management, LLC**
**Amounts held on deposit for Gain Servicing**
5/20/2022

| PatientID: | 276 | 1571 | 1206 | 1960 | 2624 | 2963 | Total |
|---|---|---|---|---|---|---|---|
| Patient: | ■ | ■ | ■ | ■ | ■ | ■ | Total |
| **Outstanding Gross Billed Charges ($)** | | | | | | | |
| Infinity Holders | $    - | $    - | $ 7,919.72 | $ 1,593.00 | $ 34,887.48 | $ 11,387.45 | $ 55,787.65 |
| HASelect Only (DOS serviced by Gain) | $    - | $    - | $ 151,569.38 | $ 8,794.05 | $ 311,418.11 | $ 86,365.45 | $ 558,146.99 |
| Total | $    - | $    - | $ 159,489.10 | $ 10,387.05 | $ 346,305.59 | $ 97,752.90 | $ 613,934.64 |
| **Outstanding Gross Billed Charges (%)** | | | | | | | |
| Infinity Holders | na | na | 5% | 15% | 10% | 12% | 9% |
| HASelect Only (DOS serviced by Gain) | 100% | 100% | 95% | 85% | 90% | 88% | 91% |
| **Total Settlement Amount** | $ 4,200.00 | $ 40,500.00 | $ 125,000.00 | $ 5,700.00 | $ 280,000.00 | $ 48,000.00 | $ 503,400.00 |
| **Pro Rata Amount Due\*** | | | | | | | |
| Infinity Holders | $    - | $    - | $ 6,207.10 | $ 874.18 | $ 28,207.73 | $ 5,591.63 | $ 40,880.63 |
| HASelect Only (DOS serviced by Gain) | $ 4,200.00 | $ 40,500.00 | $ 118,792.90 | $ 4,825.82 | $ 251,792.27 | $ 42,408.37 | $ 462,519.37 |
| *check* | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

*\* Payments applied pro rata based on total outstanding gross billed charges*





**Michael Stone**
**Chief Executive Officer**
10100 W. Charleston Blvd, Suite 120
Las Vegas, NV 89135
Phone: 213-700-4764
Email: mstone@provepartners.com
Web: www.provepartners.com

P R O V E™

| PROVE Online Portal | Submit A New Funding Request | Customer Satisfaction Survey |
|---|---|---|

*Confidentiality Statement: The information in this e-mail may be privileged and/or confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this e-mail in error, please notify me immediately by replying to this message and deleting the material from any computer. Thank You.*

**From:** Mike Belotz <mbelotz@tecumsehalts.com>
**Sent:** Tuesday, May 17, 2022 9:39 AM
**To:** John Gordon <jgordon@provepartners.com>; Michael Stone <mstone@provepartners.com>
**Cc:** michael.napoli@akerman.com; Bart Larsen <blarsen@shea.law>; Chad Meyer <cmeyer@tecumsehalts.com>; Maggie Jenkins <MJenkins@tplcmgmt.com>; Alison Francis <afrancis@tplcmgmt.com>; Igor Shleypak <ishleypak@hedgeact.com>
**Subject:** RE: Infinity Capital Management/Preva Advanced Surgicare

Michael,

To get these overlap claims settled we'd like to see detail on the proposed amount being sent to GAIN.  I don't believe any details were provided except for the proposed amount.  Specifically:

- The patients at issue.  Through our lawyers we understand six patients make up the amount of which two are non-overlap receivables and solely HA receivables.  Please confirm.
- On the overlap receivables the total amount of receivables attributable to HA versus the portfolio.
- The basis of calculation for attributing the settlements.

Thanks.

Best,
MB

---

**From:** Igor Shleypak <ishleypak@hedgeact.com>
**Sent:** Tuesday, May 17, 2022 9:28 AM
**To:** John Gordon <jgordon@provepartners.com>
**Cc:** Mike Belotz <mbelotz@tecumsehalts.com>; Michael Stone <mstone@provepartners.com>; michael.napoli@akerman.com; Bart Larsen <blarsen@shea.law>; Chad Meyer <cmeyer@tecumsehalts.com>; Maggie Jenkins <MJenkins@tplcmgmt.com>; Alison Francis <afrancis@tplcmgmt.com>
**Subject:** Re: Infinity Capital Management/Preva Advanced Surgicare

Hi John and Team TPL,

Let's hold off on going forward with mediation. We do not approve of any further legal expenses until some other issues are resolved concerning the overlapping claims. I believe our counsels are discussing the issue.

Thanks.

