# EXHIBIT A

# EXHIBIT A

Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
          kwyant@shea.law

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

INFINITY CAPITAL MANAGEMENT,
INC.

                    Debtor.

Case No. 21-14486-abl
Chapter 7

**DECLARATION OF MICHAEL GRIFFIN IN SUPPORT OF JOINT MOTION OF
CHAPTER 7 TRUSTEE AND SECURED CREDITOR HASELECT-MEDICAL
RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP TO
APPROVE ABANDONMENT OF COLLATERAL**

I, Michael Griffin, hereby declare as follows:

1.      I am over the age of twenty-one (21) years old and am mentally competent.  I have personal knowledge of the matters set forth herein except as to those matters stated on information and belief, which I believe to be true, and if called upon as a witness to testify to these facts, I could and would competently and truthfully do so.

2.      I make this Declaration in support of the *Joint Motion of Chapter 7 Trustee and Secured Creditor HASelect-Medical Receivables Litigation Finance Fund International SP to Approve Abandonment of Collateral* (the "Motion") filed herewith.

3.      I am the majority member and manager of Griffin Asset Management LLC ("GAM").

*SHEA LARSEN*
*1731 Village Center Circle, Suite 150*
*Las Vegas, Nevada 89134*
*(702) 471-7432*

GAM serves as asset manager to HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect").

4.  I make this declaration based upon my own personal knowledge of the facts stated herein as well as my review of the certain books and records of GAM and HASelect related to the Debtor Infinity Capital Management, Inc. ("Debtor" or "Infinity"), including the exhibits attached hereto. I am familiar with the business operations and document retention practices of both GAM and HASelect. I am informed and believe that the business records I have reviewed in connection with the preparation of this Declaration, including the exhibits attached hereto, were made at or near the time of the events they document by, or from information transmitted by, a person with knowledge of such events, all in the course of regularly conducted business activities.

5.  Beginning in February 2019, HASelect made several loans to Infinity that were document through various loan agreements and promissory notes through which Infinity pledged all of its assets to HASelect as collateral for such loans.

6.  On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (the "MLA"). A true and correct copy of the MLA is attached hereto as Exhibit 1.

7.  The MLA superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.

8.  Pursuant to the MLA, HASelect continues to hold a perfected security interest in all of Infinity's assets as collateral for all indebtedness owed by Infinity in connection with the MLA.

9.  HASelect perfected its security interest in Infinity's assets through the filing of a UCC-1 with the Nevada Secretary of State. A true and correct copy of the UCC-1 filed by HASelect is attached hereto as Exhibit 2.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

10. As of May 31, 2021, Infinity owed the following amounts to HASelect pursuant to the MLA.

| | |
|---|---:|
| Principal: | $10,351,972 |
| Unpaid fee owed under MLA § 1.3(c): | $87,500 |
| Interest accrued through May 31, 2021: | $3,051,648 |
| Six percent (6%) of Advances owed under MLA § 1.3: | $635,740 |
| **Total:** | **$14,126.860** |

These amounts do not include other fees and costs owed by Infinity under the MLA that continue to accrue as well as interest that continued to accrue past May 31, 2021, less any payments made by Infinity since May 31, 2021.

11. Infinity has not paid any amount to HASelect since July 15, 2021.

12. As of September 14, 2021, Infinity owed total indebtedness in excess of $14 million to HASelect pursuant to the MLA.

13. Infinity used the proceeds of the loans it obtained from HASelect to purchase receivables from medical providers (the "Receivables"). The Receivables generally arise from medical treatment provided to individuals who were injured in accidents and have asserted personal injury claims. The Receivables are generally secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.

14. I am informed and believe that the Receivables (along with the contracts, technology, and records related thereto) constitute a substantial majority of Infinity's assets and, therefore, a substantial majority of the collateral for the indebtedness owed to HASelect under the MLA.

15. To increase the likelihood that the Receivables will be collected, it is imperative that the status of the personal injury claims that secure payment of the Receivables be actively monitored through regular contact with the attorneys handling such claims. Without such contact, there is an increased risk of these attorneys neglecting payment of the Receivables when the personal injury claims are settled. Additionally, personal injury claims that secure payment of the Receivables sometimes result in the filing of interpleader actions in which settlement proceeds are deposited with the court and claims must be submitted in order to receive payment.

16. I am informed and believe that, prior to the filing of its Chapter 7 petition, Infinity

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Page 3 of 6

performed monitoring and collection services with respect to the Receivables. Based on recent communications with Infinity and its counsel, I am informed and believe that Infinity is no longer providing any monitoring or collections services.

17.    I am informed and believe that payments on account of the Receivables continue to be received by mail by Infinity's principals, Anne Pentalas and Oliver Hemmers.

18.    For the reasons explained above, I believe there is a substantial risk that the Receivables owed under the MLA will quickly dissipate in value if appropriate monitoring and collection services do not promptly resume.

19.    I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED this 22nd day of September 2021.

/s/ *Michael Griffin*
MICHAEL GRIFFIN

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1.   On September 22, 2021, I served the following document(s): **DECLARATION OF MICHAEL GRIFFIN IN SUPPORT OF JOINT MOTION OF CHAPTER 7 TRUSTEE AND SECURED CREDITOR HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP TO APPROVE ABANDONMENT OF COLLATERAL**

2.   I served the above document(s) by the following means to the persons as listed below:

☒   a.   ECF System:

MATTHEW C. ZIRZOW on behalf of Debtor INFINITY CAPITAL MANAGEMENT, INC.
mzirzow@lzlawnv.com; carey@lzlawnv.com; trish@lzlawnv.com; allison@lzlawnv.com; zirzow.matthewc.r99681@notify.bestcase.com

ROBERT E. ATKINSON, Chapter 7 Trustee
Robert@ch7.vegas; TrusteeECF@ch7.vegas; ecf.alert+atkinson@titlexi.com

U.S. TRUSTEE – LV – 7, U.S. Trustee
USTPRegion17.LV.ECF@usdoj.gov

☐   b.   United States mail, postage fully prepaid:

☐   c.   Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐   For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐   For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐   d.   By direct email (as opposed to through the ECF System):

Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐   e.   By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐   f.   By messenger:

1

2
      I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

3

4
      I declare under penalty of perjury that the foregoing is true and correct.

5
      Dated: September 22, 2021.

                        By: /s/ *Bart K. Larsen, Esq,*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**EXHIBIT 1**

Execution Version

## SECOND AMENDED & RESTATED
## LOAN AND SECURITY AGREEMENT

This **SECOND AMENDED & RESTATED LOAN AND SECURITY AGREEMENT** ("**Agreement**"), dated as of December 18, 2019 (the "**Effective Date**"), by and between HASELECT-FTM MEDICAL RECEIVABLES LITIGATION FINANCE FUND SP ("**Lender**"), a segregated portfolio of HedgeACT International SPC Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, having its place of business at 403 South La Grange Road, La Grange, Illinois 60525, and INFINITY CAPITAL MANAGEMENT, INC. ("**Borrower**"), a Nevada corporation, having its principal place of business at 1700 W Horizon Ridge Pkwy #206, Henderson, NV 89012.