Best regards,


Igor Shleypak, Esq.
Director of Compliance,
In-House Counsel
HedgeACT
Griffin Capital Mgt.
Griffin Asset Management
T: 248-225-0535
E: ishleypak@hedgeact.com

**EXHIBIT 3**

| Fund | PatientID | HASPerClaimCount | TIFPerClaimCount | TotalClaimGFB | BillGFB | AttorneyFirstName | AttorneyLastName | Provider | PaidDate | PaidCheckNo | BillCost |
|------|-----------|------------------|------------------|---------------|---------|-------------------|------------------|----------|----------|-------------|----------|
| HAS | 1206 | 11 | 1 | $346,305.59 | $19,840.00 | Jonathan | Wade | Chimedical Management Group LLC | 2017-08-17 | NSB-1315WIRE-22999274 | $9,523.20 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $885.00 | Jonathan | Wade | Polaris Spine & Neurosurgery Center | 2018-02-12 | 5349 | $424.80 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $4,944.00 | Jonathan | Wade | Chimedical Management Group LLC | 2017-08-17 | NSB-1315WIRE-22999274 | $2,373.12 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $1,230.00 | Jonathan | Wade | Chimedical Management Group LLC | 2017-08-17 | NSB-1315WIRE-22999274 | $590.40 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $226,603.63 | Jonathan | Wade | Perimeter Surgery Center of Atlanta | 2018-06-20 | 1193 | $38,296.08 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $9,708.00 | Jonathan | Wade | Chimedical Management Group LLC | 2017-09-25 | 4186 | $3,600.00 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $34,887.48 | Jonathan | Wade | Legacy Brain & Spine | 2018-04-11 | 1060 | $22,874.74 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $700.00 | Jonathan | Wade | Legacy Brain & Spine | 2018-04-26 | 1062 | $427.00 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $5,800.00 | Jonathan | Wade | North Fulton Anesthesia Associates | 2018-06-06 | 1147 | $3,537.96 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $4,595.00 | Jonathan | Wade | (AHI) American Health Imaging | 2017-08-16 | 4099 | $1,560.00 |
| HAS | 1206 | 11 | 1 | $346,305.59 | $2,225.00 | Jonathan | Wade | (AHI) American Health Imaging | 2017-09-26 | 4189 | $780.00 |
| TIF | 1206 | 11 | 1 | $346,305.59 | $34,887.48 | Jonathan | Wade | Legacy Brain & Spine | 2020-11-16 | BA1531 | $18,000.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $160.25 | Jonathan | Wade | Perimeter Orthopaedics PC | 2020-04-08 | 7453 | $80.13 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $35,291.40 | Jonathan | Wade | Perimeter Outpatient Surgical Assoc | 2020-03-26 | 7432 | $14,000.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $412.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-01-16 | 5636 | $214.24 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $341.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-01-16 | 5636 | $177.32 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $355.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-01-16 | 5636 | $184.60 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $381.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-01-16 | 5636 | $198.12 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $381.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-01-16 | 5636 | $198.12 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $381.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-04-30 | 6020 | $190.50 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $331.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-05-31 | 6119 | $148.95 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $405.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-05-31 | 6119 | $182.25 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $405.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-05-31 | 6119 | $182.25 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $413.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-05-31 | 6119 | $206.25 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $403.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-17 | 6169 | $201.50 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $413.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-17 | 6169 | $213.46 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $403.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-17 | 6169 | $169.26 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $416.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-17 | 6169 | $231.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $406.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-17 | 6169 | $227.36 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $406.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-06-30 | 6244 | $227.36 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $413.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-07-29 | 6313 | $214.50 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $413.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-08-15 | 6366 | $214.50 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $502.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-08-15 | 6366 | $214.50 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $401.85 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-11-02 | 6560 | $196.91 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $11,454.75 | Jonathan | Wade | Perimeter Orthopaedics PC | 2020-03-26 | 7431 | $3,500.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2018-12-03 | 1474 | $329.98 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $200.00 | Jonathan | Wade | Synergy Rehab Svcs Inc | 2019-04-30 | 6020 | $197.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $11,139.75 | Jonathan | Wade | Perimeter Orthopaedics PC | 2020-03-26 | 7431 | $2,100.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-09-06 | 6420 | $281.29 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $2,225.00 | Jonathan | Wade | (AHI) American Health Imaging | 2019-01-16 | 5616 | $845.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $2,370.00 | Jonathan | Wade | (AHI) American Health Imaging | 2019-01-16 | 5616 | $845.00 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $703.00 | Jonathan | Wade | (AHI) American Health Imaging | 2019-01-16 | 5616 | $365.56 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $736.00 | Jonathan | Wade | (AHI) American Health Imaging | 2019-10-03 | 6471 | $382.72 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $2,370.00 | Jonathan | Wade | (AHI) American Health Imaging | 2019-12-04 | 6651 | $1,201.59 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $444.00 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-04 | 7380 | $202.02 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-04 | 7380 | $195.88 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $444.00 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-04 | 7380 | $217.56 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $401.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-04 | 7380 | $196.73 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-04 | 7380 | $210.95 |