## RECITALS

A.    Borrower and Lender entered into that Loan and Security Agreement dated February 26, 2019 (the "**Original Agreement**") in the maximum principal amount of $5,000,000 (the "**Original Loan**"), and in connection with the Original Agreement, Borrower issued to

Lender that Promissory Note dated February 26, 2019 (the "**Original Note**").

B.    Borrower and Lender entered into that Amendment 1 Loan and Security Agreement dated July 23, 2019 (the "**Amendment**") in the maximum principal amount of $1,000,000 (the "**Amendment Loan**"), and in connection with the Amendment, Borrower issued

to Lender that Promissory Note dated July 23, 2019 (the "**Amendment Note**").

C.    Borrower and Lender entered into that First Amended & Restated Loan and Security Agreement dated August 30, 2019 (the "**First Amendment**") in the maximum principal amount of $15,000,000 (the "**First Amendment Loan**"), and in connection with the Amendment, Borrower issued to Lender that Promissory Note dated August 30, 2019 (the "**First Amendment Note**").

D.    Borrower and Lender entered into that Amendment 1 to First Amended & Restated Loan and Security Agreement dated November 7, 2019 (the "**Amendment 2**") in the maximum principal amount of $1,000,000 (the "**Amendment 2 Loan**"), and in connection with Amendment 2, Borrower issued to Lender that Promissory Note dated November 2, 2019 (the

"**Amendment 2 Note**").

E.    Borrower has applied to Lender to increase the size of the revolving loan under the Original Agreement, the Amendment, the First Amendment and Amendment 2, and Lender is willing to make such revolving loan upon the terms and conditions hereinafter set forth.

F.    Borrower has applied to Lender to advance funds to Borrower during the first 20 days of a given month, preceding Borrower's standard monthly Advances (each an "**Intermediate Advance**"); and to advance funds to Borrower in connection with Receivables not having liens executed in favor of Borrower (the "**Alternative Receivables**").

G.    Lender has agreed to make Intermediate Advances, each in an amount up to 20% of the monthly standard Advance and not to exceed $600,000 in the aggregate, in exchange for payment by Borrower of a fee in the amount of 0.25% of each such Intermediate Advance.

H.    Lender has further agreed to advance funds to Borrower in connection with Alternative Receivables.

I.    The parties wish to consolidate the terms of the Original Agreement, the Amendment, the First Amendment and Amendment 2 (collectively, the "**Prior Agreements**"), and to reflect other changes to the terms of the Loan.

J.    Pursuant to the terms and conditions of this Agreement, Lender has agreed to increase the size of the loans represented by the Original Loan, the Amendment Loan, the First Amendment Loan and the Amendment 2 Loan (collectively, the "**Existing Loans**") to Borrower as a revolving loan in the maximum principal amount of **THIRTY MILLION AND 00/100 DOLLARS ($30,000,000.00)** ("**Loan**").

K.    The Loan (which, for the avoidance of doubt, includes the Existing Loans) is evidenced by a Promissory Note, in form and content as set forth on <u>Exhibit A</u> hereof, of even date herewith made payable by Borrower to the order of Lender in the maximum principal



**NOW, THEREFORE,** in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties hereto represent and agree as follows:

## AGREEMENT

In consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### 1. LOAN.

**1.1 Loan.**

    (a)    At Lender's sole and absolute discretion, and otherwise on the terms and subject to the conditions set forth in this Agreement, Lender agrees to make advances (each an "**Advance**" and collectively, "**Advances**") available to Borrower from time to time in the maximum aggregate principal amount (inclusive of the Existing Loans) of THIRTY MILLION AND 00/100 DOLLARS ($30,000,000.00). Advances may be repaid and used again during the period from the date hereof to and including the latest Advance Maturity Date; *provided, however,* that the unpaid principal amount of each Advance, together with interest accrued thereon which has not previously been paid hereunder, shall be due and payable in full on each corresponding Advance Maturity Date.

    (b)    At Lender's sole and absolute discretion, and otherwise on the terms and subject to the conditions set forth in this Agreement, Lender agrees to make Advances to Borrower to fund Borrower's purchase of Alternative Receivables (each an "**Alternative Receivable Advance**") from time to time, not to exceed $400,000 in the aggregate. Except with respect to the type of collateral otherwise required by Lender respecting Receivables and the differing interest applicable to the Alternative Receivable Advances under Section 1.6, and as otherwise provided herein, each Alternative Receivable Advance is subject to all terms of this Agreement respecting Advances, and will be considered an Advance under this Agreement.

    (c)    At Lender's sole and absolute discretion, and otherwise on the terms and subject to the conditions set forth in this Agreement, Lender agrees to make Intermediate Advances available to Borrower during the first 20 days of a given month, each in an amount up to up to 20% of the monthly standard Advance, which may range from $700,000 - $3,000,000, under this Agreement, and not to exceed $600,000 in the aggregate. Intermediate Advances are "Advances" under this Agreement for all purposes.

**1.2 Borrowing Procedures**. An authorized officer of Borrower shall give Lender irrevocable telephone notice (which notice shall be promptly confirmed in writing) no later than 12 p.m. Chicago, Illinois time, on the day that is five Business Days before the Business Day that it requests an Advance. Each such notice shall be effective upon receipt by Lender and shall specify the date and amount of such Advance as well as such additional information set forth in Section 3 below. Upon satisfaction of all conditions, Lender shall make available the amount of the Advance to be made by it on such date to Borrower by depositing the same, in immediately available funds, in an account designated by Borrower. The amount of each Advance and the date and amount of each repayment of principal received by Lender shall be recorded by Lender in its records. The aggregate unpaid principal amount so recorded shall be prima facie evidence of the principal amount owing and unpaid on the Note. The failure to so record any such amount or any error in so recording any such amount shall not limit or otherwise affect the obligations of Borrower hereunder or under the Note to repay the principal amount thereof together with all interest accrued thereon.