| Fund | PatientID | HASPerClaimCount | TIFPerClaimCount | TotalClaimGFB | BillGFB | AttorneyFirstName | AttorneyLastName | Provider | PaidDate | PaidCheckNo | BillCost |
|------|-----------|------------------|------------------|---------------|---------|-------------------|------------------|----------|----------|-------------|----------|
| HAS | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-03-26 | 7409 | $210.95 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $432.00 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-04-10 | 7462 | $211.68 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $361.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-04-10 | 7462 | $177.13 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-04-10 | 7462 | $210.95 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $470.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-04-10 | 7462 | $230.55 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $888.30 | Jonathan | Wade | Perimeter Orthopaedics PC | 2018-11-18 | 1446 | $530.13 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-04-07 | 5899 | $270.48 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $1,290.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2020-04-08 | 7453 | $645.48 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $664.00 | Jonathan | Wade | Orthopaedic Solutions | 2018-08-12 | 1254 | $405.04 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-05-31 | 6105 | $243.43 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-02-26 | 5807 | $281.29 |
| HAS | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2019-12-04 | 6665 | $274.26 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $788.00 | Jonathan | Wade | Joint Active Systems | 2020-05-29 | 7537 | $472.80 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $6,226.00 | Jonathan | Wade | Perimeter Anesthesia LLC | 2020-10-06 | 6715 | $2,988.48 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $540.95 | Jonathan | Wade | Perimeter Orthopaedics PC | 2020-05-29 | 7532 | $259.66 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-14 | 7511 | $180.82 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-14 | 7511 | $180.82 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $505.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-29 | 7521 | $212.30 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $444.00 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-29 | 7521 | $186.48 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $430.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-29 | 7521 | $180.82 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $361.50 | Jonathan | Wade | BENCHMARK PHYSICAL THERAPY | 2020-05-29 | 7521 | $151.82 |
| TIF | 1960 | 52 | 10 | $97,752.90 | $1,230.00 | Jonathan | Wade | DuraMed LLC | 2020-05-29 | 7528 | $590.40 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-17 | 5668 | $164.89 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $215.55 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-30 | 6002 | $107.78 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $98.48 | Bobby | Johnson | Resurgens Orthopaedics | 2020-02-24 | 7349 | $57.62 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-06-07 | 6135 | $158.55 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $210.03 | Bobby | Johnson | Resurgens Orthopaedics | 2019-03-08 | 5822 | $122.86 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $287.40 | Bobby | Johnson | Resurgens Orthopaedics | 2019-05-31 | 6107 | $129.33 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $287.40 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-17 | 5668 | $168.13 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $210.03 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $105.02 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $287.40 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $143.70 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $140.94 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $390.03 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-17 | 5668 | $228.16 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-29 | 5706 | $164.91 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $215.55 | Bobby | Johnson | Resurgens Orthopaedics | 2019-05-31 | 6107 | $97.00 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $287.40 | Bobby | Johnson | Resurgens Orthopaedics | 2019-05-31 | 6107 | $129.33 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-17 | 5668 | $164.89 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $164.12 | Bobby | Johnson | Resurgens Orthopaedics | 2019-07-29 | 6298 | $82.06 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $215.55 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $107.78 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-06-07 | 6135 | $158.56 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $215.55 | Bobby | Johnson | Resurgens Orthopaedics | 2019-06-07 | 6135 | $121.25 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $2,278.00 | Bobby | Johnson | Northwest Georgia Orthopaedic | 2019-04-07 | 5948 | $1,139.00 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $281.88 | Bobby | Johnson | Resurgens Orthopaedics | 2019-03-08 | 5822 | $164.91 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $782.00 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $391.00 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $98.48 | Bobby | Johnson | Resurgens Orthopaedics | 2019-04-07 | 5934 | $49.24 |
| HAS | 2624 | 24 | 6 | $10,387.05 | $577.92 | Bobby | Johnson | Resurgens Orthopaedics | 2019-01-17 | 5668 | $338.08 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $151.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-11-10 | BA1519 | $81.54 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $213.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-12-22 | BA1597 | $115.02 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $345.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-11-10 | BA1519 | $186.30 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $291.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-11-10 | BA1519 | $157.14 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $248.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-11-10 | BA1519 | $133.92 |
| TIF | 2624 | 24 | 6 | $10,387.05 | $345.00 | Bobby | Johnson | Resurgens Orthopaedics | 2020-11-10 | BA1519 | $186.30 |