**1.3 Certain Fees**.

    (a)    The Monthly Origination Fee will be payable by Borrower each month through December, 2019. At Lender's election, any Monthly Origination Fee that is due may be paid by adding such amount to any Advance.

    (b)    In connection with each Intermediate Advance, Borrower will pay to Lender a fee in the amount of 0.25% of such Intermediate Advance (the "**Intermediate Advance Fee**"), and the amount of each Intermediate Advance will be added to the total amount of the next Advance made to Borrower and will bear interest as provided in Section 1.6 of this Agreement. The Intermediate Advance Fee will be added to the amount of the next Advance made to Borrower following an Intermediate Advance.

(c)    With respect to the amount by which the Loan is increased above that provided in the First Amended Loan hereunder, on the Effective Date, Borrower will pay a one-time origination fee of $12,500, and will pay $5,000 in each of the months of January and February 2020 (with such fees collectively, the "**Supplemental Origination Fees**").  At Lender's election, any Supplemental Origination Fee that is due may be paid by adding such amount to any Advance.

**1.4 Interest Payments**.  Unless earlier accelerated by the terms of this Agreement or the Note, the accrued interest on each Advance (including all "Advances" under the Existing Loans, and including any Monthly Origination Fees or Supplemental Origination Fees permitted to be added to any Advance) must be paid by Borrower on the seventh Business Day of each month.  If the accrued interest on any Advance is not so paid, it will be automatically added to the principal amount of the Advance on which such interest accrued, without any further action by Borrower or by Lender.  In light of Borrower's desire to have Lender make Advances available as of the first Business Day of each month, interest on each Advance will begin accruing on the first Business Day of the month in which the Advance is made (irrespective of the date on which each Advance is actually made).

**1.5 Principal Payments**.  Unless earlier accelerated by the terms of this Agreement or the Note, the entire principal balance of each Advance (including all "Advances" under the Existing Loans, and including any Monthly Origination Fees or Supplemental Origination Fees permitted to be added to any Advance, as well as any Intermediate Advances added to Advances), plus all accrued but unpaid interest thereon, must be repaid by Borrower at the date which is the earlier of (a) such time as Borrower receives the proceeds of the Claim repaying the Receivables or Alternative Receivables (as applicable) acquired with the proceeds of such Advance, or (b) thirty months (30) months after the Advance (with the earliest of such dates respecting each Advance, an "**Advance Maturity Date**").

**1.6 Interest**.  The outstanding principal balance of the Note shall bear interest at the following rates: (a) with respect to each Advance (including Intermediate Advances but excluding Alternative Receivable Advances), a rate of (i) (I) during the period that began on the date of the first Advance under the Original Agreement and continuing for six months, twenty-one percent (21%) per annum, (II) following such six-month period, nineteen percent (19%) per annum, plus (ii) six percent (6%) of the amount of such Advance; (b) with respect to each Alternative Receivable Advance, a rate of (i) twenty-two percent (22%) per annum, plus (ii) six percent (6%) of the amount of such Alternative Receivable Advance; and (c) any past due amounts of both principal and accrued and unpaid interest outstanding under the Note shall bear interest at thirty percent (30%) per annum.  Such interest shall be computed on the basis of the actual number of days elapsed over a year of 360 days, consisting of twelve months of 30 days each month.  All accrued and unpaid interest shall be payable on each Advance Maturity Date respecting each Advance.

**1.7 Early Payments**.    Principal may be repaid at any time, together with interest thereon.  Borrower may prepay, without penalty, any interest respecting any Receivables acquired with an Advance.

**1.8 Replacement of Notes**.    The parties agree that upon the execution of this Agreement and the Note, the Lender will return the First Amendment Note and the Amendment 2 Note to Borrower executed "CANCELLED," and thereby the Borrower's obligations under the First Amendment Note and the Amendment 2 Note will be subsumed in the Note.

**2. DEFINITIONS**.  As used in this Agreement, the following terms have the following meanings:

"**Accounting Principles**" means generally accepted accounting principles, applied on a consistent basis.

"**Account**" has the meaning set forth in the Code.

"**Business Day**" means a day on which banks in Illinois are open for business other than Saturdays.

"**Chattel Paper**" has the meaning set forth in the Code.

"**Claim**" means a claim by an Obligor for medical and other damages in connection with the event or events for which Borrower has acquired the Receivable.

"**Code**" means the Uniform Commercial Code as adopted and in effect in the State of Illinois from time to time.

"**Collateral**" has the meaning set forth in Section 3.1 below.

"**Default**" means any event which with notice or passage time or both, would constitute an Event of Default.



"**FTM Parties**" means FTM Limited, having a business address of First Floor, Suite T-19, Kumul Highway, Port Vila, Vanuato, South Pacific, Mr. Endre Dobozy, Mr. William Dalzell, and any entity controlled by, controlling, or under common control of any of such parties.

"**Monthly Origination Fee**" means a fee payable to Lender in the amount of $5,000.

"**Obligor**" means a plaintiff, or minor child of a plaintiff, who is the owner of a Claim who is obligated to Borrower respecting a Receivable, or other person obligated to Borrower under any Receivable funded by Borrower.

"**Origination Fee**" means the total of all Monthly Origination Fees payable to Lender in the aggregate amount of $25,000.

"**Permitted Liens**" means those promissory notes made by Borrower in favor of FTM Limited, an investment company incorporated in Vanuatu as a Public Company under the laws of the Republic of Vanuatu (the "**FTM Notes**"), in the amount of $8,723,575.37 as of November 30, 2019, having the maturities as described on Schedule 1.

"**Receivable**" means receivables owing to medical providers for health care services or other service providers of the type approved by Lender, and acquired by Borrower, in each case secured by a Claim or some other collateral approved by Lender.

Other Terms. All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with generally accepted accounting principles, consistently applied. Capitalized terms not otherwise defined herein, and which are defined in the Code, shall have the meaning given to such terms in the Code.

### 3. CONDITIONS PRECEDENT.

**3.1 Initial Loan Conditions Precedent.** This Agreement shall not be effective until each of the following conditions precedent have been satisfied:

(a) Fees and Expenses. Borrower shall have paid to Lender all fees and expenses related to the Loan including, but not limited to, attorney's fees and any filing fees related to perfection of Lender's security interest.