| Fund | PatientID | HASPerClaimCount | TIFPerClaimCount | TotalClaimGFB | BillGFB | AttorneyFirstName | AttorneyLastName | Provider | PaidDate | PaidCheckNo | BillCost |
|------|-----------|------------------|------------------|---------------|---------|-------------------|------------------|----------|----------|-------------|----------|
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,326.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $672.28 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,373.72 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-03-05 | 7390 | $686.86 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $630.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-03-05 | 7390 | $315.00 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $326.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $165.28 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $404.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-05 | 7238 | $254.52 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $172.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-05 | 7238 | $108.36 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,905.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-07-29 | 6296 | $2,869.43 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $735.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $477.75 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $796.80 | Caroline | Owings | Northside Anesthesiology Consultant | 2019-12-04 | 6645 | $403.98 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $398.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $232.83 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,570.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-06 | 6419 | $2,673.45 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $504.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-13 | 6162 | $352.80 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $316.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-13 | 6162 | $199.08 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $584.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-06 | 6419 | $353.73 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $480.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $243.36 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $222.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-05 | 7238 | $139.86 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $544.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-13 | 6162 | $228.48 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $10,915.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-06-30 | 6238 | $6,385.28 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $5,535.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-07-29 | 6310 | $3,237.98 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $645.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-09-07 | 6438 | $419.25 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $744.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $435.24 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $5,535.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-08-15 | 6337 | $3,237.98 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $5,535.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-08-15 | 6337 | $3,237.98 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $5,535.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-09-06 | 6397 | $3,237.98 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $9,092.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-10-03 | 6475 | $5,318.82 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $9,092.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2019-10-03 | 6475 | $5,318.82 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $230.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $116.61 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $356.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-20 | 7280 | $224.28 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $2,501.00 | Caroline | Owings | Peachtree Orthopaedic Surgery Center | 2020-01-28 | 7298 | $1,575.63 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $410.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-03-05 | 7390 | $205.00 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $480.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-04-29 | 7475 | $302.40 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,905.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $2,869.43 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $316.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $160.21 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $258.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $130.81 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,195.70 | Caroline | Owings | Northside Anesthesiology Consultant | 2019-12-04 | 6645 | $606.22 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $322.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-05 | 7238 | $202.86 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $225.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $131.63 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $398.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $232.83 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $2,355.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $1,377.68 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $656.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-08-26 | 6380 | $383.76 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $11,003.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-30 | 6237 | $2,860.78 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $8,804.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-10-03 | 6485 | $5,150.34 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,523.72 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-03-26 | 7429 | $746.62 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,662.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-13 | 6162 | $1,958.04 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $8,804.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-06 | 6419 | $5,150.34 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,373.72 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-10-17 | 6498 | $892.92 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $11,003.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-30 | 6237 | $6,436.76 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,073.72 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $697.92 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,129.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-10-17 | 6498 | $733.85 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $2,394.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $1,213.76 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,400.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-28 | 7297 | $2,772.00 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $240.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-04-29 | 7475 | $168.00 |

| Fund | PatientID | HASPerClaimCount | TIFPerClaimCount | TotalClaimGFB | BillGFB | AttorneyFirstName | AttorneyLastName | Provider | PaidDate | PaidCheckNo | BillCost |
|------|-----------|------------------|------------------|---------------|---------|-------------------|------------------|----------|----------|-------------|----------|
| HAS | 2963 | 62 | 6 | $159,489.10 | $424.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-06-13 | 6162 | $267.12 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $356.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $208.26 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,200.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-09-07 | 6438 | $702.00 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $480.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-10-17 | 6498 | $280.80 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $704.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-03-26 | 7429 | $344.96 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $4,570.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-08-26 | 6380 | $2,673.45 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $316.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $160.21 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $316.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2019-12-04 | 6663 | $160.21 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $1,031.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-01-05 | 7238 | $652.33 |
| HAS | 2963 | 62 | 6 | $159,489.10 | $240.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-04-29 | 7475 | $151.20 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $1,313.72 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-05-29 | 7525 | $788.23 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $2,363.00 | Caroline | Owings | (AHI) American Health Imaging | 2020-05-14 | 7510 | $1,134.24 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $863.00 | Caroline | Owings | (AHI) American Health Imaging | 2020-05-14 | 7510 | $414.24 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $480.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-05-29 | 7525 | $259.20 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $2,420.00 | Caroline | Owings | (AHI) American Health Imaging | 2020-07-23 | 7605 | $1,161.60 |
| TIF | 2963 | 62 | 6 | $159,489.10 | $480.00 | Caroline | Owings | Peachtree Orthopaedic Clinic | 2020-05-14 | 7515 | $259.20 |