(b) Documents. Lender shall have received the following documents, in each case in form and substance satisfactory to Lender, and all of the transactions contemplated by each such document shall have been consummated or each condition contemplated by each such document shall have been satisfied or waived by Lender:

      i. Other Agreements. Executed originals of this Agreement and the Note.

      ii. Other Documents. Such other documents as Lender may reasonably request.

(c) Lender's Review. Lender's review of such business and legal diligence as Lender reasonably requires.

**3.2 Conditions to Each Advance.** Any Advance shall be made on a monthly or other basis in Lender's sole and absolute discretion, provided that each Advance made by Lender to Borrower pursuant to this Agreement shall in any event be subject to the following conditions precedent: (a) there shall not then exist a Default or an Event of Default; (b) the representations, warranties and covenants of Borrower contained in this Agreement shall be true and correct as of the date of such Advance with the same effect as though made on such date; (c) all of the covenants and agreements of Borrower in this Agreement, and all of the requirements of this Agreement with respect to such Advance, shall have been complied with in all respects; (d) there shall not have occurred, since the date of the most recent financial statements, any material adverse change in the financial condition, results of operations or business of Borrower using the proceeds of said Advances; (e) other than with respect to Alternative Receivable Advances, Lender shall have received copies of all lien assignments, notes, agreements or other documents evidencing the proposed Receivable, including such information on the Obligor and Claim as Lender shall request; (f) other than with respect to Alternative Receivable Advances, Borrower shall have demonstrated that the value of the Collateral respecting the Receivables to be funded by such Advance equals 200% of the amount of such Receivables, as determined by Lender in its discretion; and (g) the Borrower must have paid all outstanding Monthly Origination Fees and Supplemental Origination Fees. The borrowing by Borrower hereunder shall be deemed a representation and warranty by Borrower that the foregoing conditions have been fulfilled as of the date of such borrowing.

### 4. SECURITY INTEREST.

Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "**Collateral**").

### 4.2 <u>Actions Regarding Collateral</u>.

(a) <u>Further Assurances</u>. Borrower shall, at Lender's request, at any time, and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments and do such other acts and things or cause third parties to do such other acts and things as Lender may deem reasonably necessary in its sole but reasonable discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Lender (and anyone designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and to do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrower further ratifies and confirms the prior filing by Lender of any and all financing statements which identify the Borrower as debtor, Lender as secured party and any or all Collateral as collateral.

(b) <u>Possessory Collateral</u>. Any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any tangible Chattel Paper, shall be conspicuously marked with a legend indicating Lender's lien and priority in such Collateral and shall include a provision prohibiting the transfer or assignment of such Collateral without Lender's prior written consent.

### 5. <u>REPRESENTATIONS AND WARRANTIES</u>.

To induce Lender to enter into this Agreement, Borrower represents and warrants to Lender that:

**5.1 <u>State of Organization and Legal Name</u>**. Borrower's jurisdiction of organization and exact legal name are set forth in the first paragraph of this Agreement. Borrower does not conduct business in any other state in which it is required to register without such registration. Borrower further confirms to Lender that Borrower has made no changes to its articles of incorporation or bylaws since the date of the Original Agreement.

**5.2 <u>Good Standing; Ownership of Assets</u>**. Borrower is a corporation organized, legally existing, and in good standing under the laws of its jurisdiction of organization, and has the corporate power to own its property and to carry on its business as presently conducted. Borrower is qualified and authorized to do business and is in good standing as a foreign entity in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Borrower or its business. The Borrower is the sole owner all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all liens, charges and claims, except for Permitted Liens.

**5.3 <u>Authority</u>**. Borrower has full power and authority to enter into this Agreement, to execute and deliver all documents and instruments required hereunder and to incur and perform the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate action, and no consent or approval of any person, including any public authority or regulatory body, which has not been obtained, is required as a condition to the validity or enforceability hereof or thereof.

**5.4 <u>Binding Agreements</u>**. This Agreement has been duly and properly executed by Borrower, constitutes the valid and legally binding obligation of Borrower and is fully enforceable against Borrower in accordance with its terms, except as enforceability is limited by (i) applicable bankruptcy, insolvency, fraudulent conveyance, liquidation conservatorship, reorganization, moratorium or similar laws affecting the enforceability of rights and creditors generally and (ii) general equity principles.

of this Agreement will not (a) violate (i) any provision of applicable law or any order, rule or regulation of any court or agency of government, (ii) any award of any arbitrator, (iii) the certificate of incorporation or bylaws of Borrower, or (iv) any indenture, contract, agreement, mortgage, deed of trust or other instrument to which Borrower is a party or by which Borrower or any of its property is bound, or (b) be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a material default under, any such award, indenture, contract, agreement, mortgage, deed of trust or other instrument, or result in the creation or imposition of any lien upon any of the property or assets of Borrower except for liens created in favor of Lender in the Collateral under or pursuant to this Agreement, or (c) require notice to or consent or approval of any governmental body or authority or other third party whatsoever (including, but not limited to, any other creditor, but excluding the payee of the Permitted Liens).

**5.6 Proceedings; Compliance**. There are no actions, suits or proceedings pending or, to its knowledge, threatened in writing against Borrower, in law or equity or before any governmental authority which might result in any order, judgment, injunction or decree having a material effect on Borrower's business, Collateral, or any other assets. Borrower has complied in all material respects with all laws applicable to Borrower's business, including without limitation any and all federal, state and local occupational, health, safety, environmental and zoning laws, rules and regulations. Without limiting the foregoing, Borrower is in compliance with any applicable laws and regulations relating to the acquisition of the Receivables or funding medical services for Obligors Borrower has not received any notice of any threatened liabilities, claims or expenses related to non-compliance with any law.

**5.7 Financial Condition**. All financial statements submitted to the Lender have been prepared in accordance with Accounting Principles on a basis, except as otherwise noted therein, consistent with the previous fiscal year and present fairly in all material respects the financial condition of the Borrower and the results of the operations for the Borrower as of such date and for the periods indicated. Since the date of the most recent financial statement submitted by the Borrower to the Lender, there has been no change in the financial condition or in the assets or liabilities of the Borrower having a material adverse effect on the Borrower.

**5.8 Taxes**. Borrower has paid or caused to be paid all material taxes imposed by applicable governmental authorities to the extent that such taxes have become due and has filed or caused to be filed all tax returns or other documents which are required to be filed by Borrower.

**5.9 Place of Business**. Borrower's principal place of business and chief executive office is located at the address set forth in the first paragraph of this Agreement.

**5.10 Licenses and Permits**. Borrower has duly obtained and now holds all material licenses, permits, certifications, approvals and the like required by law and necessary to operate its business in the ordinary course, including any applicable to the acquisition of the Receivables or funding services for Obligors. Without limiting the foregoing, all of the Receivables and Claims have been completed, in all respects, in accordance with all applicable laws and regulations.

**5.11 Receivables**. Each Receivable is the legal, binding, and enforceable obligation of each Obligor. Borrower has taken and will take all steps reasonable necessary or requested by Lender to document, perfect liens, and enforce such Receivables.

**5.12 FTM Affiliation**. None of the FTM Parties has any involvement (whether formally or informally) in the management of Borrower, nor do any of the FTM Parties have any ownership interest in Borrower or in any entity controlled by, controlling, or under common control with Borrower.

## 6. AFFIRMATIVE COVENANTS.

Borrower covenants and agrees with Lender that, until all obligations hereunder and under the Note have been irrevocably paid and performed in full, Borrower shall:

**6.1 Financial Records**. Maintain its books and records in accordance with the Accounting Principles, and permit Lender to examine and audit Borrower's books and records at reasonable times upon reasonable notice.

**6.2 Financial Statements and Management Reports**. Furnish Lender with the following:

    (1) *Annual Statements*. As soon as available, but in no event later than one hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant reasonably satisfactory to Lender;

    (2) *Interim Statements*. As soon as available, but in no event later than thirty (30) days



statement for the period ended, prepared by Borrower; and

    (3) *Monthly Reports.* Within ten days of the end of each calendar month, a report of Borrower's outstanding indebtedness (other than that borrowed under this Agreement) containing such detail as Lender shall reasonably require.

All financial reports required to be provided under this Agreement shall be prepared in accordance with the Accounting Principles, and certified by Borrower as being true and correct.

**6.3 Notice of Claims, Litigation and Impairment.** Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, (b) all existing and threatened, in writing, litigation, claims, investigations, administrative proceedings, or similar actions which are reasonably likely to have a material adverse effect on the financial condition of Borrower, and (c) the existence of any event of default under any other indebtedness or of the threat by any other lender to declare Borrower in default under any other indebteness.

**6.4 Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may reasonably require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies reasonably acceptable to Lender. Borrower will further obtain key person life insurance on the life of Anne Pantales in the amount of $1,000,000.00, in form and with insurance companies reasonably acceptable to Lender, within sixty (60) days of the Effective Date. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form reasonably satisfactory to Lender. Borrower acknowledges that Lender reserves the right to require further insurance on Borrower's principals' lives, in such amounts and on such terms as Lender may determine, prior to making future Advances.

**6.5 Taxes, Charges, and Liens.** Pay and discharge when due all governmental assessments, taxes, charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income or profits**.** Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with the Accounting Principles.

**6.6 Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in any related documents, and in all other instruments and agreements between Borrower and Lender in all material respects.

**6.7 Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**6.8 Compliance with Governmental Regulations.** In all material respects comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, business and operations, and to the use or occupancy of the Collateral**.** Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's reasonable opinion, Lender's interests in the Collateral are not materially jeopardized.

**6.9 Inspection.** Permit agents of Lender at any reasonable time and upon reasonable notice to inspect any and all Collateral for the Loan and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and upon reasonable notice and to provide Lender with copies of any records it may request, all at Borrower's expense. In furtherance of the foregoing, Borrower will permit an agent of Lender to monitor Collateral, Claims and Receivables during Borrower's normal business hours, and to receive and inspect all incoming mail respecting the same while on Borrower's premises.

**6.10 Collateral.**

    (a) Inspections. Permit Lender to examine any of the Collateral at any time and wherever the Collateral may be located. Borrower shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder.



respect to all Receivables. All such original documentation shall be held by Borrower in care for the benefit of Lender.

### 7. NEGATIVE COVENANTS.

Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**7.1 Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged; (2) cease operations, liquidate, merge, transfer, acquire, or consolidate with any other entity, change its name, dissolve, or transfer or sell Collateral out of the ordinary course of business; or (3) Borrower shall not declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock. Notwithstanding the foregoing, if (a) Borrower remains an S corporation for federal income tax purposes, and (b) an Event of Default has not occurred and will not occur as a result of the distribution, Borrower shall be entitled to make distributions to its shareholders relating to the United States federal and state income taxes arising out of Borrower's operations in an amount which, when added to all prior distributions made pursuant to this paragraph, does not exceed the taxable income allocable to Borrower's shareholders based upon the highest federal and state income tax rate being paid by a recipient.

**7.2 Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**7.3 Liens.** Borrower shall not grant or permit to exist (voluntarily or involuntarily) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than the Permitted Liens.

**7.4 Borrowings.** Without Lender's written consent (which consent will not be unreasonably withheld), Borrower shall not incur any indebtedness of any kind (including any further indebtedness associated with the Permitted Liens) from other than Lender after the Effective Date.

### 8. EVENTS OF DEFAULT AND REMEDIES.

**8.1 Events of Default.** The occurrence of any of the following events shall constitute an "**Event of Default**" under this Agreement: (a) Borrower shall fail to pay when due any amount owing Lender hereunder or under the Note, including any payment of the principal amount of the Loan (including any Advance) and any Monthly Origination Fee or Supplemental Origination Fees, or any interest thereon; or (b) Borrower shall fail to comply, within fifteen days of receiving notice from Lender of such failure, with any of the covenants, financial or otherwise, set forth herein or shall fail to perform any other non-monetary obligation (provided that Borrower shall not be entitled to a cure period if Lender determines in good faith that such breach or default is not capable of being cured or is not capable of being cured within such 15-day period) or (c) a default or event of default occurs under any other material indebtedness of Borrower; or (d) the making or furnishing by Borrower to Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement which is untrue or misleading in any material respect as of the date made; or (e) the making or any attempt by any person to make any levy, seizure or attachment upon any of the Collateral; or (f) this Agreement or the Note ceases to be enforceable or the liens granted Lender hereunder cease to be valid perfected liens; or (g) the commencement of any proceedings in bankruptcy by or against Borrower or for the liquidation or reorganization of Borrower, or alleging that Borrower is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of Borrower's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving Borrower; provided, however, that if such commencement of proceedings against Borrower is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within forty-five (45) days after the commencement of such proceedings; or (h) Lender otherwise deems, in good faith, that a material adverse event has occurred which causes Lender to be under secured or feel that Borrower's ability to repay the Loan has been reduced.

**8.2 Remedies.** Upon the occurrence of any Event of Default, Lender may, in its sole discretion, pursue any one or more of the following remedies concurrently or successively: (a) declare all or any part of the outstanding principal amount of the Loan and all unpaid interest, as well as the Origination Fee (less all Monthly Origination Fees actually paid by Borrower), to be due and payable at once and, in such event, such obligations shall become immediately due and payable; (b) exercise any or all remedies specified herein, in the Note, or in any other related document or agreement, including (without limiting the generality of the foregoing) the right to foreclose the Collateral; (c) exercise any or all rights or remedies available at law or in equity including those available under the Code; or (d) if the Event of Default is not cured within five Business Days, impose an Event of Default charge of $5,000. Borrower hereby waives

presentment, demand, protest and notice of dishonor, nonpayment or default and nonpayment of the Loan and agrees that Lender shall not be required to initiate any suit or exhaust its remedies against the Borrower or any other person or parties in order to enforce payment of the Loan.

**8.3 Remedies Cumulative.** In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded a secured party under the Code and under all other applicable laws, and under any other instrument or agreement now or in the future entered into between Lender and Borrower, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the obligations have been fully paid and performed.

## 9. GENERAL PROVISIONS.

**9.1 Application of Payments.** Provided no Event of Default has occurred and is continuing, all Payments, including prepayments, shall be applied first to reimbursable costs and expenses of Lender (including those set forth in Section 9.7 below) then to accrued and unpaid interest and then the balance to reduction of principal.

**9.2 Notices.** All notices to be given under this Agreement shall be in writing and shall be given either personally or by reputable overnight delivery service or by regular first-class mail, or certified mail return receipt requested, addressed to Lender or Borrower at the addresses shown in the heading to this Agreement, or at any other address designated in writing by one party to the other party. All notices shall be deemed to have been given upon delivery in the case of notices personally delivered, or at the expiration of one Business Day following delivery to the overnight delivery service, or two Business Days following the deposit thereof in the United States mail, with postage prepaid.

**9.3 Severability.** Should any provision of this Agreement be held by any court of competent jurisdiction to be void or unenforceable, such defect shall not affect the remainder of this Agreement, which shall continue in full force and effect.

**9.4 Integration.** This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith are the final, entire and complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, including the Original Agreement and the Amendment, all of which are merged and integrated in this Agreement. There are no oral understandings, representations or agreements between the parties which are not set forth in this Agreement or in other written agreements signed by the parties in connection herewith.

**9.5 Amendment, Waiver.** The terms and provisions of this Agreement may not be waived or amended, except in a writing executed by Lender and a duly authorized officer of Borrower.

**9.6 Time of Essence.** Time is of the essence in the performance by Borrower of each and every obligation under this Agreement.

**9.7 Attorneys Fees and Costs.** In the event any payment of principal or interest coming due under the Note shall not be paid when due, Borrower shall pay all costs of collection (including reasonable attorneys' fees) incurred in collecting the amount due. All payments made under this Agreement or the Note shall be applied to any such costs of collection not otherwise paid by Borrower before being applied to interest or principal.

**9.8 Benefit of Agreement.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; provided, however, that neither party may assign or transfer any of its rights under this Agreement without the prior written consent of the other party, and any prohibited assignment shall be void.

**9.9 Paragraph Headings; Construction.** Paragraph headings are only used in this Agreement for convenience. Borrower and Lender acknowledge that the headings may not describe completely the subject matter of the applicable paragraph, and the headings shall not be used in any manner to construe, limit, define or interpret any term or provision of this Agreement. The term "including", whenever used in this Agreement, shall mean "including (but not limited to)". This Agreement has been fully reviewed and negotiated between the parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

**9.10 Governing Law; Jurisdiction; Venue.** This Agreement and all acts and transactions hereunder and all rights and obligations of Lender and Borrower shall be governed by the laws of the State of Illinois. Each party (a) agrees that all actions and proceedings

(b) consents to the jurisdiction and venue of any such court and consents to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and (c) waives any and all rights it may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding.

**9.11** <u>Mutual Waiver of Jury Trial</u>. BORROWER AND LENDER EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO, THIS AGREEMENT OR ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND BORROWER, OR ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN ALL OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

*[SIGNATURES FOLLOW SCHEDULE 1]*

<u>Schedule 1</u>

| FTM Note Number | | January 31, 2019 Value ($) | Interest Start Date | Expiration Date | November 30, 2019 Value ($) | Expiration Date |
|---|---|---|---|---|---|---|
| 75 | 20-Aug-17 | 93,985.12 | 21-Aug-17 | 01-Aug-19 | 99,440.86 | 01-Jul-19 |
| 76 | 20-Aug-17 | 243,804.76 | 22-Aug-17 | 01-Aug-19 | 258,287.95 | 01-Jul-19 |
| 77 | RO #45 | 150,470.35 | 03-Sep-17 | 01-Sep-19 | 159,204.99 | 01-Aug-19 |
| 78 | RO #46 | 189,021.18 | 25-Sep-17 | 01-Sep-19 | 206,667.42 | 01-Aug-19 |
| 79 | RO #47 | 243,362.21 | 15-Jan-18 | 01-Jan-20 | 273,004.01 | 01-Jan-20 |
| 80 | RO #49 | 75,868.08 | 22-Jan-18 | 01-Jan-20 | 85,042.18 | 01-Jan-20 |
| 81 | RO #51 | 149,897.69 | 23-Feb-18 | 01-Feb-20 | 168,128.65 | 01-Feb-20 |
| 86 | RO #50 | 300,485.72 | 18-Feb-18 | 01-Feb-20 | 337,038.56 | 01-Feb-20 |
| 87 | RO #52 | 102,466.26 | 05-Mar-18 | 01-Mar-20 | 114,924.09 | 01-Mar-20 |
| 88 | RO #53 | 193,688.39 | 11-Mar-18 | 01-Mar-20 | 217,231.39 | 01-Mar-20 |
| 89 | RO #54 | 257,334.45 | 23-Mar-18 | 01-Mar-20 | 288,598.64 | 01-Mar-20 |
| 82 | 03-Apr-18 | 50,000.00 | 03-Apr-18 | 01-Apr-20 | 50,000.00 | 01-Apr-20 |
| 85 | 13-Jul-18 | 77,102.58 | 13-Apr-18 | 01-Apr-20 | 86,433.07 | 01-Apr-20 |
| 90 | RO #55 | 203,469.35 | 27-Apr-18 | 01-Apr-20 | 261,812.82 | 01-Apr-20 |
| 93 | | 109,787.69 | 30-May-18 | 01-May-20 | 123,073.54 | 01-May-20 |
| 83 | 11-Jul-18 | 240,000.00 | 12-Jul-18 | 01-Jul-20 | 240,000.00 | 01-Jul-20 |
| 91 | RO #57 | 59,610.52 | 16-Jul-18 | 01-Jul-20 | 66,824.23 | 01-Jul-20 |
| 84 | 27-Jul-18 | 50,700.00 | 27-Jul-18 | 01-Jul-20 | 50,700.00 | 01-Jul-20 |
| 92 | RO #58 | 351,061.73 | 17-Aug-18 | 01-Aug-20 | 393,545.12 | 01-Aug-20 |
| 94 | 21-Aug-18 | 942,205.00 | 20-Aug-18 | 01-Aug-20 | 942,205.00 | 01-Aug-20 |
| 95 | 21-Aug-18 | 101,975.00 | 20-Aug-18 | 01-Aug-20 | 101,975.00 | 01-Aug-20 |
| 97 | RO #62 | 1,817,545.49 | 01-Oct-18 | 01-Oct-20 | 1,531,740.55 | 01-Oct-20 |
| 98 | RO #63 | 405,901.70 | 11-Oct-18 | 01-Oct-20 | 454,380.36 | 01-Oct-20 |
| 99 | RO #64 | 312,651.26 | 30-Oct-18 | 01-Oct-20 | 350,017.12 | 01-Oct-20 |
| 104 | RO #60 | 54,164.36 | 28-Nov-18 | 01-Nov-20 | 60,644.31 | 01-Nov-20 |
| 102 | RO #67 | 233,895.55 | 01-Dec-18 | 01-Dec-20 | 262,200.19 | 01-Dec-20 |
| 100 | RO #65 | 215,568.79 | 10-Dec-18 | 01-Dec-20 | 241,369.37 | 01-Dec-20 |
| 101 | RO #66 | 609,681.86 | 01-Jan-19 | 01-Jan-21 | 682,710.30 | 01-Jan-21 |
| 96 | 01-Jan-19 | 165,100.00 | 08-Jan-19 | 01-Jan-21 | 165,100.00 | 01-Jan-21 |
| 103 | RO #69 | | | | 171,275.65 | 02-Apr-21 |
| 105 | RO #70 | | | | 230,000.00 | 01-May-21 |
| 106 | RO #73 | | | | 50,000.00 | 01-May-21 |
| Total: | | | | | 8,723,575.37 | |

Loan and Security Agreement      1
67079909.13

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Borrower:**

INFINITY CAPITAL MANAGEMENT, INC.

By:

Name:  ANNE PANTELAS

Title:

**Lender:**

HASELECT-FTM MEDICAL RECEIVABLES
LITIGATION FINANCE FUND SP

By:

Name:  SIMON·H CLARK

Title:  PRESIDENT, HODGEACT INTERNATIONAL LTD
         + DIRECTOR                              SPC

Loan and Security Agreement    SIGNATURE PAGE
67079909.13

**EXHIBIT A**

FORM OF PROMISSORY NOTE

**PROMISSORY NOTE**

**$30,000,000.00**                                    DECEMBER 18, 2019

**FOR VALUE RECEIVED**, the undersigned, INFINITY CAPITAL MANAGEMENT, INC. a Nevada corporation (the "**Borrower**"), hereby promises to pay to the order of HASELECT-FTM MEDICAL RECEIVABLES LITIGATION FINANCE FUND SP, or its successors and assigns (together with its successors and assigns, the "**Lender**"), in lawful money of the United States of America, the principal sum of up to **THIRTY MILLION and No/100 Dollars** ($30,000,000.00), or such lesser amount as has been advanced hereunder, which principal sum shall be due and payable as hereinafter provided with interest thereon as set forth below.

**RECITALS**

A.        Borrower and Lender entered into: (i) that Loan and Security Agreement dated February 26, 2019 (the "**Original Agreement**") in the maximum principal amount of $5,000,000 (the "**Original Loan**"); (ii) that Amendment 1 Loan and Security Agreement dated July 23, 2019 (the "**Amendment**"), in the maximum principal amount of $1,000,000 (the "**Amendment Loan**"); (iii) that First Amended & Restated Loan and Security Agreement dated August 30, 2019 (the "**First Amendment**") in the maximum principal amount of $15,000,000 (the "**First Amendment Loan**"); and (iv) that Amendment 1 to First Amended & Restated Loan and Security Agreement dated November 7, 2019 (the "**Amendment 2**") in the maximum principal amount of $1,000,000 (the "**Amendment 2 Loan**").

D.        Pursuant to the terms and conditions of that Second Amended & Restated Loan and Security Agreement, dated as of the date hereof (the "**Loan Agreement**"), Lender has agreed to increase the size of the Original Loan, the Amendment Loan and the First Amendment Loan to Borrower as a revolving loan, in the maximum principal amount (which includes the Amendment 2 Loan) of **THIRTY MILLION AND 00/100 DOLLARS ($30,000,000.00)** ("**Loan**").

E.        The Loan (which, for the avoidance of doubt, includes the Original Loan, the Amendment Loan, the First Amendment Loan and the Amendment 2 Loan (collectively, the "**Existing Loans**")) is evidenced by this Promissory Note ("**Note**").

This Note is being issued to Lender by Borrower pursuant, and otherwise subject, to the terms and conditions of the Loan Agreement.  Capitalized terms used herein unless otherwise defined, have the meanings given such terms in the Loan Agreement

**10. Principal Payments**. Unless earlier accelerated by the terms of this Note, the entire unpaid principal balance of each Advance under the Note shall be payable in cash on the Advance Maturity Date.

**11. Interest**. The outstanding principal balance of the Note shall bear interest at the following rates, and interest on each Advance will begin accruing on the first Business Day of the month in which the Advance is made: (a) with respect to each Advance (including Intermediate Advances but excluding Alternative Receivable Advances), a rate of (i) (I) during the period that began on the date of the first Advance under the Original Agreement and continuing for six months, twenty-one percent (21%) per annum, (II) following such six-month period, nineteen percent (19%) per annum, plus (ii) six percent (6%) of the amount of such Advance; (b) with respect to each Alternative Receivable Advance, a rate of (i) twenty-two percent (22%) per annum, plus (ii) six percent (6%) of the amount of such Alternative Receivable Advance; and (c) any past due amounts of both principal and accrued and unpaid interest outstanding under the Note shall bear interest at thirty percent (30%) per annum. Such interest shall be computed on the basis of the actual number of days elapsed over a year of 360 days, consisting of twelve months of 30 days each month; provided, however, in no event shall the interest rate be higher than the then maximum lawful nonusurious rate of interest under applicable law Lender is permitted to charge.

**12. Business Day**. Whenever any payment to be made hereunder shall be stated to be due on a Saturday, Sunday or bank holiday under the laws of the State of Illinois, such payment may be made on the next succeeding Business Day.

**13. Prepayment**. Borrower shall have the right to prepay the principal amount of this Note, in whole or in part, at any time, without premium or penalty, but with interest on the portion of the principal amount so prepaid accrued to the date of prepayment. Borrower may prepay, without penalty, any interest respecting any Receivables acquired with an Advance.

**14. Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" under this Note, and Borrower shall give Lender immediate written notice thereof: (a) Borrower shall fail to pay when due any amount owing Lender hereunder or under the Loan Agreement, including any payment of the principal amount of the Loan (including any Advance) or any interest thereon; or (b) Borrower shall fail to comply, within fifteen days of receiving notice from Lender of such failure, with any of the covenants, financial or otherwise, set forth herein or shall fail to perform any other non-monetary obligation (provided that Borrower shall not be entitled to a cure period if Lender determines in good faith that such breach or default is not capable of being cured or is not capable of being cured within such 15-day period) or (c) a default or event of default occurs under any other material indebtedness of Borrower; or (d) the making or furnishing by Borrower to Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Note or the Loan Agreement which is untrue or misleading in any material respect as of the date made; or (e) the making or any attempt by any person to make any levy, seizure or attachment upon any of the Collateral; or (f) this Note or the Loan Agreement ceases to be enforceable or the liens granted Lender hereunder cease to be valid perfected liens; or (g) the commencement of any proceedings in bankruptcy by or against Borrower or for the liquidation or reorganization of Borrower, or alleging that Borrower is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of Borrower's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving Borrower; provided, however, that if such commencement of proceedings against Borrower is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within forty-five (45) days after the commencement of such proceedings; or (h) Lender otherwise deems, in good faith, that a material adverse event has occurred which causes Lender to be under secured or feel that Borrower's ability to repay the Loan has been reduced.

**15. Remedies** Upon the occurrence of any Event of Default, Lender may, in its sole discretion, pursue any one or more of the following remedies concurrently or successively: (a) declare all or any part of the outstanding principal amount of the Loan and all unpaid interest, as well as the Origination Fee (less all Monthly Origination Fees actually paid by Borrower), to be due and payable at once and, in such event, such obligations shall become immediately due and payable; (b) exercise any or all remedies specified herein, in the Loan Agreement, or in any other related document or agreement, including (without limiting the generality of the foregoing) the right to foreclose the Collateral; and (c) exercise any or all rights or remedies available at law or in equity including those available under the Code. Borrower hereby waives presentment for payment or acceptance, demand and protest, and notice of protest, dishonor and nonpayment of the Loan and agrees that Lender shall not be required to initiate any suit or exhaust its remedies against the Borrower or any other person or parties in order to enforce payment of the Loan.

**16. Collateral**. This Note shall be secured by a security interest in all of Borrower's interest in the Receivables and Claims, as set forth in the Loan Agreement.



the laws of the State of Illinois without regard to the principles of conflicts of law thereof.

**18. <u>Waiver</u>**.  Borrower hereby waives presentment for payment or acceptance, demand and protest, and notice of protest, dishonor and nonpayment of this Note and agrees that Lender shall not be required to initiate any suit or exhaust its remedies against the undersigned or any other person or parties in order to enforce payment of this Note.

**19. <u>Miscellaneous Provisions</u>**.  The provisions of this Note shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; provided, however, that neither party may assign or transfer any of its rights under this Note without the prior written consent of the other party, and any prohibited assignment shall be void.  Should any provision of this Note be held by any court of competent jurisdiction to be void or unenforceable, such defect shall not affect the remainder of this Note, which shall continue in full force and effect.  The terms and provisions of this Note may not be waived or amended, except in a writing executed by Lender and a duly authorized officer of Borrower.

**20. <u>Costs of Collection</u>**.  In the event any payment of principal or interest coming due under this Note shall not be paid when due, Borrower shall pay all costs of collection (including reasonable attorneys' fees) incurred in collecting the amount due.  All payments made under this Note shall be applied to any such costs of collection not otherwise paid by Borrower before being applied to interest or principal.

**21. <u>Time of the Essence</u>**.  Time is of the essence of this Note and of each and every term and provision hereof.

[SIGNATURES ON FOLLOWING PAGE]

Promissory Note
67079909.13

**IN WITNESS WHEREOF**, this Note has been executed as of the day and year first written above.

BORROWER:

INFINITY CAPITAL MANAGEMENT, INC.

By:

Name: ANNE PANTELAS

Title: President

Date: 12-18-19

67079909.13



**EXHIBIT 2**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>CHRISTINE ADAMS |
| --- |

| B. E-MAIL CONTACT AT FILER (optional)<br>CADAMS@POLSINELLI.COM |
| --- |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
CHRISTINE ADAMS
POLSINELLI, PC
900 W. 48TH PLACE, SUITE 900
KANSAS CITY, MO 64112
```

Filed in the office of

*Barbara K Cegavske*

Barbara K. Cegavske
Secretary of State
State of Nevada

Document Number
**2019005454-7**

Filing Date and Time
**02/19/2019 1:36 PM**

(This document was filed electronically.)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME<br>INFINITY CAPITAL MANAGEMENT | | | | |
| --- | --- | --- | --- | --- | --- |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>1700 W HORIZON RIDGE PKWY #206 | CITY<br>HENDERSON | STATE<br>NV | POSTAL CODE<br>89012 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- | --- |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME<br>HASELECT-FTM MEDICAL RECEIVABLES LITIGATION FINANCE FUND SP | | | | |
| --- | --- | --- | --- | --- | --- |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS<br>403 SOUTH LA GRANGE ROAD | CITY<br>LA GRANGE | STATE<br>IL | POSTAL CODE<br>60525 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:

ALL ASSETS.

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
088219-613507

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)